Robert S. Weisbein (RW 0080)
Dana C. Rundlöf (DR 1431)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016-1314
Telephone: 212-338-3400
Facsimile: 212-687-2329
rweisbein@foley.com
drundlof@foley.com
*Attorneys for Plaintiff Instead, Inc.*



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INSTEAD, INC., a California corporation, | Civil Action No.: 08 CV 5236 (DC) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| REPROTECT, INC., a Delaware corporation, DR. RICHARD CONE, and DR. THOMAS MOENCH, | |
| Defendants. | |

Plaintiff Instead, Inc. ("Instead" or "Plaintiff"), by and through its attorneys, Foley & Lardner LLP, for its amended complaint against defendant ReProtect, Inc., as successor entity to ReProtect, LLC, (collectively, "ReProtect"), and individual defendants Dr. Richard Cone and Dr. Thomas Moench (collectively "Individual Defendants") (ReProtect and the Individual Defendants collectively "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action for declaratory judgment regarding certain intellectual property rights ("Intellectual Property Rights") owned by Plaintiff to which ReProtect now wrongfully asserts rights, originally arising under a License, Research and Product Development Agreement, dated February 8, 1996, between ReProtect, LLC and Ultrafem, Inc. ("1996 Agreement"),  and for anticipatory breach of a related non-competition agreement contained in the 1996 Agreement. A true and correct copy of the 1996 Agreement is annexed hereto as Exhibit A.

2.      As a party to the 1996 Agreement, Ultrafem, Inc. ("Ultrafem"), owned these Intellectual Property Rights and was a party to the non-competition agreement at the time a bankruptcy case under Chapter 11 of the Bankruptcy Code was commenced on April 1, 1998 (Case No. 98-42280 (PCB)).  Upon information and belief, as a result of the bankruptcy, Ultrafem ceased to exist as a viable entity for all intents and purposes.

3.      Akcess Pacific Group, LLC ("Akcess") purchased and assumed the Intellectual Property Rights and non-competition rights from Ultrafem pursuant to an Asset Purchase Agreement ("Purchase Agreement"), dated June 12, 1998, which was approved by the Bankruptcy Court by Order dated June 26, 1998.  A true and correct copy of the Purchase Agreement is annexed hereto as Exhibit B, and a true and correct copy of the Order approving the Purchase Agreement is annexed hereto as Exhibit C, and hereafter referred to as the "Sale Order."

4.      Thereafter, Akcess assigned the Intellectual Property Rights and non-competition agreement to Plaintiff Instead, Inc.

2

5.      RePotect now wrongfully asserts that the Intellectual Property Rights and non-competition agreement reverted to RePotect at some point during Ultrafem's bankruptcy, and that Ultrafem did not convey them to Akcess in the Purchase Agreement.

6.      This complaint seeks declaratory judgment that the Intellectual Property Rights and non-competition agreement have not been terminated, that Plaintiff Instead owns the Intellectual Property Rights, and that Defendants must abide by the terms of the non-competition agreement, as well as other relief requested below.

## THE PARTIES

7.      Plaintiff Instead is a California corporation with its principal place of business at 4275 Executive Square, Ste. 440, La Jolla CA 92037-1478.  Instead is in the business of developing women's reproductive health products.

8.      Upon information and belief, defendant RePotect, Inc. is a Delaware corporation with its principal place of business at 703 Stags Head Road, Baltimore, MD, 21286, and is in the business of developing women's reproductive health products.

9.      Upon information and belief, defendant Dr. Richard Cone is an individual residing in Baltimore, Maryland, and the Chairman of RePotect's Board.

10.     Upon information and belief, Defendant Dr. Thomas Moench is an individual residing in Baltimore, Maryland, and the President and Chief Operating Officer of RePotect.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3

12.    Venue lies properly in this district, pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to these claims occurred in this district, and this proceeding arises in or relates to a Chapter 11 case filed in this district (Case No. 98-42280 (PCB)).

13.    Furthermore, Defendant ReProtect agreed in section X(b) of the 1996 Agreement that this Court was an appropriate forum and waived any right to contest jurisdiction on the grounds of *forum non conveniens*.

14.    Moreover, this Court has a substantial interest in this dispute because it arises out of or relates to the 1996 Agreement and Purchase Agreement, which "shall be governed by and construed (both as to validity and performance) and enforced in accordance with the laws of the State of New York[.]"  Exhibit B at ¶ 21; *see also* Exhibit A at X(h).

## FACTUAL BACKGROUND

### License, Research and Product Development Agreement, dated February 8, 1996, Between Ultrafem And ReProtect

15.    On February 8, 1996, Ultrafem and ReProtect entered into a multi-part License, Research and Product Development Agreement to, among other things, facilitate the research, development and marketing of the "Feminine Cup," covered by United States Patent Number 5,295,984 entitled "Vaginal Discharge Collection Device and Intravaginal Drug Delivery System," owned by Ultrafem, and to grant Ultrafem certain of ReProtect's rights to the "Acidic Buffer," covered by a patent application filed June 29, 1994 entitled "A Device and Method for Acidic Buffering," owned by ReProtect.  Exhibit A at 1.  As set forth in detail below, the 1996 Agreement had separate, distinct components, including, but not limited to:  (a) a research and development component; (b) a licensing component; and (c) a component setting forth a non-competition agreement.

4

### *Research And Development Component*

16.    Under the terms of the 1996 Agreement, ReProtect, among other things, agreed to "devote a significant amount of its time and effort to the research and development of different applications and uses of the Feminine Cup, including, without limitation, long-range research." Exhibit A at I(a)(i).

17.    In consideration of ReProtect's agreement to conduct research and development related to the Feminine Cup, Ultrafem agreed to make certain payments, including, among other things, monthly payments of $40,000 after the First Payment Date, and later, upon certain conditions, monthly payments of a minimum of $83,300.  Exhibit A at I(b)(i).

18.    The 1996 Agreement provided that Ultrafem and ReProtect would each "own an undivided one-half interest in any and all products, processes, technologies and inventions" developed, invented, made or found by ReProtect arising from, or related in any way to, ReProtect's research and development activities carried out pursuant to section I(a)(i) of the 1996 Agreement.  Exhibit A at II.

19.    The 1996 Agreement further provided that "[u]pon termination of this Agreement whether at the end of the Term or otherwise, **each of Ultrafem and ReProtect shall have the right to develop and exploit, commercially or otherwise, all intellectual property in which they own an undivided one-half interest without any obligation to compensate the other** for such development and/or exploitation, provided, however, that nothing in this sentence is intended to or shall diminish the parties' obligations pursuant to this Agreement which by their terms survive such termination, including without limitation, the licenses granted hereunder and the non-competition agreements contained herein."  Exhibit A at IV(g) (emphasis added).

20.     Upon information and belief, Ultrafem complied with its obligations with respect to the research and development component of the 1996 Agreement, pursuant to section 1(b)(i), for several years, through on or about March 10, 1998.

21.     Upon information and belief, ReProtect developed, invented, made or found certain products, processes, technologies and inventions while conducting research and development related to the Feminine Cup pursuant to section I(a)(i) of the 1996 Agreement, to which Ultrafem owned an undivided one-half interest in at the time of its bankruptcy.

22.     Ultrafem conveyed its undivided, one-half ownership interest in the "products, processes, technologies and inventions" to Akcess pursuant to the court-approved Purchase Agreement in or about June 12, 1998. *See* Exhibit B.

23.     Thereafter, Akcess assigned its rights in the Purchase Agreement, including its one-half ownership interest in these "products, processes, technologies and inventions" to Plaintiff Instead, the current holder of the one-half ownership interest.

### Conveyance of Exclusive, Worldwide, Perpetual Licenses

24.     By the 1996 Agreement, ReProtect conveyed to Ultrafem, among other things, two worldwide, perpetual licenses, both of which were wholly separate and apart from the research and development component of the 1996 Agreement. *See* Exhibit A at 1(a)(i), (ii), and (iii).

25.     Pursuant to the terms of the 1996 Agreement, ReProtect conveyed to Ultrafem an "exclusive worldwide perpetual license" to, among other things, develop, use and commercially exploit the Feminine Cup with the Acidic Buffer (the "Cup License").  Exhibit A at I(a)(ii). Specifically, ReProtect conveyed to Ultrafem perpetual, unlimited rights "to develop, use, market, sell, sub-license, sub-contract, manufacture, distribute and otherwise commercially

exploit *all* **of [ReProtect's] right, title and interest** in and to the Acidic Buffer to the extent it is applied in the manufacturing process to, or become physical components of or improvements which are applied in the manufacturing process to, the Feminine Cup, including, without limitation, the acidic buffer gel and/or absorptive acidic buffer claimed in the Acidic Buffer invention when included as a component of the Feminine Cup" (the "Cup Patent Rights"). *Id.* (emphasis added).

26.    In exchange for ownership of the Cup Patent Rights, Ultrafem agreed to pay ReProtect $100,000 and to grant ReProtect certain stock options. Exhibit A at I(b)(ii).

27.    Ultrafem paid ReProtect $100,000 on or before December 31, 1996, and granted ReProtect the required stock options. As a result, the Cup Patent Rights became fully vested in Ultrafem, and Ultrafem, at the time of its bankruptcy, owned such Cup Patent Rights.

28.    Under the terms of the 1996 Agreement, ReProtect conveyed to Ultrafem a "worldwide perpetual license" to, among other things, develop, use, and commercially exploit the portion of the Acidic Buffer that is not a vaginal device, the Gel (the "Gel License"). Exhibit A at I(a)(iii). Specifically, ReProtect conveyed to Ultrafem the perpetual, unlimited rights "to develop, use, market, sell, sub-license, sub-contract, manufacture, distribute and otherwise commercially exploit *all* **of [ReProtect's] right, title and interest** in and to that portion of the Acidic Buffer which is not a vaginal device (the "Gel") (without the Feminine Cup or other vaginal device) solely for vaginal application or uses" (the "Gel Patent Rights"). The Gel Patent Rights conveyed are exclusive and unlimited in all countries worldwide, including the United States, except for certain developing countries in which the rights are non-exclusive. *See* Exhibit A at I(a)(iii) (emphasis added).

29.    In exchange for ownership of the Gel Patent Rights, Ultrafem agreed to pay ReProtect $100,000 and to grant ReProtect certain stock options. Exhibit A at I(b)(iii).

30.    Ultrafem paid ReProtect $100,000 on or before December 31, 1996, and granted ReProtect the required stock options. As a result, the Gel Patent Rights became fully vested in Ultrafem, and Ultrafem, at the time of its bankruptcy, owned such Gel Patent Rights.

31.    The 1996 Agreement provided that ReProtect could terminate the licenses conveyed in the 1996 Agreement upon 90 days notice "*only within thirty (30) days notice after the occurrence*" of one of two specified events. Exhibit A at IV(e) (emphasis added). ReProtect failed to terminate the Gel License or Cup License pursuant to section IV(e), nor in accordance with any other provision of the 1996 Agreement.

32.    According to the terms of the 1996 Agreement, neither the 1996 Agreement, nor the licenses conveyed thereunder, terminated as a result of Ultrafem entering bankruptcy.

33.    The 1996 Agreement provided that Ultrafem, "in its sole discretion," had the right to continue the Gel License and the Cup License after termination of the 1996 Agreement for any reason, with respect to any inventions, products, uses, or applications licensed to Ultrafem by ReProtect "(i) with respect to which an application has been submitted to the FDA regarding Phase II clinical trials or (ii)which are being marketed by Ultrafem anywhere in the world….." Exhibit A at IV(d).

34.    In accordance with section IV(d) of the Licenses Agreement, Ultrafem continued the Gel License and Cup License, and thus maintained ownership of the Gel Patent Rights and Cup Patent Rights after termination of the 1996 Agreement.

35.    Upon information and belief, on September 5, 1997, ReProtect submitted to the Food and Drug Administration ("FDA") an application for Phase I clinical safety trials of

8

products – specifically "BufferGel" and "Gel" – covered by the Cup License and the Gel License, and such clinical trials were completed successfully.

36.    Upon information and belief, thereafter, in or about October 27, 1997, Ultrafem corresponded with the FDA regarding Phase II clinical efficacy trials focusing on the Ultrafem Vaginal Contraceptive, a combination product consisting of a drug component, BufferGel, and a device component, a delivery cup for vaginal insertion molded of thermoplastic materials, as a drug product, and as such complied with its obligations under section IV(d) of the 1996 Agreement.

37.    Ultrafem subsequently conveyed its rights under the Gel License and the Cup License to Akcess in the court-approved Purchase Agreement. *See* Exhibit B.

38.    Thereafter, Akcess assigned its rights under the Gel License and Cup License to Instead, the current holder of these rights.

### Non-Competition Agreement

39.    The 1996 Agreement also set forth a separate non-competition agreement between Ultrafem, on the one hand, and ReProtect and the Individual Defendants, on the other hand ("Non-Competition Agreement"). Exhibit A at VI(e).

40.    The Non-Competition Agreement provides that ReProtect and the Individual Defendants cannot assist, participate or engage in the marketing of any vaginal product which is competitive with, "(i) any vaginal product which Ultrafem is then marketing or (ii) any vaginal product which Ultrafem has the right (or an option to obtain the right) to market and with respect to which an application for Phase I clinical trials has been submitted to the FDA (or an equivalent submission has been made or clinical trials have begun in any other jurisdiction), in

any geographic area in which any of Ultrafem's products are then being marketed." Exhibit A at VI(e).

41.    The 1996 Agreement also expressly provides that Ultrafem has the right to "specifically enforce[]" the non-competition agreement, "it being agreed that any breach or threatened breach of [section VI(e)] would cause irreparable injury to Ultrafem and that money damages would not provide an adequate remedy to Ultrafem," and also provides that Ultrafem has the right to seek damages for any such breach. Exhibit A at VI(e). *See also* Exhibit A at X(b).

42.    The 1996 Agreement expressly provides that the Non-Competition Agreement survives termination of the 1996 Agreement. *See e.g.* Exhibit A at VI(e).

43.    Ultrafem conveyed its rights under the Non-Competition agreement to Akcess through the Purchase Agreement, and thereafter, Akcess assigned these rights to Instead, the current holder of these rights.

## Asset Purchase Agreement Between Ultrafem And Akcess

44.    On April 1, 1998, Ultrafem commenced a case under Chapter 11 of the Bankruptcy Code in the Southern District of New York (Case No. 98-42280 (PCB)).

45.    As a result, the Cup License and associated Cup Patent Rights, the Gel License and the associated Gel Patent Rights, and the Non-Competition Agreement, among other things, became part of Ultrafem's bankruptcy estate.

46.    Ultrafem, as Debtor-in-Possession in Chapter 11, sold and assigned to Akcess substantially all of its assets, including all of its right, title and interest in and to the Cup License and the associated Cup Patent Rights, the Gel License and the associated Gel Patent Rights, and the Non-Competition Agreement, pursuant to the Purchase Agreement dated June 12, 1998.

47.    Akcess purchased "[a]ll of [Ultrafem's] right, title and interest in and to the patents, copyrights, trademarks, service marks, and trade names, and all applications therefore [sic], whether U.S. or foreign, and franchises, goodwill and other intangible property (collectively, the 'Intangibles')" pursuant to the Purchase Agreement. *See e.g.* Exhibit B at 1.1(a).

48.    Akcess also acquired all of Ultrafem's rights under "all non-compete agreements (other than agreements with employees)" pursuant to the Purchase Agreement. *See e.g.* Exhibit B at 1.1(h).

49.    Under the terms of the Purchase Agreement, the research and development component of the 1996 Agreement, which, upon information and belief, was terminated prior to Ultrafem entering bankruptcy, was not conveyed to Akcess.

50.    Upon information and belief, the listing of the 1996 Agreement on Schedule 1.4 as an Excluded Asset acknowledged the termination of the research and development component of the 1996 Agreement which had occurred prior to Ultrafem's bankruptcy as a result of Ultrafem failing to make required monthly payments, but did not include, as excluded assets, among other things, the Gel Patent Rights and Cup Patent Rights which had been conveyed to Ultrafem prior to its bankruptcy. Schedule 1.4 states expressly that the reason for the exclusion was "[Ultrafem] has not made payments required thereunder for the months of March, April, May, and June, 1998, and [Ultrafem] is in default thereunder," a fact relevant only to the research and development component of the 1996 Agreement. *See* Exhibit B, Schedule 1.4.

51.    Upon information and belief, the assets conveyed under the Purchase Agreement included the Gel Patent rights, the Cup Patent Rights, the Non-Competition rights, and any other

rights which had been conveyed to Ultrafem through the 19996 Agreement prior to its bankruptcy.

52.     On August 1, 2000, the Bankruptcy Court issued an Order confirming Ultrafem's Plan of Liquidation (the "Plan Order"), a true and correct copy of which is annexed hereto as Exhibit D.

53.     Upon information and belief, ReProtect was on notice of Ultrafem's bankruptcy and never objected to the Plan Order, nor did ReProtect terminate the Gel License, the Cup License, or the Non-Competition Agreement prior to Ultrafem conveying its interest in each to Akcess pursuant to the Purchase Agreement (nor before Akcess assigned the same to Instead).

### ReProtect Asserts Exclusive Ownership In And To The Cup Patent Rights And The Gel Patent Rights – *For The First Time* – In No Earlier Than 2003

54.     Upon information and belief, in no earlier than 2003, ReProtect asserted, for the first time, that Instead did not own the Cup Patent Rights or the Gel Patent Rights, and that ReProtect was not obligated to comply with the Non-Competition Agreement related to those patent rights.

55.     Thereafter, when it became clear that the parties could not resolve their dispute, Instead filed this action.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment That The Cup License Was Not Terminated )

56.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 55 of this Amended Complaint as if fully set forth herein.

57.     This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

58.    An actual controversy now exists as to the rights and other legal relations of Plaintiff and ReProtect with respect to the Cup Patent Rights arising under the Cup License. Plaintiff asserts that it owns the Cup Patent Rights conveyed by the 1996 Agreement. ReProtect disputes Plaintiff's assertion, and contends that the Cup License has been terminated.

59.    Plaintiff seeks a declaration from this Court as to whether the Cup License, conveyed in the 1996 Agreement, has been terminated.

60.    A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights with respect to the Cup License, and Plaintiff may obtain the relief to which it is entitled.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment That The Gel License Was Not Terminated )

61.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 60 of this Amended Complaint as if fully set forth herein.

62.    This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

63.    An actual controversy now exists as to the rights and other legal relations of Plaintiff and ReProtect with respect to the Gel Patent Rights arising under the Gel License. Plaintiff asserts that it owns the Gel Patent Rights conveyed by the 1996 Agreement. ReProtect disputes Plaintiff's assertion, and contends that the Gel License has been terminated.

64.    Plaintiff seeks a declaration from this Court as to whether the Gel License, conveyed in the 1996 Agreement, has been terminated.

65.    A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights with respect to the Gel License, and Plaintiff may obtain the relief to which it is entitled.

13

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment that Instead Owns the Cup Patent Rights)

66.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 65 of this Amended Complaint as if fully set forth herein.

67.     This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

68.     An actual controversy now exists as to the rights and other legal relations of Plaintiff and ReProtect with respect to the Cup Patent Rights.  Plaintiff asserts that it owns the Cup Patent Rights conveyed by the 1996 Agreement.  ReProtect disputes Plaintiff's assertion, and contends that Plaintiff has no interest in the Cup Patent Rights.

69.     Plaintiff seeks a declaration from this Court as to its rights and ReProtect's obligations vis a vis the Cup Patent Rights:  Instead owns the Cup Patent Rights conveyed under the 1996 Agreement.

70.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights in the Cup Patent Rights conveyed under the 1996 Agreement, and Plaintiff may obtain the relief to which it is entitled.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment that Instead Owns the Gel Patent Rights)

71.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 70 of this Amended Complaint as if fully set forth herein.

72.     This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

73.     An actual controversy now exists as to the rights and other legal relations of Plaintiff and ReProtect with respect to the Gel Patent Rights.  Plaintiff asserts that it owns the

14

Gel Patent Rights conveyed by the 1996 Agreement. ReProtect disputes Plaintiff's assertion, and contends that Plaintiff has no interest in the Gel Patent Rights.

74.     Plaintiff seeks a declaration from this Court as to its rights and ReProtect's obligations vis a vis the Gel Patent Rights: Instead owns the Gel Patent Rights conveyed under the 1996 Agreement.

75.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights in the Gel Patent Rights conveyed under the 1996 Agreement, and Plaintiff may obtain the relief to which it is entitled.

### FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment that Instead Owns An Undivided One-Half Interest In Certain Products, Processes, Technologies and Inventions)

76.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 75 of this Amended Complaint as if fully set forth herein.

77.     This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

78.     An actual controversy now exists as to the rights and other legal relations of Plaintiff and ReProtect with respect to, among other things, "all products, processes, technologies and inventions" developed, invented, made or found by ReProtect arising from, or related in any way to, ReProtect's research and development activities carried out pursuant to section I(a)(i) of the 1996 Agreement. Plaintiff asserts that it owns an undivided, one-half interest in all such "products, processes, technologies and inventions." Whereas, ReProtect disputes Plaintiff's assertion, claiming that it owns all such rights.

79.     Plaintiff seeks a declaration from this Court as to the ownership interests in and to the "products, processes, technologies and inventions" developed, invented, made or found by

15

ReProtect pursuant to the research and development component of the 1996 Agreement, to the effect that Instead owns an undivided one-half interest in and to all such "products, processes, technologies and inventions."

80.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights with respect to all such products, processes, technologies and inventions conveyed under the 1996 Agreement, and Plaintiff may obtain the relief to which it is entitled.

**SIXTH CLAIM FOR RELIEF**
**(Declaratory Judgment that Defendants Must Abide by the Non-Competition Agreement)**

81.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 80 of this Amended Complaint as if fully set forth herein.

82.     This cause of action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

83.     An actual controversy now exists as to the rights and other legal relations of Plaintiff and Defendants with respect to the Non-Competition Agreement.  Plaintiff asserts that defendant ReProtect and the Individual Defendants must abide by the Non-Competition Agreement.  ReProtect and the Individual Defendants dispute Plaintiff's assertion, and contend that Plaintiff has no right to enforce the Non-Competition Agreement.

84.     Plaintiff seeks a declaration from this Court as to its rights and other legal relations concerning ReProtect and the Individual Defendants under the Non-Competition Agreement to the effect that ReProtect and the Individual Defendants must abide by the terms of the Non-Competition Agreement.

85.    A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights under the Non-Competition Agreement and obtain the relief to which it is entitled.

## SEVENTH CLAIM FOR RELIEF
### (Anticipatory Breach of Non-Competition Agreement by Defendants)

86.    Instead repeats and realleges each and every allegation set forth in paragraphs 1 through 85 above as if fully set forth herein.

87.    The Non-Competition Agreement is a valid and binding agreement between Plaintiff, on the one hand, and ReProtect and the Individual Defendants, on the other hand.

88.    Plaintiff has complied fully with its obligations under the Non-Competition Agreement.

89.    On several occasions, ReProtect and the Individual Defendants have informed Plaintiff that they will not abide by the terms of the Non-Competition Agreement.

90.    ReProtect and the Individual Defendants are therefore in anticipatory breach of their obligations under the Non-Competition Agreement by clearly and unequivocally expressing their intention not to abide by the terms of the Non-Competition Agreement.

91.    As a direct and proximate result of ReProtect's and the Individual Defendants' anticipatory breaches of the Non-Competition Agreement, Plaintiff has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an entry of judgment and for relief against Defendants as follows:

1.    A Court Declaration confirming that the Cup License has not been terminated;

2.    A Court Declaration confirming that the Gel License has not been terminated;

17

3.      A Court Declaration confirming that Plaintiff Instead owns the Cup Patent Rights;

4.      A Court Declaration confirming that Plaintiff Instead owns the Gel Patent Rights;

5.      A Court Declaration confirming that Plaintiff Instead owns an undivided, one-half interest in and to all "products, processes, technologies and inventions" developed, invented, made or found by ReProtect pursuant to the research and development component of the 1996 Agreement;

6.      A Court Declaration confirming that Defendants must abide by the Non-Competition Agreement;

7.      Defendants' specific performance of the Non-Competition Agreement;

8.      Damages for anticipatory breach of the Non-Competition Agreement;

9.      All other actual, consequential or other damages to which Instead may be legally entitled;

10.     All costs, attorneys' fees and expenses incurred by Instead in connection with this lawsuit; and,

11.     Such other relief as the Court deems just and proper.


Dated: August 22, 2008
       New York, New York

FOLEY & LARDNER LLP

By: _____
    Robert S. Weisbein (RW 0080)
    Dana C. Rundlöf (DR 1431)
    FOLEY & LARDNER LLP
    90 Park Avenue
    New York, NY  10016
    Telephone: (212) 682-7474
    Facsimile:  (212) 687-2329
    rweisbein@foley.com
    drundlof@foley.com

    *Attorneys for Plaintiff Instead, Inc.*

18

Of Counsel:

Victor A. Vilaplana, Esq.
Katherine P. Soby, Esq.
FOLEY & LARDNER LLP
402 West Broadway
Suite 2100
San Diego, CA 92101-3542
Phone: 619-234-6655
Facsimile: 619-234-3510

## LICENSE, RESEARCH AND PRODUCT DEVELOPMENT AGREEMENT

THIS AGREEMENT by and between Ultrafem, Inc., a Delaware corporation ("Ultrafem"), and ReProtect, LLC, a Maryland limited liability company ("ReProtect"), is made as of this 8th day of February, 1996 (hereinafter referred to as the "Agreement").

## W I T N E S S E T H:

WHEREAS, Ultrafem is the owner of United States Patent Number 5,295,984 entitled "Vaginal Discharge Collection Device and Intravaginal Drug Delivery System" which may be used for reproductive health and related products using the feminine hygiene device (the "Feminine Cup") as a vaginal delivery mechanism for vaginal treatment and protection;

WHEREAS, ReProtect desires to conduct research and development of different applications and uses of the Feminine Cup as a vaginal delivery mechanism for vaginal treatment/protection, contraception, prevention of sexually transmitted diseases, and topical and systemic therapies during and not during menstruation;

WHEREAS, Ultrafem and ReProtect desire to enter into this Agreement to facilitate the research, development and marketing of the Feminine Cup for various applications;

WHEREAS, ReProtect is the owner of an invention (the "Acidic Buffer") covered by a patent application filed June 29, 1994 entitled "A Device and Method for Acidic Buffering," that discloses an "Absorbent Buffer" and a "Buffer Gel";

WHEREAS, Ultrafem desires to license the Acidic Buffer and certain other intellectual property owned by ReProtect for certain applications;

WHEREAS, the parties intend to develop a long-term mutually beneficial relationship;

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements contained herein, and with the intention of being legally bound hereby, the parties agree as follows:

## 1. *OBLIGATIONS OF THE PARTIES*

    (a)    ReProtect.

        (i)    ReProtect shall devote a significant amount of its time and effort to the research and development of different applications and uses of the Feminine Cup, including, without limitation, long-range research. Such applications and uses shall include, without limitation, vaginal delivery mechanisms for vaginal treatment/protection, contraception,

prevention of sexually transmitted diseases, including AIDs ("STD"), and topical and systemic therapies, both during and not during menstruation. Without limiting the foregoing, ReProtect agrees to consult with Ultrafem and make such presentations as Ultrafem shall request to Ultrafem's potential customers, suppliers, investors, strategic partners and others, provided, that, Ultrafem shall give ReProtect reasonable advance notice of the date and time of such presentations and shall pay the reasonable actual costs of travel and lodging. ReProtect hereby grants Ultrafem the exclusive worldwide perpetual license to develop, use, market, sell, sub-license, sub-contract, manufacture, distribute and otherwise commercially exploit all of ReProtect's right, title and interest in and to all technology, know-how, inventions, discoveries, ideas, innovations, concepts, information, data, and/or products and/or applications thereof, whether or not patentable, to the extent that such items are physical components of or improvements which are applied in the manufacturing process to the Feminine Cup, and which arise out of or result from the research and development performed in accordance with the terms of this Agreement.

(ii)    In addition to and without limiting the provisions of paragraph I(a)(i), ReProtect hereby grants Ultrafem the exclusive worldwide perpetual license to develop, use, market, sell, sub-license, sub-contract, manufacture, distribute and otherwise commercially exploit all of its right, title and interest in and to the Acidic Buffer to the extent it is applied in the manufacturing process to, or become physical components of or improvements which are applied in the manufacturing process to, the Feminine Cup, including, without limitation, the acidic buffer gel and/or absorptive acidic buffer claimed in the Acidic Buffer invention when included as a component of the Feminine Cup. At such time as it can do so under law, Ultrafem shall and/or shall cause its successors, assignees, subsidiaries or licensees to use reasonable best efforts to produce, manufacture, develop, bring to market, sell and/or commercially exploit the Feminine Cup with the Acidic Buffer. The license granted by this paragraph I(a)(ii) is sometimes referred to herein as the "Cup License."

(iii)    In addition to and without limiting the provisions of paragraph I(a)(i) and (ii), ReProtect hereby grants Ultrafem the worldwide perpetual license to develop, use, market, sell, sub-license, sub-contract, manufacture, distribute and otherwise commercially exploit all of its right, title and interest in and to that portion of the Acidic Buffer which is not a vaginal device (the "Gel") (without the Feminine Cup or other vaginal device) solely for vaginal applications or uses. The license granted by the prior sentence shall be a non-exclusive license in the countries listed on Schedule I(a)(iii) hereto and exclusive in all other countries, territories and jurisdictions. In countries where the license is non-exclusive, each of ReProtect and Ultrafem shall have the right to market the Gel. The parties agree that they shall keep each other informed with respect to their plans to market and their marketing the Gel in such non-exclusive countries and to cooperate with each other in the countries where the license is non-exclusive to allow ReProtect to achieve the goal of making the Gel available to women worldwide, especially in the non-exclusive countries where clinical trials have been conducted, and to allow Ultrafem to achieve the maximum profit from commercially exploiting the Gel. The parties agree that they shall in good faith consider any request to remove a country from the non-exclusive license and either add such country to the exclusive license or remove such

163

country from the non-exclusive license granted Ultrafem in view of their respective goals set forth in the prior sentence. Either party can make a request to remove a country from the non-exclusive license as provided in the preceding sentence. In the event that within 90 days after any such written request, the parties cannot agree on the status of the non-exclusive license in such country, then the dispute shall be submitted to arbitration (x) in accordance with the procedures set forth in paragraph V(c); and (y) in which arbitration, the arbitrators shall consider the respective goals of the parties set forth in this paragraph. At such time as it can do so under law, subject to the last sentence of paragraph IV(e)(2), Ultrafem shall and/or shall cause its successors, assignees, subsidiaries or licensees to use reasonable best efforts to produce, manufacture, develop, bring to market, sell and/or commercially exploit the Gel. The license granted by this paragraph I(a)(iii) is sometimes referred to herein as the "Gel License."

     (b)    Ultrafem.

     (i)    In consideration of ReProtect's research and development activities contemplated by paragraph I(a)(i) above and the license granted by such paragraph I(a), Ultrafem shall pay ReProtect, such payments to accrue commencing with the date that the Ultrafem Board of Directors approves this Agreement and the first such payment to be made on the third business day after consummation of Ultrafem's initial public offering (the "First Payment Date") and thereafter such payments shall be made on the first business day of each month thereafter until the end of the Term (as defined below) $40,000, provided, however, that the monthly amount payable pursuant to this paragraph I(b)(i) shall increase to $83,300 (or more in Ultrafem's sole discretion) commencing with the first business day of the month immediately following any month in which Ultrafem consummates one or more debt or equity financings, the gross proceeds of which, when added to the gross proceeds of all other debt and equity financings consummated by Ultrafem after the date hereof, results in aggregate gross proceeds of at least $25 million.

     (ii)    In consideration of the license granted to it in paragraph I(a)(ii) above, Ultrafem (1) shall pay ReProtect by check payable to its order on the First Payment Date $100,000, (2) grants ReProtect the options set forth in this paragraph I(b)(ii) and (3) shall pay ReProtect the royalties set forth in this paragraph I(b)(ii). Ultrafem hereby grants ReProtect options to purchase the number of shares of Common Stock, par value $.001 per share, of Ultrafem set forth below, exercisable commencing with the events described below and which shall have the additional terms and conditions set forth below and in Annex I(b)(ii) hereto:

| Number of Shares | Date or Event On or After Which Shares May be Purchased Pursuant to the Option |
|---|---|
| 50,000 | On or after the date hereof. (Initial Exercise Price - $8 per share, provided however that such exercise price shall be reduced to $6 per share upon consummation of Ultrafem's initial public offering) |
| 50,000 | On or after the date of the issuance to ReProtect of a patent for the Acidic Buffer (Initial Exercise Price - $8 per share, provided however that such exercise price shall be reduced to $6 per share upon consummation of Ultrafem's initial public offering) |

164

50,000      Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to a product to be submitted for regulatory approval as a contraceptive product (the "Contraceptive Cup") utilizing the Acidic Buffer (with or without Nonoxynol-9 ("N-9")) combined with the Feminine Cup (initial exercise price - $8 per share):

     a.      10,000 shares - Initiation of U.S. safety (Phase I) trial approved by the U.S. Food and Drug Administration (the "FDA") of the Contraceptive Cup in humans;

     b.      10,000 shares - Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the Contraceptive Cup;

     c.      10,000 shares - Obtaining United States regulatory approval for marketing the Contraceptive Cup;

     d.      10,000 shares - Market introduction of the Contraceptive Cup;

     e.      10,000 shares - Finalizing a strategic alliance with a third party for the Contraceptive Cup.

50,000      Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to a product to be submitted for regulatory approval as a prophylactic product for protection against STDs (including AIDs) ("STD Cup") that uses an Acidic Buffer combined with the Feminine Cup (with or without N-9) that may or may not be identical with the Contraceptive Cup (initial exercise price -$8 per share):

     a.      10,000 shares - Initiation of U.S. safety (Phase I) trial approved by the FDA of the STD Cup in humans;

     b.      10,000 shares - Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the STD Cup;

     c.      10,000 shares - Obtaining United States regulatory approval for marketing the STD Cup;

     d.      10,000 shares - Market introduction of the STD Cup;

     e.      10,000 shares - Finalizing a strategic alliance with a third party for the STD Cup.

25,000      Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to a product to be submitted for regulatory approval as a therapeutic product for treating and/or preventing vaginal yeast infections or bacterial vaginosis (the "Therapy Cup") that uses an Acidic Buffer with or without pharmaceutical agents combined with the Feminine Cup and that may or may not be identical with the Contraceptive Cup or STD Cup (initial exercise price - $8 per share):

     a.      5,000 shares - Initiation of U.S. safety (Phase I) trial approved by the FDA of the Therapy Cup in humans;

     b.      5,000 shares - Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the Therapy Cup;

     c.      5,000 shares - Obtaining United States regulatory approval for marketing the Therapy Cup;

     d.      5,000 shares - Market introduction of the Therapy Cup;

     e.      5,000 shares - Finalizing a strategic alliance with a third party for the Therapy Cup.

If any of the milestones are deleted by Ultrafem, in its sole discretion, the options subject to such milestone shall vest proportionately with and at such times as the other milestones in such

category are met.  In the event the milestone relating to obtaining United States regulatory approval for marketing a product is achieved, all other milestones in such category, other than one-half of the options relating to a strategic alliance (options for 5,000 shares or 2,500 shares, as the case may be) and all of the options relating to market introduction (options for 10,000 shares or 5,000 shares, as the case may be), shall vest. The parties may at any time or from time to time alter the milestones by mutual agreement. All of the above options shall become exercisable, regardless of whether any of the events set forth above have occurred, upon a Change of Control (as such term is defined in Annex I(b)(ii) hereto) of Ultrafem. All options that are not exercisable upon expiration of the Term shall become exercisable upon the expiration of the Term. All of these options shall finally expire ten years and six months after the First Payment Date. Except as expressly set forth above, the initial exercise price ("Exercise Price") of the options shall be $8 per share, subject to adjustment as provided in Annex I(b)(ii) hereto.

Ultrafem shall pay ReProtect royalties in an amount equal to $.01 (one cent) for each unit of the Feminine Cup, which includes the Acidic Buffer as a component or improvement, sold by Ultrafem, its successors, assigns, subsidiaries, or licensees (which licensees are manufacturing the Feminine Cup with Acidic Buffer). The terms of paragraph I(c) shall apply to the royalties provided for in this paragraph as if fully set forth herein.

(iii)    In consideration of the license granted to it in paragraph I(a)(iii) above, Ultrafem (1) shall pay ReProtect by check payable to its order on the First Payment Date $100,000, (2) grants ReProtect the options set forth in this paragraph I(b)(iii) and (3) shall pay ReProtect the royalties set forth in this paragraph I(b)(iii). Ultrafem hereby grants ReProtect options to purchase the number of shares of Common Stock, par value $.001 per share, of Ultrafem set forth below, exercisable commencing with the events described below and which shall have the additional terms and conditions set forth below and in Annex I(b)(ii) hereto:

| Number of Shares | Date or Event or After Which Shares May be Purchased Pursuant to the Option |
|---|---|
| 50,000 | On or after the date hereof. |
| 50,000 | Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to the use of the Gel (without a vaginal device other than an applicator) as a contraceptive product (the "Contraceptive Gel"): |

        a.    10,000 shares – Initiation of U.S. safety (Phase I) trial approved by the FDA of the Contraceptive Gel in humans;

        b.    10,000 shares – Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the Contraceptive Gel;

        c.    10,000 shares – Obtaining United States regulatory approval for marketing the Contraceptive Gel;

        d.    10,000 shares – Market introduction of the Contraceptive Gel;

        e.    10,000 shares – Finalizing a strategic alliance with a third party for the Contraceptive Gel.

| | |
|---|---|
| 50,000 | Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to the use of the Gel (without a vaginal device other than an applicator) as a prophylactic product for protection against STDs (including AIDS) ("STD Gel") that may or may not be identical with the Contraceptive Gel:<br><br>a.   10,000 shares - Initiation of U.S. safety (Phase I) trial approved by the FDA of the STD Gel in humans;<br>b.   10,000 shares - Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the STD Gel;<br>c.   10,000 shares - Obtaining United States regulatory approval for marketing the STD Gel;<br>d.   10,000 shares - Market introduction of the STD Gel;<br>e.   10,000 shares - Finalizing a strategic alliance with a third party for the STD Gel. |
| 25,000 | Options for the number of shares set forth opposite such milestone shall be exercisable on or after the date each of the following milestones is met with respect to the use of the Gel (without a vaginal device other than an applicator) as a therapeutic product for treating and/or preventing vaginal yeast infections or bacterial vaginosis (the "Therapy Gel" (that may or may not be identical with the Contraceptive Gel)):<br><br>a.   5,000 shares - Initiation of U.S. safety (Phase I) trial approved by the FDA of the Therapy Gel in humans;<br>b.   5,000 shares - Completion of U.S. efficacy (Phase II) trials approved by the FDA in humans of the Therapy Gel;<br>c.   5,000 shares - Obtaining United States regulatory approval for marketing the Therapy Gel;<br>d.   5,000 shares - Market introduction of the Therapy Gel;<br>e.   5,000 shares - Finalizing a strategic alliance with a third party for the Therapy Gel. |

If any of the milestones are deleted by Ultrafem, in its sole discretion, the options subject to such milestone shall vest proportionately with and at such times as the other milestones in such category are met. All of the above options shall become exercisable, regardless of whether any of the events set forth above have occurred, upon a Change of Control (as such term is defined in Annex I(b)(ii) hereto) of Ultrafem. All options that are not exercisable upon expiration of the Term shall become exercisable upon the expiration of the Term. All options shall finally expire ten years and six months after the First Payment Date. The initial exercise price of the options shall be $8 per share, subject to adjustment as provided in Annex I(b)(ii) hereto. In the event the milestone relating to obtaining United States regulatory approval for marketing a product is achieved, all other milestones in such category, other than one half of the options relating to a strategic alliance (options for 5,000 shares or 2,500, as the case may be) and all of the options relating to market introduction (options for 10,000 shares or 5,000, as the case may be), shall vest. The parties may at any time or from time to time alter the milestones by mutual agreement.

Ultrafem shall pay ReProtect royalties equal to 5% of Net Sales derived from the sale of the Gel without the Feminine Cup or other vaginal device (other than an applicator) with respect to which patents have been issued and 3% of Net Sales derived from such product with respect to which patents have not been issued. "Net Sales" as used herein, shall mean the total invoiced amount of all sales by Ultrafem or its licensee (which is either the primary manufacturer or primary distributor of the product) or assignee (which is either the primary manufacturer or primary distributor of the product) of the Gel without the Feminine Cup or other vaginal device (other than an applicator), less cash and trade discounts, returns, allowances, free goods, and replacements, taxes applicable to such sales, and governmental charges assumed and delivery charges borne by Ultrafem or such licensee or assignee. If the Gel is marketed in the same package as the Feminine Cup or other device but not as an integral part of the Feminine Cup or other device then Net Sales shall be based on that portion of Net Sales attributable to the Gel alone. The terms of paragraph I(c) shall apply to such royalties as if fully set forth herein.

(c)    All royalties provided for in paragraph 1(b) shall be due and payable during the Term or any time thereafter, it being expressly understood that upon termination of this Agreement, Ultrafem may in its sole discretion continue any or all of the licenses granted hereunder to the extent set forth in Paragraph IV(d) below by paying the Royalties due hereunder. Royalties shall be paid within 30 days after the end of each calendar quarter, which payment shall be accompanied by a statement setting forth the number of units sold during such calendar quarter and a calculation of the Royalties due to ReProtect in respect thereof. Ultrafem shall keep complete and accurate books of account and records covering all sales of units of the Feminine Cup with Acidic Buffer and/or units of the Acidic Buffer without the Feminine Cup. ReProtect and its duly authorized representatives shall have the right, during normal business hours and upon reasonable advance notice and without interrupting Ultrafem's business, at any time during the Term and thereafter, to examine and copy such books of account and records and all other materials as may be reasonably necessary or appropriate to verify the information contained in the royalty statements submitted to ReProtect pursuant to this Agreement. In the case of any deviation of Royalties versus reported Royalties, Ultrafem shall pay any Royalties due within ten days, with interest thereon from the date such Royalties were due through and including the date of payment, at and changing with the rate announced from time to time by, Citibank N.A. at its principal office in New York City as its "prime rate," plus 2%, and, if such deviation exceeds 5%, Ultrafem shall pay the reasonable costs of such examination. All books of account and records relating to a particular calendar year shall be kept available for inspection as provided herein for at least two years after the end of such year.

(d)    In the event Ultrafem determines, as a consequence of consumer research, regulatory requirements, the manufacturing process or otherwise, to market the Acidic Buffer as part of the same package as a Feminine Cup, and as a result royalties would be due under both paragraphs I(b)(ii) and I(b)(iii), then ReProtect shall, within 30 days after it receives notice from Ultrafem, decide whether royalties on such product are payable under paragraph I(b)(ii) or I(b)(iii); it being the parties agreement that Ultrafem shall be responsible for paying royalties for a product pursuant to paragraph I(b)(ii) or I(b)(iii) but not both.

(e)    Ultrafem shall use its best efforts, subject to its fiduciary duties, to nominate and recommend for election a person designated by ReProtect who shall be a principal of ReProtect to serve on Ultrafem's Board of Directors (the "Board") for each year during the Term, except that Ultrafem shall not be required to so nominate a designee if such representative's term is not then up for reelection. ReProtect's initial designee is Dr. Richard Cone.

(f)    Ultrafem agrees that it will pursue the development and marketing of a Contraceptive Cup prior to pursuing the development and marketing of either the STD Cup or Therapy Cup.

(g)    Ultrafem confirms that it intends to market the Gel worldwide through one or more of the following distribution channels: private distribution, commercial distribution and/or governmental distribution. Such marketing and distribution may be accomplished with or without one or more strategic partners, depending on the territory. Ultrafem will act reasonably in considering any request by ReProtect to delete one or more specific countries from the worldwide license granted hereby. However, Ultrafem shall not be obligated to do so.

(h)    Ultrafem and ReProtect have a mutual interest in developing a method (possibly through one or more charitable foundations) of allocating a portion of profits derived from the sale of products which use the licenses granted under this Agreement in developed markets for the benefit of women in underdeveloped commercial markets. The parties agree to consider developing such a mutually agreeable method which would require the financial participation of each of them on a mutually agreeable basis to be determined as well as a mutually agreeable definition of those who will benefit from such allocation.

II.    *OWNERSHIP OF INTELLECTUAL PROPERTY*

Each of ReProtect and Ultrafem shall own an undivided one-half interest in any and all products, processes, technologies and inventions, including, without limitation, new contributions, improvements, discoveries and applications conceived, developed, invented, made or found by ReProtect which are related in any way or arise out of ReProtect's activities (i) pursuant to paragraph I(a) of this Agreement, whether or not patentable, that are physical components of or improvements which are applied in the manufacturing process to the Feminine Cup; or (ii) which are included on a Budget (as defined in paragraph VI(a) of this Agreement) and with respect to which some funds have been expended. ReProtect shall own any and all products, inventions and/or technology used without the Feminine Cup made solely by a ReProtect employee subject to any interest of JHU (as defined herein) and subject to Ultrafem's rights pursuant to paragraphs I and V of this Agreement. Ultrafem shall own any and all products, inventions and/or technology made solely by Ultrafem employees, whether or not related to the Feminine Cup, which shall not be subject to this Agreement.

III.    *JHU AGREEMENT*

(a)    ReProtect shall maintain an agreement (which agreement shall be reasonably acceptable to Ultrafem) with Johns Hopkins University ("JHU") throughout the Term of this Agreement. ReProtect's agreement with JHU shall include the following terms:

(1)    ReProtect shall be granted access and use of a laboratory and office facilities at JHU which shall be adequate in the reasonable opinion of ReProtect and Ultrafem for the performance of ReProtect's obligations pursuant to paragraph I(a) of this Agreement.

(2)    Rights to and ownership of intellectual property shall be treated as provided under the caption "Intellectual Property" in the Research Agreement referred to in paragraph III(c) below.

(b)    ReProtect's interest in any items jointly owned by it and JHU or licensed by it from JHU or with respect to which it has a right of first negotiation, to the extent such items if they had existed as of the date hereof would have been subject to the licenses granted under paragraph I(a) of this Agreement, shall become subject to the licenses granted by ReProtect pursuant to paragraph I(a) of this Agreement.

(c)    Ultrafem acknowledges that the Agreement between JHU and ReProtect dated September 12, 1995, a copy of which is annexed as Exhibit III hereto, is acceptable to Ultrafem.

IV.    *TERM*

(a)    This Agreement shall commence as of the date hereof and shall terminate on the tenth anniversary of the First Payment Date (the "Term") unless terminated sooner in accordance with the provisions of this paragraph IV.

(b)    This Agreement shall terminate prior to the tenth anniversary of the First Payment Date at any time upon ninety (90) days prior written notice given by Ultrafem to ReProtect.

(c)    This Agreement shall terminate prior to the tenth anniversary of the First Payment Date upon ninety (90) days prior written notice given by ReProtect to Ultrafem, provided however that ReProtect shall have the right to give such notice only within thirty (30) days after the occurrence of one of the following events:

(1)    Ultrafem does not consummate an initial public offering or raise aggregate gross proceeds of $20 million or more in equity and debt financings after the date hereof and on or before June 30, 1996, provided, however that the $100,000 due pursuant to paragraph I(b)(ii), the $100,000 due pursuant to paragraph I(b)(iii) and all amounts accrued pursuant to paragraph I(b)(i) which have not been paid shall be payable to ReProtect on the date of termination;

170

(2)    Ultrafem does not commence the initial marketing of the Feminine Cup as a feminine protection product in the United States or Europe on or before June 30, 1997; or

(3)    Ultrafem fails to make the payments due under paragraph I(b)(i) hereof and such failure continues for a period of 90 days after written notice has been received by Ultrafem from ReProtect.

(d)    The monthly payments provided for in paragraph I(b)(i) of this Agreement shall continue after the date of termination of the Term as a result of termination by Ultrafem for a period of six months.  In addition, upon termination of this Agreement for any reason, Ultrafem shall have the right, in its sole discretion, to continue the licenses granted by ReProtect pursuant to paragraph I(a) hereof with respect to any or all  inventions, products, uses or applications which at the date of such termination are licensed by ReProtect to Ultrafem hereunder and either (i) with respect to which an application has been submitted to the FDA regarding Phase II clinical trials or (ii) which are being marketed by Ultrafem anywhere in the world, in consideration of the payment by Ultrafem to ReProtect of the royalties provided in this Agreement with respect to such product.

(e)    ReProtect shall have the right to terminate the license of a particular product granted by this Agreement upon ninety days prior written notice given by ReProtect to Ultrafem, provided however that ReProtect shall have the right to give such notice only within thirty (30) days after the occurrence of one of the following events with respect to such product:  :

(1)    with respect to a product covered by the Gel License, if Ultrafem has not provided the amount of funding set forth below (which shall be in addition to the funding to be provided under paragraph I(b) of this Agreement) with respect to clinical trials approved by the FDA within the time period set forth below and such funding has not been provided by other sources:

| AMOUNT OF FUNDING | TIME PERIOD COMMENCING WITH DATE AFTER JUNE 30, 1996  ULTRAFEM IS NOTIFIED IN WRITING OF FDA APPROVAL TO PROCEED WITH TRIAL |
|---|---|
| Up to and including $500,000 | Ninety Days |
| Greater than $500,000 and less than $3 million | One Year |
| $3,000,000 or more | Two Years |

(2)    with respect to the first product covered by the Gel License, subject to the last sentence of this paragraph, (i) if a contraceptive product using the Acidic Buffer (without a vaginal device other than an applicator) (the "Contraceptive Gel") is not introduced

into the market within one year (or six months if Ultrafem has not then commenced marketing the Contraceptive Cup in the United States and ReProtect does not reasonably believe that marketing of the Contraceptive Cup will commence in such one year period) after the FDA has granted final approval to commence marketing the Contraceptive Gel in the United States; or (ii) if, once marketing of the Contraceptive Gel has commenced, Ultrafem refuses to market the Contraceptive Gel in a multiple application tube (as spermicide). The obligation of Ultrafem to market the Contraceptive Gel shall be excused during each period of delay caused by matters which are beyond the control of Ultrafem, including, without limitation, legal or other regulatory impediments, strikes, shortages of raw materials, government orders or acts of God.

(f)    The parties agree that on or after the seventh anniversary of the First Payment Date, ReProtect may give written notice to Ultrafem that it would like certain modifications in the Agreement. The modifications could apply to the balance of the Term of the Agreement and/or to an extension of the Term. The notice must state, in detail, ReProtect's requested modifications. If in ReProtect's opinion the requested modifications so warrant, ReProtect may state in such written notice that if the modifications are not made, ReProtect would demand an early termination of the provisions of the Agreement set forth in this paragraph IV(f).

If ReProtect demands an early termination, the parties will have a three month period to negotiate in good faith with a view to resolving the issues raised by ReProtect. If at the end of such three month period, the issues have not been resolved to ReProtect's satisfaction, ReProtect may give Ultrafem written notice that it is terminating the provisions of the Agreement set forth below effective on the 90th day following the date of this second written notice. If ReProtect gives the notice referred to in the preceding sentence, the following provisions of the Agreement shall, from and after the 90th day following the date of such notice, no longer be applicable (except as set forth below): paragraphs I(a)(i); I(b)(i); I(e); I(h); II; III; V; VI(a); VI(b); VI(c); VI(d); VI(i); and VII(h). In addition, if ReProtect gives such second written notice, notwithstanding anything to the contrary contained herein, (i) any Options granted pursuant to paragraphs I(b) and I(e) hereof which are not exercisable on the date of such notice shall expire and be canceled and (ii) the "Non Competition Period" for all products and activities other than Competitive Products (as defined below) shall end at the later to occur of (x) two years after the ninetieth day after such second written notice and (y) the tenth anniversary of the First Payment Date. The Non Competition Period for Competitive Products shall be as provided in paragraph VI(e) below.

If the provisions of the Agreement set forth above are terminated pursuant to this paragraph IV(f): (i) ReProtect shall continue to comply after the date of termination with paragraph VI(d) with respect to all intellectual property that is co-owned by ReProtect and Ultrafem or licensed to Ultrafem hereunder; (ii) ReProtect shall supply Ultrafem with all data that was produced or developed by ReProtect or that ReProtect has the right to use in respect of projects included in the Budget and with respect to which some funds have been expended which exists at the date of termination; (iii) paragraph VI(b) shall continue to apply for a period of six months following the date of termination; and (iv) the parties shall cooperate toward achieving a smooth transition.

172

(g)    Upon termination of this Agreement whether at the end of the Term or otherwise, each of Ultrafem and ReProtect shall have the right to develop and exploit, commercially or otherwise, all intellectual property in which they own an undivided one-half interest without any obligation to compensate the other for such development and/or exploitation, provided, however, that nothing in this sentence is intended to or shall diminish the parties' obligations pursuant to this Agreement which by their terms survive such termination, including without limitation, the licenses granted hereunder and the non-competition agreements contained herein.

## V.    _RIGHTS OF FIRST NEGOTIATION_

(a)    In the event that during the Term, ReProtect desires to pursue commercial development of a product, invention or technology intended for vaginal use and which ReProtect in good faith believes is capable of commercial development, ReProtect shall notify Ultrafem of ReProtect's intention to seek to commercially develop such product, invention or technology. Ultrafem shall have the exclusive right for six (6) months from the date of receipt of such notice (accompanied by appropriate reports and documentation) to decide whether or not to pursue commercial development of such product, invention or technology. If during such six (6) month period Ultrafem determines not to seek commercialization of such product, invention or technology, it shall notify ReProtect of its determination. If during such six (6) month period Ultrafem determines to seek commercialization of such product, invention or technology, it shall notify ReProtect of its determination and the parties shall in good faith negotiate an exclusive license (or with respect to certain underdeveloped countries, a non-exclusive license) for such product. Such negotiation shall relate to a license which reflects the commercial value of the concept being considered as well as the structural terms, including, without limitation, the granting of an equity interest and payment of a royalty which the parties have historically found mutually acceptable, such as the Gel License and Cup License granted hereby. If, after six (6) months, the parties cannot agree on the terms of such license, then the terms of such license shall be determined by arbitration in accordance with the procedures set forth in paragraph V(c) below. Such arbitration shall be binding on the parties hereto except that Ultrafem may determine not to enter into a license agreement if the terms of such agreement as determined by the arbitrators are not satisfactory to Ultrafem. If Ultrafem determines not to seek commercialization of such product, invention or technology either during the initial six (6) month period or after the arbitration, ReProtect will be free to pursue commercial development of such product, invention or technology through alternate means, except as provided in paragraph VI(e) hereof, and except that for a six (6) month period following the later of the end of the six (6) month period during which Ultrafem has the right to determine whether or not to seek commercialization of such product, invention or technology, or the end of the arbitration, ReProtect shall not enter into any agreement with respect to such product whose material economic terms are not more favorable to ReProtect than the terms offered by Ultrafem. If ReProtect is entitled to pursue commercial development of a project, invention or technology after complying with, and in accordance with, this paragraph V(A), then Ultrafem shall be deemed to have assigned to ReProtect all of its right, title and interest in such product, invention or technology and shall execute such documents as may be reasonably requested by ReProtect

173

to evidence ReProtect's exclusive right to pursue such commercial development, in each case without any compensation to Ultrafem.

(b)    In the event that during the Term, Ultrafem desires to pursue a research and development activity not covered by this Agreement, Ultrafem shall notify ReProtect of Ultrafem's intention to pursue such activity. ReProtect shall have the exclusive right for ninety (90) days from the date of receipt of such notice (accompanied by appropriate reports and documentation) to decide whether or not to pursue such research and development. If during such ninety (90) day period ReProtect determines to pursue such research and development, it shall notify Ultrafem of its determination and the parties shall in good faith negotiate an exclusive research and development agreement. If, after ninety (90) days, the parties cannot agree on the terms of such agreement, then Ultrafem will be free to pursue such research and development through alternate means, provided that for a ninety (90) day period following the end of the ninety day (90) period referred to earlier in this sentence, Ultrafem shall not enter into any agreement with respect to such research and development whose material economic terms are not more favorable to Ultrafem than the terms offered by ReProtect.

(c)    The following terms shall apply to any arbitration hereunder. A party shall provide written notice of the dispute to the other party and such notice shall contain the appointment of an individual to serve as an arbitrator of the dispute. Within thirty (30) days of its receipt of such notice, the other party shall provide written notice to the first party which notice shall contain the appointment of another individual to serve as an arbitrator of such dispute. Within thirty (30) days of the period described above, the two individuals previously appointed shall mutually select a third individual to serve as an arbitrator of the dispute. In the event that the two (2) designated arbitrators are unable to agree on the third arbitrator, the third arbitrator shall be selected by the senior officer of the American Arbitration Association in New York, New York. The three arbitrators shall then deliver a notice to each of the parties designating the time and place in the United States of the arbitration hearing with respect to the dispute. The decision or order by the arbitrators shall be binding upon the parties hereto and shall be non-appealable in any manner and may be entered into any court of competent jurisdiction. The decision of the arbitrators shall be based on the substantive law of the State of New York without giving effect to the procedural laws or rules or to the principles of conflicts of laws thereof. The arbitrators selected for the purposes of this paragraph shall be independent and unrelated third parties, who have experience in commercial and contractual relations.

VI.    COVENANTS

(a)    Budget. In connection with the performance of its obligations hereunder, commencing with the first month following the date of this Agreement, and no later than December 1 and June 1 during each year of the Term, ReProtect shall deliver to Ultrafem a budget and operating plan for the use and expenditure of the funds payable under paragraph I(b)(i) of this Agreement for the twelve (12) month period commencing with the immediately succeeding January 1 and July 1. In addition, in connection with the performance of its

obligations hereunder, each such budget shall contain a five year business plan for ReProtect for the use and expenditure of funds payable under paragraph I(b)(i) of the Agreement for the five year period beginning with the date referred to in the prior sentence, or for such shorter period as may remain in the Term. Ultrafem shall have thirty (30) days to review and approve the budget. ReProtect shall operate and expend funds in accordance with the budget approved by Ultrafem. To the extent the budget is not approved by the Chief Executive Officer of Ultrafem, ReProtect shall continue to operate and expend funds received under this Agreement in accordance with the last budget which has been so approved. For purposes of this Agreement, the term "Budget" shall mean a budget approved by the Chief Executive Officer of Ultrafem.

The Managing Director of ReProtect shall report to the Chief Executive Officer of Ultrafem. The Managing Director of ReProtect shall meet with the Chief Executive Officer of Ultrafem at least once every three (3) months during the term. Such meetings shall be scheduled on the first business day of each of January, April, July and October, respectively, for a meeting to convene within ten (10) days thereafter. ReProtect shall furnish to Ultrafem at least once every three months a detailed report of the actual uses of the funds provided to ReProtect under this Agreement, provided that not more than 15% of such funds may be used by ReProtect as a "non-accountable" allowance. Such report shall contain the following four columns: "Actual expenditures for the prior three months (shown on a month by month basis);" "Projected expenditures for the prior three months (shown on a month by month basis) as reflected in the budget;" "Actual expenditures for the twelve months ended on the last day of the prior month;" and "Projected expenditures for the preceding twelve months ended on the last day of the prior month as reflected in the budget." ReProtect shall provide Ultrafem with such additional information and documentation as Ultrafem shall reasonably request, including, without limitation, such additional financial information as the Chief Financial Officer of Ultrafem shall request, consistent with Ultrafem's obligations as a public company (or a company seeking to become a public company).

(b)    Access and Audit.  Ultrafem, through its employees, consultants or other representatives, shall have the right during normal business hours to inspect and audit ReProtect's operations to determine whether or not ReProtect is complying in all respects with its obligations hereunder. Ultrafem warrants that all such inspections and audits shall be carried out in a manner calculated not to unreasonably interfere with ReProtect's conduct of business and to ensure the continued confidentiality of ReProtect's business and technical information. Further, Ultrafem agrees to comply with all of ReProtect's safety and security requirements during any visits. Appropriate employees or representatives of Ultrafem shall have the right periodically and upon reasonable advance notice to audit the books and records of ReProtect that relate in any fashion to the provision by ReProtect of services hereunder. ReProtect will provide copies of all relevant documentation and appropriate ReProtect personnel will be made available to answer questions and provide information in connection with any such audit.

(c)    Research and Development.  ReProtect hereby covenants and agrees to take all necessary steps to ensure that it has the equipment, instrumentation, resources and trained personnel to conduct research and development in accordance with the terms hereof. ReProtect

shall be responsible for all processes, cleaning and methods of validation, stability studies toxicity and biocompatibility tests or other tests and procedures in developing products and applications in accordance with the terms hereof. ReProtect shall ensure that all procedures and testing performed which may be used to obtain regulatory approval comply with applicable good laboratory practice regulations. ReProtect shall maintain complete and accurate documentation of all validation data, stability testing data, quality control and toxicity and biocompatibility testing and any other data required for the research and development of the Feminine Cup and Acidic Buffer. ReProtect shall promptly disclose to Ultrafem all new inventions or product applications which arise out of ReProtect's activities pursuant to paragraph I(a) of this Agreement or which may be used with the Feminine Cup or Acidic Buffer, and shall provide Ultrafem, at Ultrafem's request, accurate and complete copies of all notes, data, and other information relating to such developments, inventions or product applications. ReProtect acknowledges that Ultrafem intends to file applications with domestic and foreign authorities, including, without limitation, the Food and Drug Administration, and that all notes, reports, data and other information provided by ReProtect may be used in such applications. ReProtect shall provide Ultrafem with all notes, reports, data and other information reasonably requested by Ultrafem in connection with any such application. ReProtect may utilize subcontractors in performing certain trials, tests and procedures with respect to one or more products provided that it shall be the responsibility of ReProtect to ensure that such subcontractors comply with the requirements of this Agreement.

(d)    Patent Filings. ReProtect agrees that it will file and maintain (or cause JHU to file and maintain) all United States or foreign patents for all products, processes, technologies and inventions licensed to Ultrafem under this Agreement. ReProtect shall bear all expenses of such filings and maintenance provided however that Ultrafem shall pay one-half of such expenses if Ultrafem is the one-half owner of such patent. ReProtect shall notify Ultrafem at least thirty (30) days prior to the making of any filing with respect to any patent covering a product licensed to Ultrafem under this Agreement and shall give Ultrafem a period of at least 20 days to review and comment on any such filing before such filing is made. ReProtect shall provide Ultrafem promptly with all correspondence, notices, office actions and applications with the United States Patent and Trademark Office and any foreign patent office relating to any intellectual property licensed by Ultrafem hereunder or co-owned by ReProtect and Ultrafem. The foregoing sentence shall apply to, without limitation, any application for the Acidic Buffer.

(e)    Non-Competition. Each of ReProtect and the employees who are signatories hereto (the "Employees") agree that during the Non-Competition Period (as defined below), it, he or she shall not, except with respect to and to the extent provided under Permitted Exceptions (as defined below), directly or indirectly (whether as an officer, director, executive, employee, representative, agent, licensor or consultant, or through the acquisition of an equity interest or by making a loan or advance to any entity or otherwise) assist, participate or engage in the marketing of any vaginal product which is competitive with, (i) any vaginal product which Ultrafem is then marketing or (ii) any vaginal product which Ultrafem has the right (or an option to obtain the right) to market and with respect to which an application for Phase I clinical trials has been submitted to the FDA (or an equivalent submission has been made or clinical trials

176

have begun in any other jurisdiction), in any geographic area in which any of Ultrafem's products are then being marketed. The parties confirm their belief that the provisions of this paragraph are reasonable and necessary to protect the competitive position of the parties in view of the nature of this Agreement.

The term "Non-Competition Period" means the period beginning with the date hereof and ending (i) upon the complete termination of this Agreement pursuant to paragraph IV(b) or (c) hereof, if such termination occurs prior to the first anniversary of the date hereof; (ii) one year after termination of this Agreement pursuant to paragraph IV(b) or (c) hereof if such termination occurs on or after the first anniversary of the date hereof but prior to the second anniversary of the date hereof; and (iii) two years after the earlier of the end of the Term or after termination of this Agreement pursuant to paragraph IV(b) or (c) hereof, if such termination occurs on or after the second anniversary of the date hereof; provided, however, that, with respect to a Competitive Product (as defined below) the Non-Competition Period shall end on the latest to occur of (i) the dates set forth in the foregoing sentence; and (ii) the date Ultrafem does not have any obligation to pay any royalties pursuant to either paragraph I(b) or paragraph I(c). The term "Competitive Product" means any vaginal product which utilizes the Acidic Buffer or any component thereof, including, without limitation, the Gel (with or without a device), whose purpose is contraception, protection or prevention of STDs (including AIDS), or as therapy for treating and/or preventing vaginal yeast or bacterial vaginosis, provided, however, that the term "Competitive Product" shall not include a product which is marketed primarily to a male market even though such product can also be applied externally to the vaginal area.

The following are Permitted Exceptions:

(1)    If ReProtect terminates the license of a particular product granted by this Agreement pursuant to paragraph IV(e)(1) hereof, then the marketing of the Gel (without a vaginal device other than an applicator) to be used for the same application as was contemplated by the trial which Ultrafem failed to fund shall not be prohibited by this paragraph VI.

(2)    If ReProtect terminates the license of a particular product granted by this Agreement pursuant to paragraph IV(e)(2) hereof, then the marketing of the Gel without a vaginal device, other than an applicator, for the same application as is contemplated by said paragraph IV(e)(2) shall not be prohibited by this paragraph VI.

(3)    The marketing of a product (other than a Competitive Product) which is subject to paragraph V(a) of this Agreement and with respect to which ReProtect complied with the terms of said paragraph V(a) but Ultrafem determined not to seek commercialization or with respect to which Ultrafem determined not to enter into a license agreement after receiving the determination of the arbitrators in accordance with said paragraph V(a).

13/3788-0/REPROTEC.2071/QA Ultrafem #2
K.L.L.:dk:bb:dr:-02/08/96 (Thu) 10:28am                - 16 -

177

(4)    The marketing of a Competitive Product which is subject to paragraph V(a) of this Agreement and with respect to which ReProtect complied with the terms of said paragraph V(a) but Ultrafem determined not to enter into a license agreement after receiving the final determination of the arbitrators regarding the terms of the license agreement as contemplated by paragraph V(a).

(5)    The marketing of the Gel (without the Feminine Cup or other vaginal device) in countries where the license granted by paragraph I(a)(iii) is non-exclusive.

If ReProtect or an Employee breaches, or threatens to commit a breach of, this paragraph VI(e) (the "Restrictive Covenants"), Ultrafem shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Ultrafem under law or in equity:  (A) the right and remedy to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Restrictive Covenants would cause irreparable injury to Ultrafem and that money damages would not provide an adequate remedy to Ultrafem and (b) the right and remedy to require the person that violates the Restrictive Covenant to account for and pay over to Ultrafem all compensation, profits, monies, accruals, increments or other benefits derived or received by such person as the result of any action constituting a breach of the Restrictive Covenants.

Each of ReProtect and the Employees acknowledges and agrees that the Restrictive Covenants are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any of the Restrictive Covenants, or any part thereof, are invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect without regard to the invalid portions. If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration or geographical scope of such provision, such court shall have the power to reduce the duration or scope of such provision, as the case may be, and, in its reduced form, such provision shall then be enforceable. Ultrafem, ReProtect and each Employee intend to and hereby confer jurisdiction to enforce the Restrictive Covenants upon the courts of any jurisdiction within the geographical scope of such Restrictive Covenants. If the courts of any one or more of such jurisdictions hold the Restrictive Covenants unenforceable by reason of the breadth of such scope or otherwise, it is the intention of such parties that such determination not bar or in any way affect the right of Ultrafem or any successor thereto to the relief provided above in the courts of any other jurisdiction within the geographical scope of such Restrictive Covenants, as to breaches of such Restrictive Covenants in such other respective jurisdictions, such Restrictive Covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

(f)    Confidentiality.  Each of ReProtect, the Employees and Ultrafem shall maintain in confidence and not use or disclose to any third party, except for scientific publication as contemplated by the Research Agreement annexed as Exhibit III hereto, and except as is specifically contemplated herein or is otherwise necessary to perform their respective obligations under this Agreement, and then only on a confidential basis, any information, including without limitation business and technical information, experience or data regarding any facility,

programs, laboratories, processes, products, costs, equipment operation or customers, relating to the services performed pursuant to or in connection with this Agreement. Nothing herein shall prevent any party from disclosing any information required to be disclosed by law or from disclosing information which (i) has been published or has become part of the public domain other than by acts, omissions or fault of such party, (ii) was lawfully received by such party from a third party free of any obligation of confidentiality to such third party, or (iii) which such party can demonstrate was already in its possession prior to receipt thereof, directly or indirectly, from the other party.

(g)     Insurance. Ultrafem shall at all times during the term hereof maintain general liability insurance, including products liability for all products marketed by Ultrafem. From and after the date that Ultrafem commences marketing of a product which is covered by a license granted hereunder, such insurance shall have coverage applying anywhere in the world that Ultrafem markets such product regardless of where a claim is filed, and shall name ReProtect as an additional insured. Ultrafem shall furnish certificates of insurance evidencing the foregoing coverage as and when reasonably requested by ReProtect.

(h)     Sufficient Number of Shares. Ultrafem further covenants and agrees that it shall at all times have authorized and reserved, free from pre-emptive rights, a sufficient number of shares of its Common Stock to provide for the exercise of the options granted pursuant to this Agreement.

(i) '   Clinical Trials. Without limiting the parties obligations hereunder, except as otherwise provided below, the parties agree that ReProtect shall be responsible for preparing the protocols and dealing with the FDA with respect to trials of applications of the Acidic Buffer without the Feminine Cup or other vaginal device (except an applicator). ReProtect shall keep Ultrafem fully informed with respect to, and Ultrafem shall have the right to review and comment on, all such submissions and dealings. Notwithstanding the foregoing, Ultrafem shall have the right to choose the manufacturers, packaging, suppliers and make all other decisions regarding the marketing of any such product, subject to applicable laws and regulations, and ReProtect shall not in any way obligate Ultrafem with respect to such marketing except as expressly provided herein with respect to the marketing of the Gel in a multiple application tube. Without limiting the parties obligations hereunder, the parties agree that they shall be jointly responsible for preparing the protocols and dealing with the FDA with respect to trials of applications of the Feminine Cup (and/or trials of applications of the Gel without the Feminine Cup or other vaginal device (except an applicator) which are being funded in whole or in part by Ultrafem), provided however that Ultrafem shall have the right to choose the manufacturers, packaging, suppliers and make all other decisions regarding marketing of any such product, subject to applicable laws and regulations.

179

## VII.    _REPRESENTATIONS AND WARRANTIES OF REPROTECT_

RePpotect hereby represents and warrants to Ultrafem:

(a)    Organization; Authority; Enforceability. RePpotect is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Maryland and has all requisite and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by RePpotect, has been duly authorized by all necessary action, and when this Agreement becomes the legal and valid obligation of Ultrafem in accordance with paragraph VIII(a), it will constitute the legal, valid and binding obligation of RePpotect enforceable in accordance with its terms.

(b)    No Conflict or Breach. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of the terms hereof, will not (i) constitute, with or without the giving of notice or passage of time, or both, a breach of any of the terms or provisions of, or a default under any agreement, indenture or other instrument to which RePpotect is a party or by which it or any of its property is bound, (ii) cause, or give any person grounds to cause, with or without the giving of notice or passage of time, or both, the maturity of any material liability or obligation of RePpotect to be accelerated, increased or otherwise affected, or (iii) conflict with RePpotect's Articles of Organization or Operating Agreement, or equivalent organizational documents, or any judgment, decree, order or award of any court, governmental body or arbitrator binding upon RePpotect, or any law, rule, or regulation applicable to it.

(c)    Approvals. No consent, action, approval or authorization prescribed by any law, rule or regulation, or by any agreement to which RePpotect is a party, is required in order to permit the consummation of the transactions contemplated by this Agreement.

(d)    No Legal Bar. RePpotect is not prohibited by any order, writ, injunction or decree from consummating the transactions contemplated by this Agreement, and no action or proceeding is pending or, to the best of RePpotect's knowledge, threatened against RePpotect which questions the validity of this Agreement or any of the actions which the parties hereto have taken in connection herewith or which it is contemplated they shall take in connection herewith.

(e)    Finder. RePpotect has taken no action and has not dealt with any person in any manner which will result in any liability to RePpotect to pay any brokerage fees or commissions or finder's fees with respect to this Agreement or the transactions contemplated hereby.

(f)    Exercise of Options; Registration Statement. RePpotect is purchasing the options granted herein for its own account, for investment purposes only, and not for the account of any other entity, and not with a view to distribution, assignment or resale to others or to fractionalization. RePpotect shall not sell, assign, hypothecate or otherwise transfer the options, other than pursuant to an exemption from the registration requirements of the Securities Act of

1933, as amended. Ultrafem may request, as a condition to any such transfer, a written opinion of counsel, satisfactory to Ultrafem and its counsel, to the effect that the proposed disposition is exempt from such registration requirements. ReProtect has carefully considered and has, to the extent it believes such discussion necessary, discussed with its legal, tax and financial advisers the suitability of an investment in Ultrafem for its particular tax and financial situation, and ReProtect has determined that the receipt of the options is a suitable investment.

ReProtect hereby agrees that for a period of 18 months after the effective date of a registration statement relating to Ultrafem's initial public offering, ReProtect will not offer, sell, contract to sell, grant any option for the sale of, or otherwise dispose of, directly or indirectly, any shares of Common Stock of Ultrafem, or securities convertible into or exercisable or exchangeable for shares of Common Stock or other securities of Ultrafem, held by ReProtect as of such effective date without Ultrafem's prior written consent; provided, however, that ReProtect may (a) offer, sell, contract to sell, grant an option for the sale of, or otherwise dispose of all or any part of its shares of Common Stock or other such security or instrument of Ultrafem during such period if such transaction is private in nature and the transferee of such shares of Common Stock or other securities or instruments agrees, prior to such transaction, to be bound by all of the provisions of paragraph VII(f) of this Agreement; and (b) sell or otherwise dispose of any shares of Ultrafem Common Stock purchased in the open market subsequent to the commencement of Ultrafem's initial public offering.

Ultrafem shall use its best efforts to file with the Securities and Exchange Commission and have declared effective a Registration Statement on Form S-8 (or similar form) covering the issuance of Ultrafem shares of Common Stock which do not contain a "restricted securities" legend upon the exercise of the options granted pursuant to paragraphs I(b)(ii) and I(b)(iii) of this Agreement (the "Registrable Securities") or, alternatively a Registration Statement on a Form S-3 (or other applicable form) covering the resale by the holders thereof of the shares of Common Stock issued upon exercise of such options. ReProtect shall notify Ultrafem in writing no later than the first anniversary of the First Payment Date of whether it desires that Ultrafem file a Registration Statement on Form S-8 or on Form S-3. In the event ReProtect does not duly give such notice, Ultrafem shall choose the applicable form of registration statement but if ReProtect gives such notice in a timely fashion Ultrafem shall file the form chosen by ReProtect. Such filing shall be made no later than 18 months after the effective date of a registration statement with respect to Ultrafem's initial public offering of Common Stock. Ultrafem shall use its best efforts to maintain the effectiveness of such Registration Statement until the first anniversary of the expiration of the Term.

After the completion by Ultrafem of an initial public offering, and so long as there is no effective registration statement covering the issuance or resale of the Registrable Securities, if Ultrafem proposes to register any of its securities under the Securities Act of 1933, as amended (the "Securities Act") (other than by a registration on Form S-4 or S-8 or any successor or similar forms) it will, each such time, give prompt written notice (at least 20 business days before the proposed registration) to all holders ("Holders") of Registrable Securities of its intention to do so. Upon the written request of any such Holder, made within 15 business days

- 20 -

181

after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Holder and the intended method of disposition thereof), Ultrafem will use its best efforts to effect the registration under the Securities Act of all such Registrable Securities, to the extent required to permit the disposition (in accordance with the intended methods thereof) of the Registrable Securities so to be registered; provided, however, that if at any time after giving written notice of its intention to register securities and before the effective date of the related registration statement Ultrafem determines for any reason not to register or to delay registration of such securities, Ultrafem may, at its election, give written notice of such determination to each Holder and, (x) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such registration, and (y) in the case of a determination to delay registering, shall be permitted to delay registering any Registrable Securities, for the same period as the delay in registering such other securities. Ultrafem will pay all registration expenses in connection with each registration of Registrable Securities requested pursuant to the terms hereof, excluding any fees or disbursements of counsel to the Holders and excluding underwriting discounts and commissions in respect of the sale of the Registrable Securities, if any.

Notwithstanding anything in this Agreement to the contrary, Ultrafem shall be entitled to postpone for a reasonable period of time (but not exceeding 180 days) the filing or effectiveness of any registration statement otherwise required to be prepared and filed by it pursuant to this paragraph (f) if Ultrafem determines, in its sole discretion, that (x) Ultrafem is in possession of material information that has not yet been disclosed to the public and Ultrafem deems it to be advisable not to disclose such information at such time in a registration statement, (y) such registration and offering would adversely affect any financing, acquisition, corporate reorganization, acquisition by Ultrafem of any of its securities (under Rule 10b-6 or otherwise) or other material transaction involving Ultrafem or any of its Affiliates (as defined in the rules and regulation adopted under the Securities Exchange Act of 1934, as amended), or (z) Ultrafem is subject to an underwriter's lock-up and, in any such case Ultrafem gives the Holders written notice of such determination and an approximation of the anticipated delay.

If a requested registration pursuant to this paragraph VII(f) above, involves an underwritten offering (on a firm commitment basis), and the managing underwriter(s) advises Ultrafem in writing (with a copy provided to each holder of Registrable Securities requesting registration) that, in its opinion, the number of Registrable Securities and other securities requested to be included in such registration including shares of Common Stock of holders who have incidental registration rights pursuant to other agreements with Ultrafem ("Other Shares") exceeds the number which can be sold in such offering (within a price range acceptable to Ultrafem), then Ultrafem will include in such registration, to the extent of the number which Ultrafem is so advised can be sold in such offering, first, all securities proposed by Ultrafem to be sold for its own account, second, any securities which, as of the date of the execution of this Agreement, have, by their terms, a priority with respect to incidental registration rights, third, the Registrable Securities and Other Shares of holders who are entitled to registration at the same time as the Registrable Securities, pro rata among all holders requesting registration on the basis of the total number of shares beneficially owned by such holders and fourth, other

182

securities requested to be included in such registration *pro rata* among all such holders of Common Stock requesting registration on the basis of the total number of shares owned by such holders of Common Stock.

Ultrafem may require each seller of Registrable Securities as to which any registration is being effected to furnish Ultrafem such information regarding such seller and the distribution of such securities as Ultrafem may from time to time reasonably request in writing.

Ultrafem will, as soon as practicable notify each seller of Registrable Securities covered by such registration statement, when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made, and, at the request of any such seller, promptly prepare and file with the Commission and furnish to such seller a reasonable number of copies of any supplement or amendment as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they are made. Each Holder agrees by acquisition of such Registrable Securities that, upon receipt of any notice from Ultrafem of the happening of any event of the kind described in this subparagraph, such Holder will forthwith discontinue such Holder's disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus contemplated hereby and, if so directed by Ultrafem, will deliver to Ultrafem (at Ultrafem's expense) all copies, other than permanent file copies, then in such Holder's possession of the prospectus relating to such Registrable Securities current at the time of receipt of such notice.

The indemnification and contribution provisions annexed as Exhibit VII(f) hereto are hereby incorporated by reference herein.

(g)    Patent Disclosure.  Prior to the date hereof, ReProtect has furnished to Ultrafem true, complete and correct copies of the patent application of the Acidic Buffer entitled "A Device and Method for Acid Buffering;" and all correspondence of any nature whatsoever (including without limitation patent office actions) between the United States Patent Office and ReProtect or any third party relating to such patent application.

(h)    Rights in Intellectual Property.  ReProtect hereby represents and warrants that ReProtect has exclusive ownership of the patent application for the Acidic Buffer. Each of ReProtect and the Employees hereby represent and warrant that ReProtect has previously supplied to Ultrafem a true correct and complete copy of ReProtect's operating agreement dated as of December 4, 1995, as amended on February 6, 1996, which is and shall remain throughout the Term in full force and effect and is and shall remain throughout the Term the valid and binding obligation of each of the signatories thereto, provided, however, that the signatories

13/3788-07REPROTEC.207/GA Ultrafem #2
XLL:dk;bb:dk.:-02/08/96 (Thu) 10:28am

- 22 -

thereto may amend such agreement without Ultrafem's consent unless such amendment relates to Section 10.4 or the paragraphs, sentences or sections referred to in such Section 10.4 of which Ultrafem is a third party beneficiary, in which event Ultrafem's prior written consent to the amendment shall be required. In addition, ReProtect and the Employees agree that a change of control of ReProtect by way of merger, sale of substantially all of its assets or otherwise shall require the prior written consent of Ultrafem which consent shall not be unreasonably withheld. To the best of ReProtect's knowledge, there are no claims, demands, or proceedings alleging any infringement in any patents or other intellectual property rights of third parties, or otherwise challenging ReProtect's right to own, use or license the Acidic Buffer. To the best of ReProtect's knowledge, the patent application for the Acidic Buffer has been duly filed in or issued in the United States Patent and Trademark Office and the foreign patent offices listed in Schedule VII(b) hereto in accordance with all applicable provisions of law and administrative regulations applicable in the United States and such jurisdictions, respectively.

## VIII.  REPRESENTATIONS AND WARRANTIES OF ULTRAFEM

Ultrafem hereby represents and warrants to ReProtect:

(a)    Organization: Authority: Enforceability.    Ultrafem is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. At the time Ultrafem obtains the approval of its Board of Directors (which shall be prior to February 29, 1996), this Agreement (including without limitation the options granted hereby) will have been duly executed and delivered by Ultrafem, will have been duly authorized by all necessary corporate action, and will constitute the legal, valid and binding obligation of Ultrafem enforceable in accordance with its terms. In the event Ultrafem does not obtain the approval of its Board of Directors prior to the First Payment Date, this Agreement (including without limitation the options) shall be null and void.

(b)    No Conflict or Breach.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of the terms hereof, will not (i) constitute, with or without the giving of notice or passage of time, or both, a breach of any of the terms or provisions of, or a default under any agreement, indenture or other instrument to which Ultrafem is a party or by which it or any of its property is bound, (ii) cause, or give any person grounds to cause, with or without the giving of notice or passage of time, or both, the maturity of any material liability or obligation of Ultrafem to be accelerated, increased or otherwise affected, or (iii) conflict with Ultrafem's Certificate or Incorporation, or By-Laws, or any judgment, decree, order or award of any court, governmental body or arbitrator binding upon Ultrafem, or any law, rule, or regulation applicable to it.

184

(c)    Approvals.  No consent, action, approval or authorization prescribed by any law, rule or regulation, or by any agreement to which Ultrafem is a party, is required in order to permit the consummation of the transactions contemplated by this Agreement.

(d)    No Legal Bar.  Ultrafem is not prohibited by any order, writ, injunction or decree from consummating the transactions contemplated by this Agreement, and no action or proceeding is pending or, to the best of Ultrafem's knowledge, threatened against Ultrafem with questions the validity of this Agreement or any of the actions which the parties hereto have taken in connection herewith or which it is contemplated they shall take in connection herewith.

(e)    Finder.  Ultrafem has taken no action and has not dealt with any person in any manner which will result in any liability to Ultrafem to pay any or finder's fees with respect to this Agreement or the transactions contemplated hereby.

(f)    Shares of Common Stock.  Ultrafem represents and warrants to ReProtect that all shares of Common Stock issuable upon due exercise of the options granted hereunder will, upon issuance in accordance with the terms of the options, be validly issued, fully paid and nonassessable, with no personal liability attaching to the ownership thereof, and free from all taxes, liens and charges with respect to the issue thereof.

(g)    Rights in Intellectual Property.  Ultrafem has exclusive ownership of the Feminine Cup, subject to the rights of the holders of certain secured debt of Ultrafem.  To the best of Ultrafem's knowledge, there are no claims, demands, or proceedings alleging any infringement in any patents or other intellectual property rights of third parties, or otherwise challenging Ultrafem's right to own, use or license the Feminine Cup.  To the best of Ultrafem's knowledge, the patent application for the Feminine Cup has been duly filed in or issued in the United Sates Patent and Trademark Office and the foreign patent offices listed in Schedule VIII(g) hereto in accordance with all applicable provisions of law and administrative regulations applicable in the United States and such jurisdictions, respectively.

(h)    Employee Leaving.  Ultrafem acknowledges that it shall not be deemed a breach of this Agreement by ReProtect if one of the Employees leaves the employ of ReProtect during the Term.

IX.    *INDEMNIFICATION*

(a)    By ReProtect.  ReProtect hereby agrees to indemnify, defend and hold harmless Ultrafem and its officers, directors, employees and affiliates from and against any and all demands, claims, actions, causes of action, assessments, losses, damages, injuries, liabilities, costs and expenses, including without limitation, interest, penalties and reasonable attorneys' fees and expenses (collectively "Damages") asserted against, imposed upon or incurred by Ultrafem or its officers, directors, employees and affiliates, directly or indirectly related to, arising out of or resulting from:

    (i)      any breach of any of the representations and warranties of ReProtect contained herein;

    (ii)    any breach or failure by or on behalf of ReProtect to perform any obligation of ReProtect contained herein; and

    (iii)   any failure of ReProtect, or anyone acting on behalf of ReProtect, to observe or comply with any applicable laws, rules or regulations related in any fashion to ReProtect's performance of its obligations hereunder.

    (b)    **By Ultrafem.**  Ultrafem hereby agrees to indemnify, defend and hold harmless ReProtect and its officers, directors, employees and affiliates from and against any and all Damages asserted against, resulting to, imposed upon or incurred by ReProtect or its officers, directors, employees and affiliates, directly or indirectly related to, arising out of or resulting from:

    (i)      any breach of any of the representations and warranties of Ultrafem contained herein;

    (ii)    any breach or failure by or on behalf of Ultrafem to perform any obligation of Ultrafem contained herein; and

    (iii)   any failure of Ultrafem, or anyone acting on behalf of Ultrafem, to observe or comply with any applicable laws, rules or regulations related in any fashion to Ultrafem's performance of its obligations hereunder;

    (c)    Ultrafem shall indemnify and hold ReProtect harmless from and against all losses, liability and expenses incurred as a result of any claims, suits or causes of action, arising out of death or injury to persons under strict liability relating to a product sold by Ultrafem pursuant to a license granted by this Agreement, from any person, firm or corporation (except that ReProtect shall be solely liable, without indemnity by Ultrafem and shall indemnify Ultrafem, for all losses, liability and expenses incurred as a result of any claim, suit or cause of action to the extent such loss, liability or expense arises from ReProtect's negligence or willful misconduct).

    (d)    A party entitled to indemnification hereunder ("Indemnified Party") will promptly give notice to the other party ("Indemnifying Party") of any claim of a third party which may reasonably be expected to result in a claim for indemnification ("Third Party Claim") by the Indemnified Party.  An Indemnifying Party shall have the right to direct the defense, compromise or settlement of a Third Party Claim with counsel selected by it, provided the Indemnifying Party gives written notice to the Indemnified Party of its election to do so within twenty (20) days after receipt of notice in accordance with the preceding sentence.  If the Indemnifying Party fails to so notify the Indemnified Party of its election to defend a Third Party Claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right

to undertake the defense, compromise or settlement thereof on behalf of and for the account and expense of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such Third Party Claim at any time prior to settlement, compromise or final determination thereof if and only if, in the reasonable judgment of the Indemnified Party, such assumption would not prejudice the defense thereof or the rights of the Indemnified Party. In the event an Indemnifying Party has assumed the defense of any Third Party Claim, the Indemnified Party shall nonetheless have the right to select its own counsel and participate in the defense thereof at and for its own expense and account. Counsel for the Indemnified Party in such circumstances shall consult and cooperate with counsel for the Indemnifying Party in defending against any such Third Party Claim.

(e)    An Indemnifying Party shall not under any circumstances, without the written consent of the Indemnified Party, settle or compromise any Third Party Claim or consent to the entry of any judgment or decree which does not include as an unconditional term thereof the giving by the third party claimant to the Indemnified Party release from all liability in respect of such Third Party Claim.

(f)    All claims for indemnification hereunder shall be made in a written notice setting forth the nature of the claim for indemnification and the type and amount (if known) of relief sought. Both parties agree that no claims for indemnification shall be made hereunder unless the party requesting indemnification shall have a good faith belief that it is entitled to indemnification hereunder. In the event that more than one party is an Indemnified Party in any claim or action, then the Indemnifying Party shall be responsible for the costs and expenses of only one counsel for all Indemnified Parties.

(g)    In the event of acts by a third party which ReProtect or Ultrafem believes constitute an infringement of any patent relating to a product which is co-owned by Ultrafem and ReProtect and which is not licensed by Ultrafem hereunder, Ultrafem or ReProtect may elect to prosecute a suit for infringement after notice to the other of that intention. Each party shall pay one-half of the legal fees and costs of prosecution subject to being reimbursed therefor from any recovery in said suit. Such recovery shall be shared equally by the parties. Notwithstanding anything to the contrary contained in this paragraph, in the event of acts by a third party which ReProtect or Ultrafem believes constitute an infringement of any patent relating to a product which is licensed to Ultrafem hereunder, Ultrafem may in its sole discretion elect to prosecute a suit for infringement. Ultrafem shall be solely responsible for the legal fees and costs of prosecution in any such suit and shall be entitled to any recovery in any such suit. The parties shall fully cooperate with each other in connection with the prosection of any such litigation, including participating therein as plaintiff if so requested by the other party. The parties shall agree on legal counsel, or if they cannot agree, the party electing to prosecute such suit may select legal counsel.

## X.    *MISCELLANEOUS*

(a)    Entire Agreement; Amendments.  This Agreement along with the annexes and exhibits hereto constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, whether oral or written, except that the Confidentiality Agreement dated as of December 5, 1995, between the parties shall continue in full force and effect with respect to ReProtect's patent application and operating agreement.  No modification, amendment or waiver of any provision of this Agreement shall be effective unless in writing and signed by the party or parties against whom enforcement thereof is sought, and any such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)    Specific Performance; Jurisdiction.  ReProtect, the Employees and Ultrafem each acknowledge that the license granted hereunder to Ultrafem is unique and that Ultrafem may have no adequate remedy at law for the failure by ReProtect or the Employees to perform their respective obligations hereunder including, without limitation, the non-competition and confidentiality clauses contained in paragraphs VI(c) and (d) hereof.  Accordingly, each of the parties agrees that in the event of any such failure, Ultrafem shall have the right, in addition to any other rights which it may have at law, in equity or otherwise, to specific performance of any and all of such other party's obligations under this Agreement.  The parties agree that any action for equitable relief to enforce this Agreement or any provision hereof may be brought in any court of competent jurisdiction in the State of New York, and each party hereby consents to personal jurisdiction in any such action and waives any right to contest such jurisdiction on the grounds of forum non conveniens

(c)    Severability.  The invalidity of all or part of any paragraph of this Agreement shall not render invalid the remainder of such paragraph or of this Agreement.  If any provision of this Agreement including, without limitation, the non-competition and confidentiality clauses contained in Paragraphs VI(c) and (d) hereof, is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

(d)    Notices.  Except as otherwise specified herein, all notices, requests, demands, consents and other communications required or permitted to be given or made hereunder, including notice of change of address, shall be in writing and shall be deemed to have been duly given or made when received, and shall be either hand delivered, telexed, faxed or mailed, federal express courier, registered or certified first class mail, postage prepaid, return receipt requested, to the party to whom the same is so given or made as follows:

(i)    if to Ultrafem, to:

Ultrafem, Inc.
500 Fifth Avenue, Suite 3620
New York, New York  10110
Attention:    John Andersen, President

188

and Chief Executive Officer

    (ii)    if to ReProtect, to:

            ReProtect, LLC
            703 Stags Head Road
            Baltimore, Maryland 21286
            Attention:    Richard A. Cone, Managing Director

    (iii)    if to the Employees, to each of their addresses set forth on the signature
    pages hereto.

    (e)    Binding Effect; Benefits; Assignment. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors, permitted assigns, heirs and legal representatives. ReProtect may not assign this Agreement without the prior written consent of Ultrafem, which consent shall not be unreasonably withheld. Ultrafem may not assign this Agreement unless (i) Ultrafem has received the prior written consent of ReProtect, which consent shall not be unreasonably withheld; or (ii) such assignment is to a pharmaceutical or consumer product company with annual gross revenues of $100 million.

    (f)    Headings. The headings of this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

    (g)    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute a single instrument.

    (h)    Governing Law. This Agreement shall be governed by, and construed and interpreted in all respects in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

    (i)    Further Assurances. The parties hereto hereby agree to execute and deliver any further instruments, certificates and documents as may be reasonably requested from it by another party hereto in order to carry out the terms and conditions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered, or have caused this Agreement to be executed and delivered, by their duly authorized representative as of the date above written.

ULTRAFEM, INC.

By_____

      Name:
      Title:

REPROTECT, LLC

By_____

      Name:
      Title:

190

The following employees are signing this Agreement with respect to paragraphs VI(e) and VI(f) and the second and third sentences of paragraph VII(h) only:

Dr. Richard Cone
c/o ReProtect LLC
703 Stags Head Road
Baltimore, Maryland 21286

Dr. Kevin Whaley
c/o ReProtect LLC
703 Stags Head Road
Baltimore, Maryland 21286

Dr. Thomas Moench
c/o ReProtect LLC
703 Stags Head Road
Baltimore, Maryland 21286

191

ANNEX I(b)(ii) TO RESEARCH AND PRODUCT DEVELOPMENT
AGREEMENT BETWEEN REPROTECT, L.C. AND ULTRAFEM, INC.
DATED AS OF FEBRUARY 8, 1996 (THE "AGREEMENT")

This Annex forms a part of the Agreement.. All capitalized terms not herein defined shall have
the same meaning as is ascribed to such term in the Agreement.

The Options shall become exercisable upon the date of the occurrence of certain events as set
forth in, and shall expire to the time set forth in, Paragraph I(b)(ii) of the Agreement. The
Options may be exercised only by delivery by registered or certified mail to Ultrafem at its
principal office of (i) written notice signed by the Option Holder of such exercise in form and
substance identical to Exhibit I attached hereto stating the number of shares of common stock
of Ultrafem ("Options Shares") then being purchased; (ii) payment of the aggregate Exercise
Price, which payment shall be in the form of (a) a certified (unless such certification is waived
by Ultrafem) check payable to the order of Ultrafem, Inc. or cash in the amount of the Exercise
Price for such Option Shares, (b) certificates duly endorsed for transfer (with all transfer taxes
paid or provided for) evidencing a number of shares of Common Stock of Ultrafem of which
the aggregate Fair Market Value (as defined herein) on the date of exercise is equal to the
aggregate Option Exercise Price of the Option Shares being purchased or (c) a combination of
these methods of payment; and (iii) an executed investment letter in form and substance
identical to Exhibit II attached hereto. Delivery of said notice and such documentation shall
constitute an irrevocable election of the Option Holder to purchase the Option Shares specified
in said notice, and the date on which Ultrafem receives said notice and documentation shall be
the date as of which the Option Shares so purchased shall be deemed to have been issued.
Ultrafem shall issue and deliver to the Option Holder a stock certificate or certificates evidencing
the Option Shares so purchased.  The term "Fair Market Value" shall mean (i) if the shares of
Common Stock are listed on a registered securities exchange or quoted on the NASDAQ-
National Market System, the closing price per share of Common Stock on such date (or, if there
was no trading reported on such date, on the next preceding day on which there was trading
reported); (ii) if the shares of Common Stock are not listed on a registered securities exchange
and not quoted on the NASDAQ-National Market System, but the bid and asked prices per share
of Common Stock are provided by NASDAQ, the National Quotation Bureau Incorporated or
any similar organization, the average of the closing bid and asked price per share of Common
Stock on such date (or, if there was no trading in the shares of Common Stock on such date, on
the next preceding day on which there was trading) as provided by such organization; and (iii)
if the shares of Common Stock are not traded on a registered securities exchange and not quoted
on the NASDAQ-National Market System and the bid and asked price per share of the shares
of Common Stock are not provided by NASDAQ, the National Quotation Bureau Incorporated
or any similar organization, as determined by the Board or a committee thereof in good faith.
Any such determination shall be final and binding on the Option Holder and Ultrafem.

The Option Holder agrees not sell, transfer, assign, pledge, hypothecate or otherwise dispose
of any of the Option Shares unless and until all of the following have occurred: (i) the Option

192

Shares are disposed of pursuant to and in conformity with an effective registration statement filed with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Act"), or the Option Holder delivers to Ultrafem a written opinion of counsel, satisfactory to Ultrafem and its counsel, to the effect that the proposed disposition is exempt from the registration and prospectus delivery requirements of the Act; and (ii) the Option Holder delivers to Ultrafem a written opinion of counsel, satisfactory in form and substance to Ultrafem and its counsel, to the effect that the proposed disposition will not result in a violation of the securities laws of any state in the United States applicable to the transaction. Any attempted transfer and breach of this paragraph shall be null and void, and of no force or effect whatsoever.

Subject to any required action by the stockholders of Ultrafem:

(i)    if outstanding shares of Ultrafem's Common Stock (the "Outstanding Shares") shall be divided into a greater number of Outstanding Shares or a dividend in shares of Common Stock shall be paid in respect of shares of Common Stock, the Exercise Price in effect immediately prior to such subdivision or at the record date of such dividend shall, simultaneously with the effectiveness of such subdivision or immediately after the record date of such dividend, be proportionately reduced, and conversely if the Outstanding Shares shall be combined into a smaller number of Outstanding Shares, the Exercise Price in effect immediately prior to such combination shall, simultaneously with the effectiveness of such combination, be proportionately increased;

(ii)   when any adjustment is required to be made in the Exercise Price, the number of Option Shares purchasable upon the exercise of the Option shall be changed and the number determined by dividing (A) an amount equal to the number of Option Shares purchasable on the exercise of the Option immediately prior to such adjustment multiplied by the Exercise Price in effect immediately prior to such adjustment, by (B) the Exercise Price in effect immediately after such adjustment;

(iii)  in case of any capital reorganization, any reclassification of the shares of Common Stock (other than a change in par value or as a result of a stock dividend, subdivision, split up or combination of shares of Common Stock), or a consolidation or merger of Ultrafem with another person where Ultrafem is the surviving corporation (collectively referred to as "Reorganizations"), the Option Holder shall thereafter be entitled to purchase the kind and number of shares of stock or other securities or property of Ultrafem receivable upon such Reorganization by a stockholder holding the number of Option Shares which the Option entitles the Option Holder to purchase from Ultrafem immediately prior to such Reorganization; and in any case appropriate adjustment shall be made in the application of the provisions of this Annex to the end that the provisions set forth herein (including the specified changes and other adjustments to the Exercise

Price) shall thereafter apply to any Option Shares or other property thereafter purchasable upon exercise of the Option;

(iv)    a dissolution or liquidation of Ultrafem, or a merger or consolidation in which Ultrafem is not the surviving corporation, shall cause the Option to terminate. The Option Holder may, in such event, exercise at any time during a ten-day period ending on the fifth day prior to such dissolution or liquidation, or merger or consolidation in which Ultrafem is not the surviving corporation, the Option in whole or in part; provided, however, that if such merger or consolidation is to be consummated in whole or in part by the tender of shares of Common Stock to the surviving corporation, the Option Holder agrees to tender the Option Shares received upon exercise of the Option to the surviving corporation on the same terms and subject to the same conditions as are applicable to other stockholders of Ultrafem who are tendering their shares of Common Stock;

(v)    to the extent that the foregoing adjustments relate to stock or securities of Ultrafem, such adjustments shall be made by the Board of Directors of Ultrafem and its determination shall be final, binding and conclusive;

(vi)    the adjustments described in the foregoing paragraphs (i) through (v) shall constitute the sole and exclusive adjustments to be made to the Option, or the number of or Exercise Price of the Option Shares, with respect to any of the events described in those paragraphs; and

(vii)    the grant of the Option shall not affect in any way the right or power of Ultrafem to make adjustments, reclassification, reorganizations or changes in its capital or business structure, or to merge or consolidate or to dissolve, liquidate or sell or transfer all or any part of its business or assets.

(viii)    For purposes of this Annex, a "Change in Control" of Ultrafem occurs if: (a) any "person" (defined as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing a majority or more of the combined voting power of Ultrafem's Outstanding Shares then entitled to vote for the election of directors; or (b) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of Ultrafem cease for any reason to constitute at least a majority thereof; or (c) Ultrafem shall sell all or substantially all of the assets of Ultrafem or merge with and into another person, where Ultrafem is not the surviving corporation.

In the event of a Change in Control of Ultrafem, the Options shall be immediately exercisable.

The Option Holder represents and agrees by signing the Agreement that if it exercises the Option in whole or in part, it will acquire the Option Shares upon such exercise for the purpose of investment and not with a view to the resale or distribution of the Option Shares, except as permitted by applicable securities laws, and that upon each exercise of the Option it will furnish to Ultrafem a written statement to such effect. The Option Holder agrees that Ultrafem may place on each certificate representing the Option Shares an appropriate legend or legends required by applicable federal and state securities laws.

The Option Holder shall have no rights as a stockholder with respect to the Option Shares until the date of the issuance of a stock certificate or stock certificates evidencing the Option Shares to the Option Holder. Except as set forth in (i) above, no adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property) or distributions or other rights for which the record date is prior to the date such stock certificate is issued.

Anything in the Agreement to the contrary notwithstanding, in no event may the Option be exercisable if Ultrafem shall, at any time and in its sole discretion, determine that (i) the listing, registration or qualification of any shares otherwise deliverable upon such exercise, upon any securities exchange or under any state or federal law, or (ii) the consent or approval of any regulatory body or the satisfaction of withholding tax or other withholding liabilities, is necessary or desirable in connection with such exercise. In such event, such exercise shall be held in abeyance and shall not be effective unless and until such withholding, listing, registration, qualification or approval shall have been effected or obtained free of any conditions not acceptable to Ultrafem in its sole discretion, notwithstanding any termination of any Option or any portion of any Option during the period when exercisability has been suspended.

## EXHIBIT I

### Notice of Exercise
(to be signed only upon exercise of the Option]

TO:   Ultrafem, Inc.

The undersigned, the holder of the within Option, hereby irrevocably elects to exercise the purchase right represented by such Option for, and to purchase thereunder, _____ shares of the Common Stock of Ultrafem, Inc. and herewith makes payment in cash of $_____ therefor or surrenders the enclosed certificates of Common Stock duly endorsed for transfer to Ultrafem, Inc.

Dated:_____

_____
(Signature must conform in all respects to name of holder as specified on the face of the Option)

_____
Address

_____

EXHIBIT II

TO:     Ultrafem, Inc.
        500 Fifth Avenue Suite 3620
        New York, NY 10110

Ladies and Gentlemen:

The undersigned understands that the shares of Common Stock ("Shares") of UltraFem, Inc., a Delaware corporation (the "Company"), that it has today purchased, have not been registered under the Securities Act of 1933, as amended (the "Securities Act").

The undersigned agrees not to sell, transfer, assign, pledge, hypothecate, or otherwise dispose of any or all of the Shares otherwise than in accordance with the terms and provisions of that certain Research and Product Development Agreement dated _____, 1995 between ReProtect, LLC and the Company, the provisions of which are incorporated by reference herein. The undersigned agrees that the Company may issue stop transfer instructions to its transfer agent with respect to the Shares to the effect that there are restrictions on transfer as described above.

The undersigned understands that there is no market for the Shares and there may never be a market for the Shares, and that even if a market develops for the Shares, as a result of the foregoing restrictions on transfer and the undersigned's representations and warranties hereunder and under the aforementioned Agreement, the undersigned may never be able to sell or dispose of the Shares and may thus have to bear the risk of its investment in the Shares for a substantial period of time, or forever.

The undersigned further agrees to indemnify and hold the Company harmless at all times from and against any and all claims, actions, demands, liabilities, losses, damages, costs and expenses incurred by the Company as a result of the sale, transfer, assignment, pledge, hypothecation or other disposition by the undersigned of any or all of the Shares in violation of this letter, the aforementioned Agreement, the Securities Act, or any other applicable law.

Very truly yours,

_____

197

## Exhibit VII(f)

(a)    Subject to the conditions set forth below, Ultrafem agrees to indemnify and hold harmless each Holder of Registrable Securities (a "Eligible Holder"), its officers, directors, partners, employees and agents, and each person, if any, who controls any such person within the meaning of Section 15 of the Act or Section 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all loss, liability, charge, claim, damage, and expense whatsoever (which shall include, for all purposes of this Section 10, without limitation, attorneys' fees and any and all expense whatsoever incurred in investigating, preparing, or defending against any litigation, commenced or threatened, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation), as and when incurred, arising out of, based upon, or in connection with, (i) any untrue statement or alleged untrue statement of a material fact contained in (A) any registration statement, preliminary prospectus, or final prospectus (as from time to time amended and supplemented), or any amendment or supplement thereto, relating to the offer and sale of any of the Registrable Securities, or (B) any application or other document or communication (in this Section 10, referred to collectively as an "application") executed by, or on behalf of, Ultrafem or based upon written information furnished by, or on behalf of, Ultrafem filed in any jurisdiction in order to register or qualify any of the Registrable Securities under the securities or "blue sky" laws thereof or filed with the Commission or any securities exchange; or any omission alleged omission to a state a material fact required to be stated therein or necessary to make the statements therein not misleading, unless such statement or omission was made in reliance upon, and in conformity with, written information furnished to Ultrafem with respect to such Eligible Holder by, or on behalf of, such person expressly for inclusion in any registration statement, preliminary prospectus or final prospectus, or any amendment or supplement thereto, or in any application, as the case may be, or (ii) any breach of any representation, warranty, covenant, or agreement of Ultrafem contained in this Exhibit or paragraph VII(f) of the Agreement. The foregoing agreement to indemnify shall be in addition to any liability Ultrafem may otherwise have, including liabilities arising under this Exhibit or paragraph VII(f) of the Agreement.

If any action is brought against any Eligible Holder or any of its officers, directors, partners, employees or agents, or any controlling persons of such person (an "indemnified party") in respect of which indemnity may be sought against Ultrafem pursuant to the foregoing paragraph, such indemnified party or parties shall promptly notify Ultrafem in writing of the institution of such action (but the failure so to notify shall not relieve Ultrafem from any liability other than pursuant to this paragraph (a) and Ultrafem shall promptly assume the defense of such action, including, without limitation, the employment of counsel reasonably satisfactory to such indemnified party or parties, and payment of expenses. Such indemnified party or parties shall have the right to employ its or their own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of such indemnified party or parties unless the employment of such counsel shall have been authorized in writing by Ultrafem in connection with the defense of such action or shall not have promptly employed counsel reasonably satisfactory to such indemnified party or parties to have charge of the defense of such action or the named parties

to such action including both the indemnified and the indemnifying parties and such indemnified party or parties shall have reasonably concluded that there may be one or more legal defenses available to it or them or to other indemnified parties which are different from, or in addition to, those available to Ultrafem, in any of which events such fees and expenses shall be borne by Ultrafem and Ultrafem shall not have the right to direct the defense of such action on behalf of the indemnified party or parties. Anything in this paragraph (a) to the contrary notwithstanding, Ultrafem shall not be liable for any settlement of any such claim or action effected without its written consent. Ultrafem shall not, without the prior written consent of each indemnified party that is not released as described in this sentence, settle or compromise any action, or permit a default or consent to the entry of judgment in, or otherwise seek to terminate, any pending or threatened action, in respect of which indemnity may be sought hereunder (whether or not any indemnified party is a party thereto), unless such settlement, compromise, consent, or termination includes an unconditional release of each indemnified party from all liability in respect of such action. Ultrafem agrees promptly to notify the Eligible Holders of the commencement of any litigation or proceedings against Ultrafem or any of its officers or directors in connection with the sale of any Registrable Securities or any preliminary prospectus, prospectus, registration statement, or amendment or supplement thereto, or any application relating to any sale of any Registrable Securities.

(b)     Each Eligible Holder severally agrees to indemnify and hold harmless Ultrafem, each director of Ultrafem, each officer of Ultrafem who shall have signed any registration statement covering Registrable Securities held by such Eligible Holder and each other person, if any, who controls Ultrafem within the meaning of Section 15 of the Act or Section 20(a) of the Exchange Act, to the same extent as the foregoing indemnity from Ultrafem to the Eligible Holders in paragraph (a), but only with respect to statements or omissions, if any, made in any registration statement, preliminary prospectus, or final prospectus (as from time to time amended and supplemented), or any amendment or supplement thereto, or in any application, in reliance upon, and in conformity with, written information furnished to Ultrafem with respect to any Eligible Holder by, or on behalf of, such Eligible Holder expressly for inclusion in any such registration statement, preliminary prospectus, or final prospectus, or any amendment or supplement thereto, or in any application, as the case may be. If any action shall be brought against Ultrafem or any other person so indemnified based on any such registration statement, preliminary prospectus, or final prospectus, or any amendment or supplement thereto, or any application, and in respect of which indemnity may be sought against any Eligible Holder pursuant to this paragraph (b), such Eligible Holder shall have the rights and duties given to Ultrafem, and Ultrafem and each other person so indemnified shall have the rights and duties given to the indemnified parties, by the provisions of paragraph (a).

(c)     To provide for just and equitable contribution, if (i) an indemnified party makes a claim for indemnification pursuant to paragraph (a) or (b) (subject to the limitations thereof), but it is found in a final judicial determination, not subject to further appeal, that such indemnification may not be enforced in such case, or (ii) any indemnified or indemnifying party seeks contribution under the Act, the Exchange Act, or otherwise, then Ultrafem (including for this purpose any contribution made by, or on behalf of, any director of Ultrafem, any officer

of Ultrafem who signed any such registration statement, and any controlling person of Ultrafem), as one entity, and the Eligible Holders of the Registrable Securities included in such registration in the aggregate (including for this purpose any contribution by, or on behalf of, an indemnified party ), as a second entity, shall contribute to the losses, liabilities, claims, damages, and expenses whatsoever to which any of them may be subject, on the basis of relevant equitable considerations such as the relative fault of Ultrafem and such Eligible Holder in connection with the facts which resulted in such losses, liabilities, claims, damages, and expenses. The relative fault, in the case of an untrue statement, alleged untrue statement, omission, or alleged omission, shall be determined by, among other things, whether such statement, alleged statement, omission, or alleged omission relates to information supplied by Ultrafem or by such Eligible Holders, and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement, alleged statement, omission, or alleged omission. Ultrafem and the Eligible Holders agree that it would be unjust and inequitable if the respective obligations of Ultrafem and the Eligible Holders for contribution were determined by pro rata or per capita allocation of the aggregate losses, liabilities, claims, damages, and expenses (even if the Eligible Holders and the other indemnified parties were treated as one entity for such purpose) or by any other method of allocation that does not reflect the equitable considerations referred to in this paragraph (c). In no case shall any Eligible Holder be responsible for a portion of the contribution obligation imposed on all Eligible Holders in excess of its pro rata share based on the number of shares of Common Stock owned (or which would be owned upon exercise of all Registrable Securities) by it and included in such registration as compared to the number of shares of Common Stock owned (or which would be owned upon exercise of all Registrable Securities) by all Eligible Holders and included in such registration. No person guilty of a fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who is not guilty of such fraudulent misrepresentation. For purposes of this paragraph (c), each person, if any, who controls any Eligible Holder within the meaning of Section 15 of the Act or Section 20(a) of the Exchange Act and each officer, director, partner, employee and agent of each such Eligible Holder or control person shall have the same rights to contribution as such Eligible Holder or control person and each person, if any, who controls Ultrafem within the meaning of Section 15 of the Act or Section 20(a) of the Exchange Act, each officer of Ultrafem who shall have signed any such registration statement and each director of Ultrafem shall have the same rights to contribution as Ultrafem, subject in each case to the provisions of this paragraph (c). Anything in this paragraph (c) to the contrary notwithstanding, no party shall be liable for contribution with respect to the settlement of any claim or action effected without its written consent. This paragraph (c) is intended to supersede any right to contribution under the Act, the Exchange Act, or otherwise.

Schedule 1(a)(iii)

| | | |
|---|---|---|
| Burundi | The Gambia | Micronesia, Fed. Sts. |
| Comoros | Ghana | Mongolia |
| Ethiopia | Guinea | Papua New Guinea |
| Kenya | Guinea-Bissau | Phillipines |
| Lesotho | Liberia | Thailand |
| Madagascar | Mali | Tonga |
| Malawi | Mauritania | Vanuatu |
| Mozambique | Niger | Western Samoa |
| Rwanda | Nigeria | Afghanistan |
| Somalia | São Torné and Principe | Bangladesh |
| Sudan | Sierra Leone | Bhutan |
| Tanzania | Togo | India |
| Uganda | Cameroon | Maldives |
| Zaire | Cape Verde | Nepal |
| Zambia | Congo | Pakistan |
| Zimbabwe | Côte d'Ivoire | Sri Lanka |
| Angola | Senegal | Yemen |
| Djibouti | Cambodia | Egypt, Arab Rep. |
| Mauritius | Indonesia | Guyana |
| Namibia | Lao PDR | Haiti |
| Swaziland | Myanmar | Honduras |
| Benin | Solomon Islands | Nicaragua |
| Burkina Faso | Fiji | |
| Central African Rep. | Kiribati | |
| Chad | Marshall Islands | |
| Equatorial Guinea | | |

201

Schedule VII(h)

## U.S. AND FOREIGN PATENT APPLICATIONS

United States:

| Serial No. | Title | Filing Date |
|---|---|---|
| 08/266,777 | A Device and a Method for Acidic Buffering | June 29,1994 |

Foreign:

| App. No. | Title | Filing Date |
|---|---|---|
| 95/07865 | A Device and a Method for Acidic Buffering | June 28, 1995 |

Filed under Patent Cooperation Treaty for
Australia
Canada
Europe
Japan
Mexico

202

JAN 25 '96 15:08 FR                                TO 7091#213500*000# P.02

## SCHEDULE VIII(q)

### U.S. Patent

| Country | Patent No. | Issue Date |
|---|---|---|
| United States | 5,295,984 | March 22, 1994 |

### Patent Applications

| Country | Patent Application No. | Filing Date |
|---|---|---|
| Canada | 2070426 | December 7, 1990 |
| Europe (designating:<br>–Austria<br>–France<br>–Belgium<br>–United Kingdom<br>–Switzerland<br>–Italy<br>–Germany<br>–Luxembourg<br>–Denmark<br>–Netherlands<br>–Spain<br>–Sweden) | 91901923.2 | December 7, 1990 |
| Australia | 46547/93 | June 28, 1993 |
| Brazil | PI 9306596-5 | December 22, 1994 |
| Canada | 2138668 | June 28, 1993 |
| Europe | 93916826.6 | June 28, 1993 |
| United States | 08/215,062 | March 21, 1994 |

203

June 12, 1998 (12:09pm)

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of the 12th day of June 1998 by and between Ultrafem, Inc., a Delaware corporation with offices at 130 West 42nd Street, Suite 1103, New York, New York 10036, as a Debtor-in-Possession in Chapter 11, Case No, 98-42280 (PCB) ("Seller"), and Akcess Pacific Group, LLC, a California limited liability company, with an address at P.O. Box 7166, Rancho Santa Fe, California 92067 ("Buyer").

## R E C I T A L S

This Agreement is made with reference to the following facts:

A.    Seller is the owner of certain Assets (as defined below) relating to the development, manufacture, distribution, marketing and sale of INSTEAD®, a proprietary vaginal discharge collection device (the "Product") based on its patented SoftCup® technology, and other assets and property relating thereto as more particularly hereinafter described and desires to sell substantially all of its assets (except as otherwise explicitly provided herein) and business relating to the Product (the "Business").

B.    Seller desires to sell and Buyer desires to purchase the Assets, and to assume certain liabilities related thereto.

C.    Seller and Buyer have reached an agreement with respect to the sale of the Assets of Seller on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements herein contained, and for other good and valuable consideration, the parties hereto agree as follows:

1.    **Purchase and Sale of Assets.**

    1.1.   **Assets to be Transferred at Closing.**   Subject to and upon the terms and conditions of this Agreement, at the Closing of the transactions contemplated by this Agreement to be held on the Closing Date (as such terms are hereinafter defined in Section 8), Seller will sell, transfer, assign and convey to Buyer by appropriate bills of sale, assignments and other instruments of transfer, for the consideration hereinafter provided, and the Buyer shall purchase from the Seller, the following properties, and assets of Seller (collectively the "Assets"):

        (a)    All of Seller's right, title and interest in and to the patents, copyrights, trademarks, service marks, and trade names, and all applications therefor, whether U.S. or foreign, and franchises, goodwill and other intangible property (collectively, the

A:\AKCESS.03

"Intangibles"), the material items of which are listed on Schedule 1.1(a), including but not limited to, product formulas, research and development, trade secrets and know how.

(b)    All of Seller's right, title and interest in and to all of the machinery, equipment, furniture, office equipment, other fixed assets, and molds and material tangible personal property owned by Seller and useful or used in the operation of its Business ("Machinery and Equipment"), the material items of which are listed on Schedule 1.1(b), at the locations listed on such Schedule.

(c)    All of Seller's right, title and interest in and to all existing inventory of the Product, finished goods and work-in-process, and related raw materials, boxes, packaging and other materials and supplies ("Inventory") at the locations listed on Schedule 1.1(c).

(d)    All fixtures and improvements, including work-in-progress, if any, owned by Seller and located in and on the real property leased by Seller and used or useful in the operation of its Business described on Schedule 1.1 (d) hereto ("Improvements").

(e)    All of the other fixed and other tangible property owned by Seller and used or useful in the operation of its Business, and replacements thereof and improvements thereto, the principal items of which are identified on Schedule 1.1(e) hereto.

(f)    All trade accounts receivable, unbilled orders, and contract rights relating to the sale of the Product, as listed on Schedule 1.1(f).

(g)    All records relating to regulatory filings, inspection reports and correspondence relating thereto, including but not limited to 510(k) application(s), sales, distribution, advertising and marketing, including all market research, artwork, advertising, marketing concepts, marketing materials and market measurement data associated with the Product, and Seller's files, logs and other records, including accounting records specifically relating to the operation of its Business, as Buyer may reasonably require, but not including any corporate or accounting books or records of Seller.

(h)    To the extent assignable without any payment by Seller, the rights of Seller under (i) all non-compete agreements (other than agreements with employees), confidentiality agreements, and non-disclosure agreements, and (ii) the contracts, licenses, leases and agreements in effect on the Closing Date relating to the operation of its Business and the Assets (other than agreements with employees) identified (i) in Schedule 1.3 and (ii) by Buyer in writing between the date hereof and the Closing Date, which Buyer in its sole discretion elects to assume as of the Closing Date, including but not limited to and any renewals or extensions thereof.

(i)    All of Seller's right, title and interest in and to the name "Ultrafem" and the Business now known as Ultrafem, Inc., which principally engaged in the manufacture, distribution and sale of the Product; provided, however, that nothing herein shall prevent the Company from continuing to use the name "Ultrafem" in connection with its Chapter 11 case

and/or disclosing in connection with its use of its new name that it was formerly known as "Ultrafem, Inc."

(j)    Any security deposit, prepaid expense or other prepaid item specifically relating to an Assumed Liability assumed by Buyer at the Closing.

**1.2.    Conveyance Free of Liens.**    On the Closing Date, (i) Seller will have good and marketable title to the Assets free and clear of all security interests, liens, mortgages, pledges, charges, deeds of trust, claims or other encumbrances of any nature whatsoever ("Claims"), and/or (ii) as the result of a Final Approval Order of the Bankruptcy Court, all the Assets will be transferred to Buyer at the Closing free and clear of any such Claims, except for the Assumed Liabilities identified in Section 1.3 below.   As used herein, "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York; "Approval Order" shall mean an order of the Bankruptcy Court approving this Agreement and the consummation of the transactions contemplated herein and providing, among other matters, that (i) the Assets shall be transferred to the Buyer free and clear of any and all Claims, (ii) any and all Claims against the Assets shall attach to the proceeds of the sale of the Assets; (iii) the Buyer shall assume the Assumed Liabilities, and (iv) the Buyer is a good faith Buyer entitled to protection pursuant to Section 363(m) of the Bankruptcy Code; and "Final" as applied to the Approval Order or any other governmental order or action, shall mean that such order or action has not been stayed, vacated or otherwise rendered ineffective.

**1.3.    Assumed Liabilities and Retained Liabilities.**

(a)    At the Closing, Buyer assumes and agrees to perform, pay as they become due and discharge the liabilities, obligations and commitments of the Seller relating to and under the contracts, licenses, leases, and agreements specifically identified (i) in Schedule 1.3, and (ii) by Buyer in writing between the date hereof and the Closing Date (collectively, "Assumed Contracts"),   which Buyer in its sole discretion elects to assume as of the Closing Date, to the extent that such liabilities, obligations and commitments arise after the Closing (collectively, the "Assumed Liabilities").

(b)    Buyer shall not assume or agree to perform, pay or discharge, and the Seller shall remain unconditionally liable for:

(i)    any and all federal, state and local income, franchise, sales, gross receipts, excise and other taxes, assessments and governmental charges, as well as withholding and social security taxes required to have been paid or accrued prior to the Closing, and interest and penalties thereon ("Taxes") relating to Seller's Business or employees of Seller attributable to (and including the last day of) and required to be paid or accrued for any period ending on or before the Closing Date, except that Buyer shall be responsible for Taxes relating to the Accounts Receivable transferred to Buyer, or

(ii)    all obligations, liabilities and commitments, fixed or contingent, of the Seller other than as set forth in Section 1.3(a),

(collectively, the "Retained Liabilities").

A:\AKCESS.03                                    - 3 -

**1.4.    Excluded Assets**.  The Assets shall not include:  (i) cash on hand or in bank accounts, cash equivalents, reserves, prepaid interest, securities, prepaid insurance, or, except as provided in 1.1(j) above, prepaid expenses, deposits and other prepaid items (including, but not limited to, those bank accounts, security deposits and insurance policies listed on Schedule 1.4, which are excluded Assets hereunder); (ii) tangible personal property disposed of or consumed between the date hereof and the Closing Date as specifically authorized by this Agreement; (iii) claims of Seller to the extent they pertain to the operation of its Business prior to the Closing Date; (iv) any tax credits and/or refunds with respect to operations of the Seller or insurance policy credits or refunds of insurance premiums; (v) insurance policies; (vi) any corporate or accounting books or records of Seller, including but not limited to, checkbooks and canceled checks, minute books, stock books and similar corporate books and records of the Company; or (vii) any claims in favor of Seller or its bankruptcy estate under Chapter 5 of the Bankruptcy Code.

## 2. Purchase Price and Payment.

**2.1.    Purchase Price.**  In full consideration of the sale of the Assets to Buyer, on the Closing Date Buyer shall:

(a)    pay Seller at the Closing, by certified or bank check or by wire transfer of federal funds to an account or accounts designated by Seller, the aggregate sum of Two Million Five Hundred Thousand Dollars ($2,500,000)(which amount includes the Deposit described in Section 2.2 herein); and

(b)    deliver to Seller Buyer's Promissory Note (the "Note") in the principal amount of Two Million Five Hundred Thousand Dollars ($2,500,000), bearing simple interest at the rate of eight (8%) percent per annum with all principal and accrued and unpaid interest thereon being due and payable twenty-four (24) months following the Closing Date.  Buyer shall have the obligation (i) to make quarterly payments on the Note in an amount equal to five (5%) of gross revenues (as adjusted for returns, discounts and bad debt, and less any applicable sales or other taxes) resulting from the sale of the Product or any other product derived from or arising out of the Assets acquired under this Agreement; and (ii) on the first anniversary of the Closing Date a principal amount equal to $833,333.33 less the amounts paid pursuant to clause (i), plus accrued interest thereon; and (iii) all remaining principal and accrued interest on the second anniversary of the Closing Date.  The Note shall be secured by a perfected first lien and security interest in the Intangibles, and may be prepaid without any premium, or discount; and

(c)    assume the Assumed Liabilities specified in Section 1.3;

(collectively, hereinafter the "Purchase Price")

A:\AKCESS.03                                                    - 4 -

**2.2.    Deposit.**

(a)    Concurrently with the execution of this Agreement, the Buyer or an affiliate shall deposit into escrow with the Escrow Agent, cash, or a certified or bank check, or by wire transfer to the account specified in Schedule 2.2, in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "Deposit").

(b)    At the Closing, the Deposit shall be paid to the Seller as a credit against the Purchase Price in addition to the amount payable at the Closing in accordance with Section 2.1, and the earnings thereon shall be paid to the Seller.

(c)    The parties agree that in the event that this Agreement is terminated by Buyer prior to the Closing pursuant to Section 10(b), Seller shall suffer damages resulting from such termination, the amount and extent of which will be difficult to calculate or establish, and Buyer desires to limit its potential liability thereunder; accordingly, in the event of a termination of this Agreement by Buyer pursuant to Section 10(b), the parties agree that the amount of the Deposit constitutes reasonable compensation to Seller for such termination and shall be paid to Seller (including all earnings thereon) within twenty-four (24) hours of the date of such termination pursuant to Section 10(b), as liquidated damages, which shall constitute Seller's sole and exclusive remedy. In the event this Agreement is terminated prior to the Closing for any reason other than pursuant to Section 10(b), the Deposit and all earnings thereon shall within twenty-four (24) hours be repaid to the Buyer and the Buyer shall not be entitled to any other remedy or relief, except as provided in Section 6.3 below.

**2.3.    Assumed Liabilities.**  As of the Closing Date, the Seller shall assign to Buyer and Buyer shall assume the Assumed Liabilities, without recourse to the Seller, to the extent permitted under Section 365 of Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. ("Bankruptcy Code"). From and after the Closing, the Buyer shall indemnify and hold the Seller harmless from and against all claims, losses, liabilities, demands, actions, suits, obligations and expenses, including reasonable legal fees and expenses, relating to or arising out of Buyer's failure to pay, discharge or perform any of the Assumed Liabilities.

**3.    Representations and Warranties of Seller.**  Seller represents and warrants to Buyer as follows:

**3.1.    Organization and Qualification of Seller.**  Seller is a corporation duly incorporated and validly existing under the laws of the jurisdiction of its incorporation with the corporate power and authority to carry on its Business, to own the Assets and operate its properties and to execute and deliver this Agreement and any other agreements to be entered into by it in connection with this Agreement on or prior to the Closing Date and to perform its obligations hereunder and thereunder. Seller is duly qualified to transact Business as a foreign corporation in each jurisdiction, where the ownership or use of the Assets and the conduct of its Business necessitates such qualification.

**3.2.    Authorization of Agreement; No Breach; Consents.**  Upon approval by the Bankruptcy Court, (a) the execution and delivery of this Agreement and any other agreements to be

entered into by Seller in connection with this Agreement on or prior to the Closing Date by Seller and the consummation by Seller of all transactions contemplated hereby and thereby will have been duly authorized and approved by all requisite corporate and stockholder action, or in the absence thereof, by appropriate Bankruptcy Court order, and (b) this Agreement is and such other agreements will be the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms. All persons who have executed or will execute this Agreement and such other agreements on behalf of Seller have been or will be duly authorized to do so by all necessary corporate action of Seller, or in the absence thereof, by appropriate Bankruptcy Court order. Except for the Final Approval Order of the Bankruptcy Court, Seller may enter into this Agreement and such other agreements and perform its obligations hereunder and thereunder without the necessity of obtaining any consent or approval from anyone, including any governmental authority except as otherwise indicated in this Agreement.

**3.3.    Litigation.** Except as set forth in Schedule 3.3, there are no governmental inquiries, or actions, suits, investigations or proceedings pending or, to the best knowledge of Seller, threatened, by or before any court, agency or other governmental body (including but not limited to the U.S. Food and Drug Administration) against or affecting Seller (or any corporation or entity affiliated with Seller) which seeks to enjoin or prohibit or otherwise challenge the transactions contemplated hereby, or which could prevent, delay, materially impair the carrying out of this Agreement and the transactions contemplated hereby.

**3.4.    Governmental Action.** Except for an Approval Order of the Bankruptcy Court, no governmental action, consent, order, or authorization is required in connection with the execution, delivery and performance by the Seller of this Agreement or any of the instruments or agreements herein referred to, or the taking of any action herein contemplated. Seller has operated its Business in conformity in all material respects with applicable laws and regulations.

**3.5.    Compliance with Environmental Laws.** Except as set forth in the three Phase I environmental audits relating to the real property leased by the Company in connection with its Missoula, Montana operations, copies of which have been delivered to Buyer, to the best of Seller's knowledge (i) Seller and its operations have been in compliance with, and Seller is not in violation of, any material requirement of any applicable environmental law as currently in effect; (ii) neither Seller nor any of its predecessors used, released or disposed of any hazardous substance in any manner that could reasonably be expected to result in material liability to Seller; (iii) the property leased or operated by Seller is not contaminated by any hazardous substance in a manner that requires investigation or corrective action under applicable environmental laws; and (iv) the property leased or operated by Seller is not affected by any condition that could reasonably be expected to result in material liability of Seller under any environmental law as currently in effect. For the purposes of this Agreement, the term "hazardous substance" means (i) any gasoline, fuel oil or any other petroleum product, explosives, alcohols or chemical solvents or polychlorinated biphenyls, (ii) any substance, waste, material or product defined as hazardous, radioactive, extremely hazardous or toxic under any environmental law and (iii) asbestos or asbestos-containing substances.

**3.6.    Intellectual Property.** Schedule 3.6 sets forth all intellectual property of Seller. Seller owns, or is licensed to, or otherwise has, the right to use such intellectual property. Seller has

not received any notice that it is in violation of, or infringing upon, any patent, trademark, service mark, trade name, copyright or franchise of any third-party, and, except as set forth on Schedule 3.6, no claims have been asserted, nor is there any litigation pending or threatened claiming such infringement. Except as set forth on Schedule 3.6, Seller has not licensed or encumbered any of its intellectual property to any third-party, nor have any other distribution rights been granted by Seller to a third-party. Except as set forth on Schedule 3.6, Seller has not entered into any other agreements whereby Seller has been appointed as a distributor or licensee of any products, patents or trademarks owned by a third-party. Except as set forth on Schedule 3.6, Seller has not entered into any agreement which restricts or affects the use of any of the intellectual property. Seller owns or has licensed from third-parties, and has the right to use, all necessary intellectual property in order to conduct its Business in all material respects as currently conducted.

3.7.    **Insurance.** All of the Assets, properties, Business and operations of Seller are insured by policies of insurance in type and amount believed to be adequate for Seller as a debtor-in-possession, which policies of insurance are listed in Schedule 3.7. All of such policies listed in Schedule 3.7 have been and will be until the Closing Date in full force and effect with no premium arrearages.

3.8.    **Subsidiaries and Other Affiliates.** Seller does not have any subsidiaries and does not own, either directly or indirectly, any interest or investment, whether debt or equity (other than an interest as a creditor holding a trade account receivable), or any obligation, joint venture, option or right to acquire any interest, direct or indirect, in any other corporation or other entity.

3.9.    **Inventory and Accounts Receivable.**    Schedule 3.9 sets forth an unaudited statement of Inventory and accounts receivable of Seller as of May 31, 1998, and the Seller's sales for the period subsequent to May 31, 1998. Schedule 3.9 also sets forth a description of Seller's policy and terms applicable to its collection of accounts receivable.

3.10.    **Contracts and Leases.** Seller has provided and/or made available to Buyer copies of all material executory contracts and unexpired leases of real and personal property, which are listed on Schedule 3.10.

3.11.    **No Other Representations or Warranties.** THE SALE OF THE ASSETS HEREUNDER IS MADE "AS IS" AND "WHERE IS" WITHOUT ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION OR QUALITY OF ANY OF THE ASSETS OR AS TO TITLE TO ANY OF THE ASSETS OR SPECIFICALLY AS TO ANY OTHER MATTER RELATING TO ANY OR ALL OF THE ASSETS, EXCEPT AS SET FORTH IN THIS SECTION. EXCEPT AS SET FORTH IN THIS SECTION 3, ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY EXCLUDED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

4.    **Representations and Warranties of Buyer.** Buyer hereby represents and warrants to Seller as follows:

A:\AKCESS.03                                    - 7 -

**4.1.    Organization; Good Standing; Power.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and has the corporate power and authority to execute, deliver and perform this Agreement and consummate the transactions contemplated hereby.

**4.2.    Authorization.** Buyer has taken all corporate or other action necessary to authorize the execution, delivery and performance of this Agreement and any other agreements and instruments to be entered into by Buyer in connection with this Agreement on or prior to the Closing Date by Buyer and the consummation by Buyer of all transactions contemplated hereby and thereby; such execution, delivery and performance do not and will not violate, result in any default or acceleration under or conflict with any terms of, any law, charter, by-law, lien, order, award, judgment, decree or contract to which Buyer is a party or is subject or by which Buyer is bound; this Agreement is and such other agreements and instruments will be legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**4.3.    No Restrictions.** Buyer is not a party to, subject to or bound by any contract, commitment or agreement, any charter, by-law or other corporate restriction, or any order, judgment, decree, injunction, law, statute, ordinance, rule, regulation or other restriction of any kind or character, which could (a) prevent Buyer from entering into this Agreement or from consummating the transactions contemplated hereby, or (b) materially impair the carrying out of this Agreement and the transactions contemplated hereby.

**4.4.    Litigation.** There are no actions, suits, investigations or proceedings pending or, to the best knowledge of Buyer, threatened, before any court, agency or other governmental body against or affecting Buyer (or any corporation or entity affiliated with Buyer) which seeks to enjoin or prohibit or otherwise challenge the transactions contemplated hereby, or which could prevent, delay, or materially impair the carrying out of this Agreement and the transactions contemplated hereby.

**4.5.    Governmental Action.** Except for an Approval Order of the Bankruptcy Court, no governmental action, consent, order, or authorization is required in connection with the execution, delivery and performance by the Buyer of this Agreement or any of the instruments or agreements herein referred to, or the taking of any action herein contemplated.

**4.6    Financial Capability.** Buyer and it affiliates have sufficient funds and/or have obtained or will have obtained prior to the Closing binding commitments from responsible financial institutions or partners of Buyer or its affiliates to enable them to borrow such funds and/or Buyer and its affiliates will have made on or before the Closing Date binding arrangements between themselves, as are needed to enable Buyer and/or such affiliates, as the case may be, to pay the Purchase Price and to consummate the transactions contemplated by this Agreement, and will maintain such funds and/or commitments and/or arrangements until the Closing Date. If necessary, Buyer will provide such further information and assurances as reasonably requested by the Bankruptcy Court, to demonstrate its ability to consummate the transactions contemplated by this Agreement. Seller may provide copies of such commitments and any other information provided by Buyer to Seller to the Official Committee of Unsecured Creditors of Seller.

**5.**    **Access to Information.**    Throughout the period between the date hereof and the Closing Date, Seller shall afford to Buyer, its counsel, accountants, and other representatives, at all reasonable times during normal business hours and upon reasonable notice, reasonable access to all of the properties, books, contracts, commitments and records of Seller relating to the Assets and its Business and furnish to Buyer during such period all such information concerning the Assets and Seller's Business as Buyer may reasonably request.

**6.**    **Covenants.**

**6.1.**    **Interim Operations.**    Subject to the Bankruptcy Code, until the Closing the Seller shall (a) not sell, transfer or otherwise encumber any of the Assets (other than the sale of Inventory and collection of receivables in the ordinary course of business by Seller as a debtor-in-possession), (b) maintain such insurance policies as provided in Section 3.7 or as shall be required by the Bankruptcy Court, (c) not enter into any contract or commitment requiring Seller to pay in excess of $10,000 in the aggregate without the prior written notice to the Buyer, (d) not make any material capital expenditure or improvement without prior written notice to Buyer, and (e) will use reasonable efforts to preserve, protect and maintain the Assets.   Between the date hereof and the Closing Date Seller shall not take any action to collect accounts receivable except in the ordinary course of business by Seller as debtor-in-possession and in accordance with the policy and terms set forth on Schedule 3.9.

**6.2.**    **Bankruptcy Court Scheduling Order and Approval Order.**    As soon as possible, but in no event later than June 16, 1998, Seller, at its sole cost and expense, shall file with the Bankruptcy Court a proposed scheduling order ("Scheduling Order") substantially in the form attached hereto as Exhibit 6.2 and supporting application which, among other things, requests that the Bankruptcy Court (i) approve the form of the notice of sale of the Assets, (ii) approve the terms and conditions of the sale of the Assets (substantially as set forth in Schedule 6.2), (iii) approve the proposed Break-up Fee (as defined in Section 6.3), (iv) fix the date of an auction to take place at the offices of Houlihan Lokey Howard & Zukin, 31 West 52nd Street, New York, New York 10019 ("Auction Date"), (v) specify the terms and conditions of the auction to be conducted on the Auction Date (substantially as set forth in Exhibit 6.2), and (vi) schedule the date and time of the hearing at which the Bankruptcy Court shall enter the Approval Order approving the sale of the Assets to the successful bidder.

**6.3.**    **Break-up Fee.**

      (a)    Except if this Agreement has been terminated under Section 10(b), in the event the Bankruptcy Court issues an order approving the Seller's acceptance of an offer for all or any portion of the Assets from a party other than the Buyer ("Overbid Order"), the Deposit and any earnings thereon shall be paid to the Buyer as provided for in Section 2.2 herein, and the Seller shall pay or cause to be paid to the Buyer a so-called break-up fee of One Hundred Fifty Thousand dollars ($150,000.00) (the "Break-up Fee") either (i) promptly from the proceeds received in connection with the closing of such other sale, or (ii) if the closing of such other sale does not occur within forty-five (45) days of the Overbid Order, the Break-up Fee shall be paid from any non-refundable deposit which is or becomes available to Seller, whichever shall first occur.

- 9 -

(b)    The Seller agrees to recommend to the Bankruptcy Court the approval of the Break-up Fee as appropriate compensation to the Buyer should it not be the successful bidder for the Assets, given the costs and expenses incurred by Buyer including legal, accounting and other professional fees incurred by the Buyer, the loss of executive time and effort and the loss of other business opportunities, each of which cannot reasonably be calculated. The Break-up Fee is in lieu of and not in addition to direct reimbursement of any and all costs, expenses and losses incurred by Buyer. Notwithstanding any other provision of this Agreement to the contrary, the Buyer shall be entitled to terminate this Agreement immediately and receive a full refund of the Deposit in the event that the Bankruptcy Court does not approve the terms and conditions of the Break-up Fee.

6.4.    **Actions of Seller.**  Seller will use its reasonable best efforts to assist Buyer to obtain product liability insurance and/or property insurance from the insurance companies listed on Schedule 1.4 which have issued insurance policies to Seller, provided that Buyer shall pay the premiums for resulting the policies, if any, obtained by Buyer. Seller shall take all such actions as may be reasonably necessary to consummate the transactions contemplated hereby, including without limitation, such actions (i) as may be necessary to obtain prompt Bankruptcy Court approval of the transactions contemplated hereby, and (ii) at Buyer's election, that qualify Buyer as a successor in interest under any Assumed Contracts, provided that Seller shall not be required to make any payment in connection therewith. While the Seller will cooperate with parties identifying themselves as potential bidders and Seller will assist such parties in conducting due diligence, by virtue of executing this Agreement, Seller has committed to use its best efforts to consummate the sale of its Assets to Buyer.

6.5.    **Satisfaction of Conditions.**  The Seller shall use reasonable efforts to cause to be satisfied the conditions to its obligations set forth in Section 7.

7.    **Conditions Precedent to Closing.**

7.1.    **Conditions to the Obligations of Buyer**.  The performance of the obligations of Buyer hereunder is subject to the fulfillment or waiver by Buyer on or before the Closing Date of the following conditions:

(a)    the Approval Order shall have been entered and not stayed;

(b)    the Seller shall be authorized by the Approval Order or otherwise (i) to assume and assign to the Buyer the Assumed Liabilities and (ii) to sell and transfer to the Buyer the Assets, and, as the result of a Final Approval Order of the Bankruptcy Court, all of the Assets (including, but not limited to, the Intangibles) will be transferred to Buyer at the Closing free and clear of any Claims (except for the Assumed Liabilities identified in Section 1.3 above), including but not limited to litigation claims, whether set forth on Schedule 3.3 or otherwise.

(c)    the representations and warranties of the Seller contained herein shall be true and correct in all material respects on the date made and on the Closing Date as if made again on the Closing Date except for changes expressly contemplated by this Agreement (including, but not limited to those contemplated under Section 8 and Section 20);

A:\AKCESS.03                                    - 10 -

(d)    the Seller shall have complied with all covenants of the Seller contained in this Agreement in all material respects;

(e)    Buyer shall have received the Closing Documents set forth in Section 9.1; and

(f)    all action necessary for the assignment or transfer of the intellectual property, including but not limited to patent assignments, will have been taken by Seller.

**7.2.    Conditions to the Obligations of Seller.**  The performance of the obligations of Seller hereunder is subject to the fulfillment on or before the Closing Date of the following conditions:

(a)    the Approval Order shall have been entered and not stayed;

(b)    the Buyer shall have assumed the Assumed Liabilities and paid to the Seller the Purchase Price in accordance with the terms hereof;

(c)    the representations and warranties of the Buyer contained herein shall be true and correct in all material respects on the date made, on the date of the Approval Order and on the Closing Date as if made again on the Closing Date except for changes expressly contemplated in this Agreement;

(d)    the Buyer shall have complied with all covenants of the Buyer contained in this Agreement in all material respects; and

(e)    Seller shall have received the Closing Documents set forth in Section 9.2 hereof.

**8.    Closing Date.**  The closing ("Closing") shall occur at the offices of Togut Segal & Segal, One Penn Plaza, Suite 3335, New York, New York 10119 at 10:00 A.M. on the later of (i) the third (3rd) business day following the date of the entry of an order of the Bankruptcy Court approving the sale of the Assets to the Buyer ("Sale Order"), or (ii) if the Sale Order has been stayed pending appeal, the date the stay has been lifted or the date the Sale Order becomes Final (the "Closing Date"). The Closing shall constitute the acts which take place on the Closing Date by which the transactions contemplated by this Agreement are consummated. Buyer acknowledges that Seller has substantially ceased its operations, it is not able to continue operations and retain current employees beyond June 28, 1998 and there can no assurance that this will not adversely affect the Business and the Assets. Buyer acknowledges that time is of the essence.

**9.    The Closing.**  On the Closing Date, the parties shall exchange documents as follows:

**9.1.    Deliveries by Seller.**  Seller shall deliver to Buyer:

(a)    One or more bills of sale covering all of the tangible assets, described in Section 1.1(b), (c), (d), (e), (g) and (j).

A:\AKCESS.03                                  - 11 -

(b)    Assignments of the leases, licenses, contracts, and agreements described in Section 1.1(b).

(c)    Assignments of the Intangible assets described in Section 1.1(a), including but not limited to assignments of patents, trademarks and copyrights and the accounts receivable and other Assets described in Section 1.1(f).

(d)    Statement of accounts receivable, current as of the Closing Date, identifying each account and the amount owed.

(e)    A copy of the resolutions duly adopted by the Board of Directors of Seller authorizing and approving the execution, delivery and performance of this Agreement and the sale and transfer of the Assets to the Buyer pursuant to the terms of this Agreement, and the execution and delivery of any other documents and agreements contemplated hereunder, certified by an officer of Seller.

(f)    An incumbency certificate or certificates dated the Closing Date certifying the incumbency of all officers and directors of Seller who have executed this Agreement or documents in connection with this Agreement or the transactions contemplated hereby, containing   specimens of the signatures of each of the officers and directors whose incumbency is certified and shall be executed by an officer or director of Seller other than an officer or director whose incumbency is certified.

(g)    An executed certificate of amendment to the Company's certificate of incorporation in a form suitable for filing with the Secretary of State of Delaware to change the Company's name from Ultrafem, Inc. to a different name which does not use the name "Ultrafem".

(h)    Such further instruments of assignment, conveyance or transfer or other documents covering the Assets as Buyer or its counsel may reasonably request to assure the full and effective assignment and transfer to it of the Assets and all the right, title and interest therein and to assure the effective carrying out of the transactions contemplated hereby.

**9.2.    Deliveries by Buyer.** Buyer shall deliver to Seller:

(a)    The Purchase Price as specified in Section 2, including the cash portion thereof and the Note.

(b)    A document executed by the Buyer whereby Buyer agrees to assume the Assumed Liabilities described in Section 1.3.

(c)    Such security agreement(s) and instruments as may be necessary to give Seller a valid perfected first lien and security interest in the Intangibles.

(d)    A copy of the resolutions duly adopted by the Board of Directors of Buyer authorizing and approving the execution, delivery and performance of this Agreement, the delivery of the Purchase Price and the execution and delivery of any and all other documents and agreements contemplated hereunder, certified by the Secretary or an Assistant Secretary of Buyer.

(e)    An incumbency certificate or certificates dated the Closing Date certifying the incumbency of all officers of Buyer who have executed this Agreement or documents in connection with this Agreement or the transactions contemplated hereby; containing specimens of the signatures of each of the officers whose incumbency is certified and shall be executed by officers of Buyer other than an officer whose incumbency is certified.

(f)    Such further instruments or other documents as Seller or their counsel may reasonably request to assure the effective carrying out of the transactions contemplated hereby.

9.3.    Transfer Taxes and Recording Fees.  At or prior to the Closing, the Seller shall pay or cause to be paid any and all transfer, stamp or other similar Taxes or and any filing or recording fees ("Fees") payable as a result of and in connection with the sale or transfer of the Assets to be purchased hereunder and the assumption and assignment of the Assumed Liabilities or shall have obtained an exception thereof under the Bankruptcy Code and/or the Approval Order, and Seller shall indemnify and hold harmless the Buyer from and against payment of any such Taxes and Fees.

9.4.    Expenses.  Except for the Breakup Fee as provided in Section 6.3 herein, Seller and Buyer shall bear their respective expenses incurred in the negotiation and consummation of this Agreement.

10.    Termination.  This Agreement may be terminated only in accordance with this Section, as follows:

(a)    Except as is set forth in subsections (b), (c), (d) and (f) below, this Agreement may not be terminated without an order of the Bankruptcy Court.

(b)    If the Buyer defaults in any of the obligations imposed upon the Buyer pursuant to this Agreement, or if any representations or warranties made by the Buyer are not true or correct in any material respect, the Seller may, in its sole and absolute discretion, provide notice (the "Default Notice") to the Buyer of such default in writing.  If said default is not cured in full within three (3) business days from the date the Default Notice is sent by overnight mail, facsimile or personal delivery, then on the third (3rd) business day following the day the Default Notice is so delivered, the Agreement shall terminate; provided, however, that if such default is Buyer's failure to timely close in accordance with Section 8, Buyer shall have twenty-seven (27) days to cure such default.

(c)    If the Seller defaults in any of the obligations imposed upon the Seller pursuant to this Agreement, or if any representations or warranties made by the Seller are not true or

correct in any material respect, the Buyer may, in its sole and absolute discretion, provide notice (the "Default Notice") to the Seller of such default in writing. If said default is not cured in full within three (3) business days from the date the Default Notice is sent by overnight mail, facsimile or personal delivery, then on the third (3rd) business day following the day the Default Notice is so delivered, this Agreement shall terminate.

(d)     This Agreement may be terminated by the joint written consent of the Seller and the Buyer, and in such event, the parties shall have no further obligation or liability to each other under this Agreement.

(e)     In the event the Bankruptcy Court, pursuant to a procedure established by the Bankruptcy Court in the Scheduling Order, approves a competing bid for the Assets, this Agreement shall terminate, and the Breakup Fee shall be paid to Buyer as provided in Section 6.3.

(f)     At the sole option of Buyer, in the event the Bankruptcy Court fails to enter the Approval Order by September 30, 1998.

11.     **Attorney-In-Fact for the Seller.** The Seller agrees that, effective as of the Closing Date, it hereby constitutes and appoints the Buyer, its successors and permitted assigns, the true and lawful attorney of the Seller, in the name of the Buyer or in their respective names, but for the benefit and at the expense of the Buyer: (i) to institute and prosecute all proceedings which the Buyer may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Assets; (ii) to defend or compromise any and all actions, suits or proceedings in respect of any of the Assets, and to do all such acts and things in relation thereto as the Buyer shall deem advisable; and (iii) to take all action which the Buyer, its successors or assigns, may reasonably deem proper in order to provide for the Buyer, its successors or assigns, the benefits under any of the Assets where any required consent of another party to the sale or assignment thereof to the Buyer pursuant to this Agreement shall not have been obtained; **provided, however,** that the foregoing shall not apply to any  any claims in favor of Seller or its bankruptcy estate under Chapter 5 of the Bankruptcy Code. If the Buyer, in the name of the Seller, desires to institute and prosecute any action, suit or proceeding, or take any other action pursuant to this Section 11, the Buyer shall give the Seller ten (10) days' written notice prior to taking any such action in the name of the Seller. The Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by the Seller. The Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof. Buyer shall defend, indemnify and hold harmless the Seller for any damages, costs and expenses, including reasonable attorneys' fees, the Seller may incur on account of the acts of Buyer taken pursuant to the authority granted to it under this Section.

12.     **Brokerage Fees.** Except for Houlihan Lokey Howard & Zukin, which has been engaged as an investment advisor by the Official Committee of Unsecured Creditors and is to be compensated out of the proceeds of the sale of the Assets pursuant to an order of the Bankruptcy Court, the Seller and the Buyer represent and warrant that they have not employed any broker, finder or investment banker who might be entitled to any brokerage, finder's fee, underwriting discount or

other fee or commission from the Buyer or the Seller in connection with the purchase or sale of the Assets, the assumption and assignment of the Assumed Liabilities and the Seller and Buyer each hereby indemnify and holds harmless the other from and against any loss, cost, damage or expense (including reasonable attorney's fees) arising out of any claim of any broker retained by the indemnitor for any fee or commission in connection with this transaction.

**13.    Preservation of and Access to Books and Records.**  Following the Closing Date, except in the event that Buyer subsequently sells all or substantially all of the Assets, Buyer shall preserve for at least three years after the Closing Date all books and records included in the Assets and thereafter shall not dispose of any such books and records without first offering them to Seller (without cost to Seller) upon 60 days written notice. Buyer shall also afford Seller, its accountants and agents access to such books and records during regular business hours and upon reasonable notice to Buyer and Seller shall be permitted to make extracts from or copies of such books and records.  Further, following the Closing Date, Seller shall preserve until closing of Seller's Chapter 11 case all corporate or accounting books or records of Seller, including but not limited to, checkbooks and canceled checks, minute books, stock books and similar corporate books and records of the Company, which are not included in the Assets being sold hereunder, and thereafter shall not dispose of any such books and records without first offering them to Buyer (without cost to Buyer) upon 60 days written notice. Seller shall also afford Buyer, its accountants and agents access to such books and records during regular business hours and upon reasonable notice to Seller and Buyer shall be permitted to make extracts from or copies of such books and records.

**14.    Additional Documents.**  The parties agree that they will execute or furnish such documents and further assurances to each other or to proper authorities as may be necessary for the full implementation and consummation of this Agreement.

**15.    Notices.**  Any notices or other communications required or permitted under this Agreement shall be in writing and shall be sufficiently given if hand delivered, if telecopied (with a confirmation copy by mail), or if sent by a nationally recognized overnight delivery service addressed as follows:

if to Seller:

Ultrafem, Inc.
130 West 42nd Street, Suite 1103
New York, New York 10036
Fax: (212) 921-2067
Attn: Ms. Dori M. Reap and Ms. Tonya G. Hinch

with copies to:

| | |
|---|---|
| Togut, Segal & Segal | Kensington & Ressler L.L.C. |
| One Penn Plaza, Suite 3335 | 400 Madison Avenue |
| New York, New York 10119 | New York, NY 10017 |
| Fax No.: (212) 967-4258 | Fax No.: (212) 838-7060 |

|                               |                                  |
|-------------------------------|----------------------------------|
| Attn:   Albert Togut, Esq.    | Attn:   Howard D. Ressler, Esq.  |
|         Neil Berger, Esq.     |         Helen J. Williamson, Esq.|

if to Buyer:                                    with copies to:

|                               |                                  |
|-------------------------------|----------------------------------|
| Akcess Pacific Group, LLC     | Zevnik Horton Guibord McGovern   |
| P.O. Box 7166                 |    Palmer & Fognani, L.L.P.       |
| Rancho Santa Fe, CA  92067    | 101 West Broadway                |
| Fax No.: (619) 756-7896       | San Diego, CA  92101             |
| Attn: Leslie Sebastian        | Fax No.:  (619) 515-9628         |
|                               | Attn:  Kenneth D. Polin, Esq.    |

or to such other address as the parties may designate in writing.

   **16.    Survival of Representations and Warranties; Indemnification.**    The representations, warranties, covenants and agreements of the parties herein contained (i) shall survive the Closing for a period of one hundred eighty (180) days (the "Survival Period"), regardless of any investigation made by the parties hereto, and (ii) shall be effective with respect to any breach thereof, notice of which shall have been duly given in accordance with Section 15 hereof prior to the expiration of the aforesaid period.  Further, from the Closing Date through the Survival Period, Buyer may file a claim in accordance with applicable bankruptcy law against Seller's Chapter 11 estate for any alleged claims, costs, damages, fines, judgments, losses, liabilities or expenses allegedly suffered or incurred by Buyer, its affiliates, successors in interest, transferees, assigns, beneficiaries, shareholders, officers, members, directors, attorneys, accountants and agents, and each of them, in all capacities including individually (collectively, the "Indemnitees"), arising out of (i) any breach by Seller of any of the representations, warranties, covenants and agreements contained in this Agreement, or (ii) any claims asserted against Buyer after the Closing Date arising from Seller's operation of the Business and/or ownership of the Assets prior to the Closing Date.

   **17.    Successors and Assigns; Benefits.**  Except (i) for an assignment by Buyer of its rights hereunder to an affiliate (including the assignment to and assumption by such affiliate  of all Assumed Liabilities), or (ii) in connection with the transfer after the Closing Date of all or certain of the Assets being purchased herein (and any corresponding Assumed Liabilities) to an affiliate of Buyer, no party shall have the right to assign its rights or delegate its obligations under this Agreement; **provided, however,** that any such affiliate must, at the date of such assignment, be in compliance with all representations and warranties made herein by Buyer as if such affiliate made such representations and warranties as to itself, and **provided, further however,** that Buyer shall be and shall remain liable for and shall guarantee, all of the obligations of such affiliate, including, but not limited to, such affiliate's obligations under the Note and the Assumed Liabilities assumed by such affiliate.  Nothing expressed or referred to in this Agreement is intended or will be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein, it being the intention of the parties to this Agreement that the Agreement be for the sole and exclusive benefit of such parties and not for the benefit of any other person.  For the purposes of this Agreement, the term "affiliate" means, with

respect to a particular party, persons or entities controlling, controlled by or under common control with such party.

18.    **Severability**.  The invalidity or illegality of any provision, term, or agreement contained in or made a part of this Agreement shall not affect the validity of the remainder of this Agreement.

19.    **Entire Agreement.**  This Agreement, together with the Schedules and Exhibits, contains all of the terms agreed upon by the parties with respect to the subject matter hereof, supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral, of the parties, and there are no representations or understandings between the parties except as provided herein.  This Agreement may not be amended or modified in any way except by a written amendment to this Agreement duly executed by the parties.

20.    **Waiver.**  No waiver of a breach of, or default under, any provision of this Agreement shall be deemed a waiver of such provision or of any subsequent breach or default of the same or similar nature or of any other provision or condition of this Agreement.  Performance of or compliance with any covenant given herein or satisfaction of any condition to the obligations of either party hereunder may be waived by the party to whom such covenant is given or whom such condition is intended to benefit, except to the extent any such condition is required by law; provided that any such waiver must be in writing.  No delay or omission on the part of any party hereto in exercising any right hereunder will operate as a waiver of such right or any other right under this Agreement.  In the event that Buyer is default for failure to timely close as provided in Section 8 and seeks to cure such default, the condition set forth in Section 7.1 (c) shall be deemed to have been satisfied as of the third (3rd) business day following the date of the Sale Order.

21.    **Applicable Law.**  Except where superseded by federal law, this Agreement shall be governed by and construed (both as to validity and performance) and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction.

22.    **Consent to Jurisdiction; Setoff.**  Each party hereto, to the extent that it may lawfully do so, hereby consents to the exclusive jurisdiction of the Bankruptcy Court, as well as to the jurisdiction of all courts to which an appeal may be taken from the Bankruptcy Court, for the purpose of any suit, action or other proceeding arising out of any of its obligations hereunder or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue, including, without limitation, the inconvenience of such forum, in any of such courts.  In addition, to the extent that it may lawfully do so, each party hereto consents to the service of process by personal service or U.S. certified or registered mail, return receipt requested, addressed to it at the address provided herein.  To the extent a party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

A:\AKCESS.03                                    - 17 -

23.   **Waiver of Jury Trial.**  EACH PARTY HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

24.   **Section Headings.**  The section headings are for reference only and will not limit or control the meaning of any provision of this Agreement.

25.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which may be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day, month and year hereinabove set forth.

SELLER:

ULTRAFEM, INC.

By:   _____
      Dori M. Reap, Office of the Chief Executive
      and Senior Vice President

By:   _____
      Tonya G. Hinch, Office of the Chief Executive
      and Senior Vice President

BUYER:

AKCESS PACIFIC GROUP, LLC

By:   _____
      Leslie Sebastian
      Joseph Pike
      Title: _____

- 18 -

23.   **Waiver of Jury Trial.** EACH PARTY HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

24.   **Section Headings.** The section headings are for reference only and will not limit or control the meaning of any provision of this Agreement.

25.   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which may be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day, month and year hereinabove set forth.

SELLER:

ULTRAFEM, INC.

By: _____
Dori M. Resp, Office of the Chief Executive
and Senior Vice President

By: _____
Tonya G. Hinch, Office of the Chief Executive
and Senior Vice President

BUYER:

AKCESS PACIFIC GROUP, LLC

By: _____
Leslie Sebastian
Joseph Pike
Title:   CEO

23.    <u>Waiver of Jury Trial.</u>  EACH PARTY HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

24.    <u>Section Headings.</u>  The section headings are for reference only and will not limit or control the meaning of any provision of this Agreement.

25.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which may be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day, month and year hereinabove set forth.

SELLER:

ULTRAFEM, INC.

By:    _Dori M. Reap_    6/12/98
       Dori M. Reap, Office of the Chief Executive
       and Senior Vice President

By:    _____
       Tonya G. Hinch, Office of the Chief Executive
       and Senior Vice President

BUYER:

AKCESS PACIFIC GROUP, LLC

By:    _____
       Leslie Sebastian
       Joseph Pike
       Title: _____

- 18 -

TOTAL P.02

6-12-1998 7:40PM    FROM KENSINGTON · RESSLER 212 838 7060    P. 2

23.    **Waiver of Jury Trial.**  EACH PARTY HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

24.    **Section Headings.**  The section headings are for reference only and will not limit or control the meaning of any provision of this Agreement.

25.    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which may be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day, month and year hereinabove set forth.

SELLER:

ULTRAFEM, INC.

By: _____
    Dori M. Reap, Office of the Chief Executive
    and Senior Vice President

By: _____ 6/12/98
    Tonya G. Hinch, Office of the Chief Executive
    and Senior Vice President

BUYER:

AKCESS PACIFIC GROUP, LLC

By: _____
    Leslie Sebastian
    Joseph Pike
    Title: _____

- 18 -

PAGE.01    TONYA G. HINCH    212.838.7060    FROM. 06:09 1995/22/21

June 15, 1998 (4:52pm)

## SCHEDULES AND EXHIBITS

Schedule 1.1(a) - Intangible Assets
Schedule 1.1(b) - Machinery and Equipment
Schedule 1.1(c) - Inventory Locations
Schedule 1.1(d) - Fixtures and Improvements
Schedule 1.1(e) - Other Tangible Assets
Schedule 1.1(f) - Accounts Receivable, Deposits and Contract Rights
Schedule 1.3 - Assumed Liabilities
Schedule 1.4 - Excluded Assets
Schedule 2.2 - Wire Transfer Instructions
Schedule 3.3 - Litigation
Schedule 3.6 - Intellectual Property
Schedule 3.7 - Insurance
Schedule 3.9 - Inventory and Accounts Receivable
Schedule 3.10 - Contracts and Leases

Exhibit 6.2 - Form of Scheduling Order and Approval Order

June 15, 1998 (4:52pm)

## SCHEDULE 1.1(a)
## INTANGIBLE ASSETS

the name Ultrafem

### Trademarks

The Company obtained the following registrations for its trademarks with the United States Patent and Trademark Office for "INSTEAD®," "INSTEAD® and its logo," "SoftCup," and "Ultrafem" in 1996, 1997, 1992 and 1993, respectively:

| Mark | Registration Number | Issue Date |
|------|---------------------|------------|
| INSTEAD | 2,026,125 | December 24, 1996 |
| INSTEAD and logo | 2,056,353 | April 22, 1997 |
| SoftCup | 1,740,545 | December 15, 1992 |
| Ultrafem | 1,788,031 | August 17, 1993 |

As of May 2, 1998, the INSTEAD® mark has been registered in Argentina, Australia, Canada, Korea, Mexico, New Zealand, Paraguay, Switzerland, Taiwan and Turkey. The Company has also filed an application to register the trademark "INSTEAD®" in Brazil, Chile, India, Pakistan, Panama, Philippines, Russia, South Africa, Uruguay, Venezuela, and the European Community.

### Patents

### PATENTS PENDING

- Australian Patent Application No. 684,717 (formerly 46547/93)
  Filing Date: June 28, 1993
  Title: Vaginal Discharge Collection and Drug Delivery Device

- Brazilian Patent Application No. P19306596
  Filing Date: December 22, 1994
  Title: Vaginal Discharge Collection and Drug Delivery Device

- Canadian Divisional Patent Application 2,201,791
  Filing Date: April 4, 1997
  Title: Feminine Hygiene Device

- European Patent Application No. 91901923.2
  Filing Date: December 7, 1990
  Title: Feminine Hygiene Device

June 15, 1998 (4:52pm)

> Designated European Countries: Belgium, Denmark, France, Germany, Italy, Netherlands, Spain, Sweden, Switzerland/Lichstenstein, and United Kingdom.

- European Patent Application No. 93916826
  Filing Date: June 28, 1993
  Title: Vaginal Discharge Collection and Drug Delivery Device

  > Designated European Countries: Belgium, Denmark, France, Germany, Italy, Netherlands, Spain, Sweden, Switzerland/Lichstenstein, and United Kingdom.

- Canadian Patent Application No. 2,138,668
  Filing Date: June 28, 1993
  Title: Vaginal Discharge Collection and Drug Delivery Device

- International (PCT) Application No. US98/06014
  Filing Date: March 26, 1998
  Title: Intravaginal Drug Delivery System and Discharge Collection Device

- International (PCT) Application No. US97/11464
  Filing Date: July 3, 1997
  Title: Method and System for Manufacturing Elastomeric Articles

- International (PCT) Application US98/06015
  Filing Date: March 26, 1998
  Title: Discharge Collection Device and Intravaginal Drug Delivery System

- U.S. Patent Application S.N. 08/828,961
  Filing Date: March 28, 1997
  Title: Discharge Collection Device and Intravaginal Drug Delivery System

- U.S. Patent Application S.N. 08/828,962
  Filing Date: March 28, 1997
  Title: Intravaginal Drug Delivery System and Discharge Collection Device

- U.S. Patent Application S.N. 08/215,062
  Filing Date: March 21, 1994
  Title: Vaginal Discharge Collection Device and Intravaginal Drug Delivery System

- U.S. Patent Application S.N. 08/886,010
  Filing Date: July 3, 1997
  Title: Method and System for Manufacturing Elastomeric Articles

June 15, 1998 (4:52pm)

## PATENTS ISSUED/ALLOWED

- U.S. Patent No. 5,295,984
  - Issue Date: March 22, 1994
  - Title: Vaginal Discharge Collection Device and Intravaginal Drug Delivery System

- Canadian Patent Application No. 2,070,426
  - Issue Date: November 11, 1997
  - Title: Feminine Hygiene Device

June 15, 1998 (4:52pm)

## SCHEDULE 1.1(b)
## MACHINERY AND EQUIPMENT

Molds wherever located

Located at Ultrafem's Plant/Warehouse at 1600 North Avenue, Missoula, Montana 59801:

- two semi-automatic manufacturing lines consisting of a thermoforming line and related attachments, replacements, parts and supplies

- five (5) flow wrapper machines

- four (4) cartoning machines

- computers, monitors, printers and software used in the conduct of Seller's business and manufacturing operations

- security system

- various plant improvements and upgrades

- inventory and work-in-progress, see Schedule 1.1(c)

- office equipment and furniture

Located at Ultrafem's Offices at 130 West 42nd Street, Suite 1103, New York, NY 10036:

- office equipment, furniture, computers, printers, software and monitors, including: file cabinets, chairs, bookcases, credenzas, prop closet, end table, TV, supply cabinet

June 12, 1998 (9:47am)


Located at Johns Hopkins University

- Certain laboratory equipment


25/01/98     12:34     ULTRAFEM → NEW YORK                    NO.244    P.5


June 1, 1998
10:11 AM

*Located Page 13 at John's Hopkins University*

### Ultrafem MT Fixed Assets
# FIXED ASSET SUMMARY REPORT
## as of ~~06/98~~ 04/98

| Asset No. Ext. | Beginning Cost | (+) Current Year Acquisition | (+) Current Year Trans-In | (-) Current Year/Disp/ Trans-Out | Ending Cost | Prior Accum Depr/179 Expense | (+) Current YTD Depr/ 179 Expense | (+) Curr Accum Depr/179/ Trans-In | (-) Curr Accum Depr/179/Disp Trans-Out | Total Accum Depr |
|---|---|---|---|---|---|---|---|---|---|---|
| 000025 000 | 1563.00 | 0.00 | 0.00 | 0.00 | 1563.00 | 562.52 | 129.16 | 0.00 | 0.00 | 1692.68 |
| *Balance A-165 Scale* | | | | | | | | | | |
| 000032 000 | 1560.00 | 0.00 | 0.00 | 0.00 | 1560.00 | 969.00 | 135.00 | 0.00 | 0.00 | 1878.00 |
| *Balance EL PB 4500 Scale* | | | | | | | | | | |
| 000033 000 | 492.00 | 0.00 | 0.00 | 0.00 | 490.00 | 302.95 | 41.50 | 0.00 | 0.00 | 344.45 |
| *PH Meter 420 8000* | | | | | | | | | | |
| 000034 000 | 13450.00 | 0.00 | 0.00 | 13150.00 | 7345.83 | 1120.83 | 0.00 | 0.00 | 8466.66 | |
| *High Press Liquid Chrom* | | | | | | | | | | |
| 000035 000 | 1153.00 | 0.00 | 0.00 | 1153.00 | 991.25% | 129.18 | 0.00 | 0.00 | 1120.41 | |
| *Polar Horizontal w/PAR* | | | | | | | | | | |
| 000036 000 | 1292.00 | 0.00 | 0.00 | 1292.00 | 1166.00 | 154.46 | 0.60 | 0.00 | 1146.00 | |
| *Sentage 1 Cartridge* | | | | | | | | | | |
| 000037 000 | 1849.00 | 0.00 | 0.00 | 1849.00 | 1513.49 | 337.45 | 0.00 | 0.00 | 1852.94 | |
| *Inverted Clemag Microscope* | | | | | | | | | | |
| 000038 000 | 2176.47 | 0.00 | 0.00 | 2176.47 | 1830.72 | 266.00 | 0.00 | 0.00 | 2066.72 | |
| *Shaker Incubator Mdl 8* | | | | | | | | | | |
| 000039 000 | 4390.00 | 0.00 | 0.00 | 4390.00 | 2451.00 | 365.00 | 0.00 | 0.00 | 2816.01 | |
| *Biological Safety Cabinet* | | | | | | | | | | |
| 000300 000 | 7280.00 | 0.00 | 0.00 | 2260.00 | 1228.33 | 183.33 | 0.00 | 0.00 | 1411.66 | |
| *Fisher ICO Incubator M* | | | | | | | | | | |
| 000301 000 | 13701.25 | 0.00 | 0.00 | 13701.25 | 7649.89 | 1141.77 | 0.00 | 0.00 | 8791.66 | |
| *High Press Liquid Chrom* | | | | | | | | | | |

June 12, 1998 (9:47am)

Located at JK Molds, 2048 West 11th Street, Upland, California 91786

- Certain molds



June 12, 1998 (9:47am)

Located at Liberty Tool at 4201 Seltice Way, Coeur d'Alene, Idaho 83814:

- Certain molds

25/01/99    12:34    ULTRAFEM → NEW YORK    NO.844    P16

June 1, 1988
10:11 AM

**Ultrafem MT Fixed Assets**
## FIXED ASSET SUMMARY REPORT
as of ~~JUNE~~ 04/98

*Handwritten: Located at Liberty Tool* 14

| FAS Ab Cat | Beginning Cost | (+) Current Year Acquisition | (+) Current Year Trans-In | (-) Current Year/Displ/Trans-Out | Ending Cost | Prior Accum Depr/179 Expense | (+) Current YTD Depr/ 179 Expense | Curr Accum Depr/179/ 179 Expense Trans-In | Curr Accum Depr/179/Displ Trans-Out | Total Accum Depr | K c |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 Cavity Matrix Mold #1 | | | | | | | | | | | |
| 000016 000 2491.00 | 0.00 | 0.00 | 0.00 | 2491.00 | 2262.66 | 228.34 | 0.00 | 0.00 | 2491.00 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000017 020 3375.56 | 0.00 | 0.00 | 0.00 | 3375.56 | 3544.87 | 430.69 | 0.00 | 0.00 | 3375.56 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000018 000 261.68 | 0.00 | 0.00 | 0.00 | 261.68 | 226.81 | 34.87 | 0.00 | 0.00 | 261.68 | |
| Control System Mold #1 | | | | | | | | | | | |
| 000019 000 220.00 | 0.00 | 0.00 | 0.00 | 220.00 | 175.00 | 25.00 | 0.00 | 0.00 | 200.00 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000020 000 560.00 | 0.00 | 0.00 | 0.00 | 560.00 | 524.00 | 136.00 | 0.00 | 0.00 | 560.00 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000021 000 1410.00 | 0.00 | 0.00 | 0.00 | 1410.00 | 1186.75 | 221.50 | 0.00 | 0.00 | 1350.25 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000022 000 565.00 | 0.00 | 0.00 | 0.00 | 565.00 | 442.00 | 44.00 | 0.00 | 0.00 | 566.00 | |
| Cavity Mold #2 Pot | | | | | | | | | | | |
| 000023 000 3741.00 | 0.00 | 0.00 | 0.00 | 3741.00 | 1916.65 | 411.25 | 0.00 | 0.00 | 2329.65 | |
| Cavity Mold #1 Pot | | | | | | | | | | | |
| 000024 000 11600.00 | 0.00 | 0.00 | 0.00 | 11600.00 | 6360.00 | 4770.00 | 0.00 | 0.00 | 11130.00 | |
| Solid Manifold M-11 for Mold #1 | | | | | | | | | | | |
| 000025 000 77576.00 | 0.00 | 0.00 | 0.00 | 77576.00 | 15515.20 | 11636.40 | 0.00 | 0.00 | 27151.60 | |
| Cavity Mold #1 | | | | | | | | | | | |
| 000026 000 77576.00 | 0.00 | 0.00 | 0.00 | 77576.00 | 15525.20 | 11636.40 | 0.00 | 0.00 | 27151.60 | |
| Cavity Mold #2 | | | | | | | | | | | |
| 000027 000 21420.56 | 0.00 | 0.00 | 0.00 | 21420.56 | 3570.09 | 3213.08 | 0.00 | 0.00 | 6783.17 | |
| Temp Ctrl Mold #2 | | | | | | | | | | | |
| 000028 000 21420.56 | 0.00 | 0.00 | 0.00 | 21420.56 | 3213.08 | 3213.08 | 0.00 | 0.00 | 4426.16 | |
| Temp Ctrl Mold #3 | | | | | | | | | | | |
| 000029 000 77576.00 | 0.00 | 0.00 | 0.00 | 77576.00 | 5050.53 | 11636.40 | 0.00 | 0.00 | 16686.93 | |
| Cavity Mold #4 | | | | | | | | | | | |
| 000030 000 21420.56 | 0.00 | 0.00 | 0.00 | 21420.56 | 2499.07 | 3213.08 | 0.00 | 0.00 | 5712.15 | |
| Temp Ctrl Mold #4 | | | | | | | | | | | |
| 000031 000 20352.00 | 0.00 | 0.00 | 0.00 | 20352.00 | 2035.20 | 3052.80 | 0.00 | 0.00 | 5088.00 | |
| New Carbonate Mold #1 | | | | | | | | | | | |

*Vertical text in left margin: LIBERTY TOOL*

June 12, 1998 (9:47am)

Located at Liberty Tool at 4201 Seltice Way, Coeur d'Alene, Idaho 83814:

- Certain molds

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000325 000 | 1535.00 | 0.03 | 0.00 | 0.00 | 1533.00 | 1533.00 | 0.00 | 0.00 | 0.00 | 1530.03 |
| | Mold Insert | | | | | | | | | |
| 000326 000 | 1140.00 | 0.00 | 0.00 | 0.00 | 1140.00 | 1140.00 | 0.00 | 0.00 | 0.00 | 1140.00 |
| | 2nd Cavity Rim Mold | | | | | | | | | |
| 000327 000 | 14000.00 | 0.00 | 0.00 | 0.00 | 14000.00 | 14000.00 | 0.00 | 0.00 | 0.00 | 14000.00 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000338 000 | 14351.33 | 0.00 | 0.00 | 0.00 | 14351.33 | 14351.33 | 0.00 | 0.00 | 0.00 | 14351.33 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000339 000 | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000310 000 | 14351.33 | 0.00 | 0.00 | 0.00 | 14351.33 | 14351.33 | 0.00 | 0.00 | 0.00 | 14351.33 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000311 000 | 4591.00 | 0.00 | 0.00 | 0.00 | 4591.00 | 4361.65 | 229.35 | 0.00 | 0.00 | 4591.00 |
| | Temp Ctrl Housing Mold #1 | | | | | | | | | |
| 000312 000 | 569.20 | 0.00 | 0.00 | 0.00 | 569.20 | 559.59 | 64.61 | 0.00 | 0.00 | 569.20 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000313 000 | 16259.34 | 0.00 | 0.00 | 0.00 | 16259.34 | 15175.39 | 1083.95 | 0.00 | 0.00 | 16259.34 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000314 000 | 519.50 | 0.00 | 0.00 | 0.00 | 519.50 | 442.88 | 76.62 | 0.00 | 0.00 | 519.52 |
| | Cavity Mold #1 Pat | | | | | | | | | |
| 000315 000 | 197.50 | 0.00 | 0.00 | 0.00 | 197.50 | 89.70 | 14.81 | 0.00 | 0.00 | 204.51 |

Located At Liberty Tool

JUN. 1.1998  5:03PM   ULTRAFEM   NO.413   P.16/21

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000361 000 | 77576.00 | 0.00 | 0.00 | 0.00 | 77576.00 | 6466.67 | 71636.40 | 0.00 | 0.00 | 18101.03 |
| | Mold #5 | | | | | | | | | |
| 000362 000 | 21466.83 | 0.00 | 0.00 | 0.00 | 21466.83 | 2788.90 | 7228.02 | 0.00 | 0.00 | 5500.32 |
| | Temp Control Mold #5 | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000385 000 | 4660.15 | 0.00 | 0.00 | 0.00 | 4660.15 | 232.41 | 697.32 | 0.00 | 0.00 | 529.63 |
| | Feed Hopper For Metal Detection Of Molds | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000399 000 | 59440.00 | 0.00 | 0.00 | 0.00 | 59440.00 | 3314.67 | 14916.00 | 0.00 | 0.00 | 18236.67 |
| | Cavity Mold #6 | | | | | | | | | |
| 000400 000 | 59440.00 | 0.00 | 0.00 | 0.00 | 59440.00 | 3314.67 | 14916.90 | 0.00 | 0.00 | 18330.67 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000405 000 | 0.00 | 27795.00 | 0.00 | 0.00 | 27795.00 | 0.00 | 4169.25 | 0.00 | 0.00 | 4169.25 |
| | Runnerless Mold Controller Mold #6 | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000416 000 | 0.00 | 59440.00 | 0.00 | 0.00 | 59440.00 | 0.00 | 13258.66 | 0.00 | 0.00 | 13258.66 |
| | Cavity Mold #8 | | | | | | | | | |

June 12, 1998 (9:47am)

## SCHEDULE 1.1(c)
## INVENTORY LOCATIONS

| Raw Materials | Finished Goods |
|---|---|
| Ultrafem Plant/Warehouse<br>1600 North Avenue<br>Missoula, Montana 59801 | Ultrafem Plant/Warehouse<br>1600 North Avenue<br>Missoula, Montana 59801 |
| Liberty Tool<br>4201 Seltice Way<br>Coeur d'Alene, Idaho 83814 | Morgan & Sampson<br>1651 S. Carlos Avenue<br>Ontario, CA 91761 |
| Clopay Plastics<br>312 Walnut Street, Suite 1600<br>Cincinnati, Ohio 45202-4036 | Morgan & Sampson<br>429C Walakamilo Road<br>Honolulu, Hawaii 96817 |
| Bloomer Plastics<br>1710 N. Industrial Drive<br>P.O. Box 5<br>Bloomer, Wisconsin 54724 | Rudie Wilhelm Warehouse Co.<br>2400 South East Mailwell Drive<br>Milwaukee Oregon 97222 |
| JK Molds<br>2048 West 11th Street<br>Upland, California 91786 | John Jeffrey Corporation<br>50 Heller Road<br>Belmar New Jersey 21227 |

June 12, 1998 (9:47am)

## SCHEDULE 1.1(d)
## FIXTURES AND IMPROVEMENTS

Ultrafem's manufacturing facility located at 1600 North Avenue, Missoula, Montana 59801

Ultrafem's offices located at 130 West 42nd Street, Suite 1103, New York, NY 10036

June 12, 1998 (9:47am)

## SCHEDULE 1.1(e)
## <u>OTHER TANGIBLE ASSETS</u>

Marketing materials at Missoula, Montana and CMR (see attached)

# Memorandum

**DATE:** April 10, 1998

**TO:** Wendy Greeson

**FROM:** Deb Fienberg *Deb*

**RE:** Fulfillment inventory at CMR

**cc:** Tonya Hinch, Dori Reap, Wendell Guthrie, Lynn Cuperus

*[handwritten: CMR — Consolidated Market Response, 700 W. Lincoln, Suite 200, Charleston, IL 61920]*

We would like to do the following with the inventory currently in stock at CMR:

| Item | *Approximate* Quantity* | Action |
|------|------------------------|--------|
| Starter Kits | 8,064 | Store for 6 months |
| Deluxe Kits | 24,780 | Store for 6 months |
| Remaining | See Attached | Destroy |

Again, thank you for all your support. We really appreciate CMR holding the starter kits and deluxe kits free of charge. As we have discussed, please feel free to offer a starter kit to each CSR. Just send me a note reflecting the new inventory.

*[handwritten: * Will be finalized at closing. (quantity approx. at 4/11/98)]*

# FULFILLMENT QUANTITIES AT
# MISSOULA, MT WAREHOUSE

APPROXIMATE

| DESCRIPTION | QUANTITY* |
|---|---|
| Deluxe Starter Kits | 52,305 |
| Professional Starter Kits | 1,873 |
| Consumer Starter Kits | 2,013 |
| In Market Starter Videos | 116,931 |
| Out of Market Starter Videos | 129 |
| Edumercial Videos | 23,886 |
| Travel Case | 13,600 |
| Coupon Mailer | 2,000 |
| $2.00 Coupon - 3 31/98 Expiration | 12,000 |
| Professional Brochure | 2,500 |

*As of 3/18/98; will be finalized at closing

June 15, 1998 (4:52pm)

## SCHEDULE 1.1(f)
## ACCOUNTS RECEIVABLE, DEPOSITS AND CONTRACT RIGHTS

Statement of accounts receivable, current as of the Closing Date, identifying each account and the amount owed, will be provided to Buyer at the Closing

Unbilled Orders

Buyer to specify any deposits or prepaid expenses to be assigned in connection with any Assumed Liabilities or contract rights relating to the sale of the Product

Seller's rights to the telephone number 1-800-Instead, to the extent transferable

June 12, 1998 (4:17pm)

## SCHEDULE 1.3
## ASSUMED LIABILITIES

Clopay Plastics                        (Reservoir Film Manufacturer)
312 Walnut Street, Suite 1600
Cincinnati, Ohio 45202-4036

GE Capital Modular Space               (Plant/Warehouse located at 1600
PO Box 641595                          North Avenue, Missoula, MT 59801)
Missoula, Montana 59806

Shell Company                          (Sale Contract for raw materials)
PO Box 2463
Houston, Texas 77252-2463

Western Trade Center                   (Plant/Warehouse located at 1600 North Avenue
PO Box 8182                            Missoula, MT 59801
Missoula, MT 59807

Unless otherwise indicated, Seller is in default under the Assumed Contracts

June 12, 1998 (9:47am)

**SCHEDULE 1.4**
**EXCLUDED ASSETS**

1997 Chevrolet Corvette

IBM Thinkpad Laptop Computer

Agreement dated as of February 8, 1996 between Seller and ReProtect, LLC. Seller has not made payments required thereunder for the months of March, April, May, and June 1998, and Seller is in default thereunder.

<u>Bank Accounts</u>

| Name of Bank | Account No. | Description |
|---|---|---|
| The Chase Manhattan Bank 60 East 42nd Street New York, NY 10165 | 6216028943-65 (High View Security Deposit) | Savings |
| | 128-6192870-19 | Charge card CD |
| | 904-901262 (Business Checking) | DIP Operating Acct. |
| | 904-901270 (Business Checking) | DIP Payroll Acct. |
| | 904-901297 (Business Checking) | DIP Tax Acct. |
| Bank of America P.O. Box 3700 San Francisco, CA 94137 | 0033-1-30804 P.O. Box 37000 Parent No. 98898 Lockbox No. 73088 | Lockbox |
| First Interstate Bank 101 E. Front Missoula, MT 5980 | 1400945380 | Veriphone |

<u>Security Deposits</u>

| Description | Date of Deposit | Security Deposit Amount |
|---|---|---|
| Tokai Financial - postage meter | 6/25/96 | 149.39 |
| Bell Atlantic - deposit on upgrade | 10/21/97 | 500.00 |
| America Properties - Security deposit 130 W. 42nd | 2/19/98 | 12,133.34 |
| GE Capital | | 7,740.00 |

June 12, 1998 (9.47am)

Insurance

| DIRECTORS AND OFFICERS' INSURANCE: | Genesis Insurance Company<br>25550 Chagrin Boulevard, Suite 300<br>Beachwood, OH  44122-5676<br><br>Admiral<br>1255 Caldwell Road<br>Cherry Hill, NJ  08034 |
| --- | --- |
| LIABILITY COVERAGE: | General Star Indemnity Co.<br>550 South Hope Street, Suite 700<br>Los Angeles, CA  90071-2648 |
| PROPERTY INSURANCE: | Chubb Insurance Co.<br>15 Mountain View Road<br>Warren, NJ  07059 |
| WORKERS COMPENSATION: | Chubb Insurance Co.<br>15 Mountain View Road<br>Warren, NJ  07059 |
| E&O COMMUNICATIONS LIABILITY INS.: | Employers Reinsurance Company |
| EMPLOYMENT PRACTICES INSURANCE: | Granite State Insurance Company<br>Morefar Marketing Inc.<br>501 Carr Road<br>Wilmington, DE  19809 |
| COMMERCIAL AUTOMOBILE COVERAGE: | Chubb Insurance<br>15 Mountain View Road<br>Warren, NJ  07059 |

See attached list of assets which Seller has not paid for, and may not have title and/or possession

*Assets in our possession and in use (when MFG. products) Bills arrived after 4/1/98, therefore, not paid*

Ultrafem MT Fixed Assets

# FIXED ASSET SUMMARY REPORT
## as of 04/98

Page 18

| | | (+) Current Year Acquisition | (+) Current Year Trans-In | (-) Current Year/Disp/ Trans-Out | Ending Cost | Prior Accum Dept/LTD Expense | (+) Current LTD Dept/ LTD Expense | (+) Corr Accum Dept/LTD/ Trans-In | (-) Curr Accum D pt/LTD/Disp Trans-Out | Total Accum Dept | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Beginning Cost | | | | | | | | | | |
| 000129 000 | 0.00 | 3505.00 | 0.00 | 0.00 | 3500.00 | 0.00 | 291.66 | 0.00 | 0.00 | 291.66 | **$1,000 pd 2500 NOT** |
| Engineering Changes JK Mold #1 | | | | | | | | | | | |
| 000130 000 | 0.00 | 7240.00 | 0.00 | 0.00 | 7240.00 | 0.00 | 482.66 | 0.00 | 0.00 | 482.66 | **NOT paid** |
| Engineering Modifications to JK Mold #1 | | | | | | | | | | | |
| 000131 000 | 0.00 | 2255.00 | 0.00 | 0.00 | 2255.00 | 0.00 | 197.89 | 0.00 | 0.00 | 197.89 | **NOT paid** |
| Wiring to the Engineering Modular | | | | | | | | | | | |
| 000132 000 | 0.00 | 5756.00 | 0.00 | 0.00 | 5756.00 | 0.00 | 504.51 | 0.00 | 0.00 | 504.51 | **NOT paid** |
| 000 Amp Power in Engineering Modular | | | | | | | | | | | |
| 000133 000 | 0.00 | 3556.00 | 0.00 | 0.00 | 3556.00 | 0.00 | 347.02 | 0.00 | 0.00 | 347.02 | **NOT paid** |
| Unit Heaters for Machine Shop | | | | | | | | | | | |
| 000134 000 | 0.00 | 8804.51 | 0.00 | 0.00 | 8804.51 | 0.00 | 772.32 | 0.00 | 0.00 | 772.32 | **$500 pd 8304 NOT** |
| Wiring To Machine Shop | | | | | | | | | | | |
| 000135 000 | 0.00 | 23572.00 | 0.00 | 0.00 | 23572.00 | 0.00 | 2067.72 | 0.00 | 0.00 | 2067.72 | **2,000 pd 21,572 NOT** |
| Sprinkler Sys Add On Warehouse | | | | | | | | | | | |

26/01/98    17:13    ULTRAFEM → NEW YORK                          NO.047    D23

## CIP DETAILED (?)

### Construction In Progress
### As Of April 30, 1998

| Date | PO# | Line# | Vendor | Description | Total Price | Payments | Balance Due | Accrued |
|---|---|---|---|---|---|---|---|---|
| 9/20/97 | 11213 | 3 | Gordon, Pnll, | Engineering Services For Clean Room & HVAC | $ 3,092.50 | | | |
| 9/20/97 | 11213 | 3 | Gordon, Pnll, | Engineering Services For Clean Room & HVAC | $ 4,836.00 | | 4,835.00 | |
| 11/1/97 | 11372 | 3 | Gordon, Pnll, | Engineering Services For Clean Room & HVAC | $ 145.00 | | | |
| 12/1/97 | 11437 | 3 | Gordon, Pnll, | Engineering Services For Clean Room & HVAC | $ 540.00 | | | |
| 11/5/97 | 10976 | 3 | Art & Archie | Architectural Drawings for new Cleanroom | $ | $ -500.00 | 4,300.00 | --- |
| 12/18/97 | 11374 | 3 | Palmer Electr | Palmer Electric Wiring for new Production | $ 25,287.00 | $ 25,287.00 | 25,287.00 | |
| 1/2/98 | 11453 | 3 | Palmer Electr | Cable Tray for Wiring Super Auto | $ 3,468.00 | $ 3,468.00 | 3,468.00 | |
| | 11376 | 3 | Palmer Electr | Wiring rear ext/Machine shop | $ 1,222.00 | $ - | 1,222.00 | |
| **WAREHOUSE** | | | | | | | | |
| 10/24/97 | 11276 | | Interstate Ala | Alarm Extensions To Warehouse | $ 7,244.00 | $ ... | 2,872.40 | |
| 11/5/97 | 10974 | | Art & Archie | Architectural Drawings for Employee Breakroom | $ | $ -872.00 | 2,872.00 | |
| 11/5/97 | 10975 | | Art & Archie | Architectural Modification to AM Kinney Concept for edam | $ | $ 720.00 | 1,720.00 | |

*(handwritten annotations: "Location: Msla", "payment due", "payment due", "Location, Msla", "payments due")*

Page 7

ULTRAFEM → NEW YORK                    NO.847    D22

## CIP DETAILED (2)
### Construction in Progress
### As Of April 30, 1998

*(handwritten, left margin: Location: Remarks, payments due)*

| Date | PO # | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|---|---|---|---|---|---|---|---|---|
| **THERMOFORMERS** | | | | | | | | |
| 5/10/96 9/17/96 11/22/96 | 7765 | 3 | Remmele | Fully Auto Line #3 | $2,002,600.00 | $ 600,760.00 $ 600,760.00 $ 300,380.00 | $ 500,669.00 $ 300,390.00 | |
| 7/31/97 | 10560 | 3 | Remmele | Installation- Fully Auto Line #3 | $ 24,901.00 | $ 8,715.35 | $ 16,185.65 | |
| 5/10/96 9/17/96 11/22/96 | 2632 | 4 | Remmele | Fully Auto Line #4 | $1,560,000.00 | $ 468,000.00 $ 468,000.00 $ 234,000.00 | $ 364,000.00 $ 390,000.00 | |
| 9/30/98 | 3027 | 3&4 | Remmele | Leak Test Station | $ 560,000.00 | $ 195,000.00 | $ 364,000.00 | $ 177,650.00 |
| 6/27/97 | 10822 | 3 | Remmele | Rim Inspection & Sorting Upgrade Line # | $ 260,000.00 | $ 90,300.00 | $ 169,700.00 | $ 63,700.00 |
| 6/27/97 | 10822 | 4 | Remmele | Rim Inspection & Sorting Upgrade Line # | $ 170,000.00 | $ 60,200.00 | $ 109,800.00 | |
| 7/2/96 | 2673 | 3&4 | Remmele | Open Station Line #3 & #4 Fully Auto | $ 56,000.00 | $ - | $ 56,000.00 | $ 27,964.00 |
| 10/2/97 | 11242 | 3&4 | Remmele | Amendment #6 Reduced Throughput & R | $ 33,900.00 | $ - | $ 33,900.00 | $ 15,235.00 |
| 7/1/96 | 2872 | 3 | Remmele | Engineering Study Of Leak Test | $ 10,500.00 | $ - | $ 10,500.00 | $ 14,635.00 |
| 3/19/97 | 10424 | 3 | Remmele | Prototype Rim Cleaning Apparatus | $ 9,000.00 | $ - | $ 9,000.00 | $ 9,060.00 |

ULTRAFEM → NEW YORK    13    ULTRAFEM → NEW YORK    NO.247

## CIP DETAILED (2)

**Construction in Progress**
**As Of April 10, 1998**

| Date | PO# | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|---|---|---|---|---|---|---|---|---|
| 4/28/97 | | | | Freight Checkweigher A3-1 & #3-2 | $ | 209.44 | | |

### MOLDS

| Date | PO# | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|---|---|---|---|---|---|---|---|---|
| 8/19/96 10/25/97 | 2900 | 2 | Liberty Tool | Mold #9 | $ 99,440.00 | $ 48,720.00 47,320.00 | $ 2,400.00 +/-320.00 $97,320.00 | |
| 1/28/97 6/11/97 | 10144 | 2 | Liberty Tool | Molds #10 | $ 102,147.00 | $ 51,073.50 29,808.98 | $ 21,264.52 | |
| 1/28/97 6/11/97 | 10144 | 3 | Liberty Tool | Molds #11 | $ 102,147.00 | $ 51,073.50 29,808.98 | $ 21,264.52 | |
| 1/28/97 6/10/97 | 10145 | 3 | Liberty Tool | Molds #12 | $ 102,147.00 | $ 51,073.50 29,808.98 | $ 21,264.52 | |
| 1/28/97 6/10/97 | 10145 | 3 | Liberty Tool | Molds #13 | $ 102,147.00 | $ 51,073.50 29,808.98 | $ 21,264.52 | |

### ACCUMULATOR SYSTEM

| Date | PO# | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|---|---|---|---|---|---|---|---|---|
| 2/13/97 3/7/97 4/21/97 6/2/97 10/31/98 | 10216 | 3 | Precision | Waterfall Proto For Accumulator Sys. | $ 69,821.00 | $ 13,024.20 20,866.30 24,357.35 10,443.15 (2,923.50) | | |
| | | | Precision | Precision-Waterfall Prototype Freight Claim | | $ (2,923.50) | | |

### SHINGLER PACKAGE

| Date | PO# | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|---|---|---|---|---|---|---|---|---|
| 3/25/97 6/11/97 | 10445 | 3 | Mid-States C | Shingler Package- R&D | $ 9,500.00 | $ 3,167.00 6,333.00 | $ - | |
| 6/27/97 4/30/98 | 10523 | 3 | Mid States C | Shingling Conveyor Line #3 | $ 47,569.00 | $ 15,852.00 31,708.00 | $ 31,706 | |
| 8/21/97 12/12/97 | 10690 | 3 | Mid States CF | Installation Of Shingling Project Freight Shingler Package | $ 17,547.00 | $ 5,860.70 2,733.95 | $ 11,683.30 | |

*Handwritten annotations:*
- location: Liberty Tool — payments due
- location: Liberty Tool — payments due
- location: Precision — no payments due for completion; repair shipping damage ($2,923.50) due
- location: Midstates — payments due

Case 1:08-cv-05236-DLC    Document 23-3    Filed 08/22/2008    Page 44 of 99

**CIP DETAILED (2)**

**Construction In Progress**
**As Of April 30, 1998**

| Date | PO# | Line # | Vendor | Description | Total Price | Payments | Balance Due | Accrual |
|------|-----|--------|--------|-------------|-------------|----------|-------------|---------|
| 10/1/97 | 11133 | 3 | Koester | Setup To Test Shuttleworth | $ 4,600.00 | $ 6,600.00 | | |
| 4/1/97 | 10607 | 3 | Mis States C | Air Table & Conveyor For Accumulator Sy | $ 40,448.00 | $ 13,482.00 | | |
| 7/31/97 | | | | | | $ 26,984.00 | | |
| 10/27/97 | | | | Misc. Add-Ons to Air Table | | $ 150.00 | 7910.00 | |
| | | | | Freight- Air Table & Conveyor | | | | |
| 8/27/97 | 10824 | 3 | U White Corp | Accumulator System- Line #3 | $ 190,760.00 | $ 69,823.00 | | |
| 7/25/97 | | | | | | $ 59,934.00 | 9,880.00 | |
| 9/5/97 | | | | | | $ 55,934.00 | 850.00 | |
| | | | | | | -550.00 | | |
| 10/31/97 | 11307 | 3 | U White Corp | Conveyor Height Adj, Accumulator Sys | $ 13,500.00 | $ 6,344.00 | $156.00 | |
| 7/31/97 | 10945 | 3 | Mid States C | 46"x12" Air Table R&D Testing & Video | $ 5,344.00 | | | |
| 7/24/97 | 10931 | 3 | Mid States C | Chain Conveyor From Rammelc To Accu | $ 11,205.00 | $ 3,735.00 | 7,470.00 | |
| 11/14/97 | | | | Freight - Chain Conveyor | | -3,500.00 | 3,532.00 | |
| 9/15/97 | 11010 | 3 | BJ Metal Wor | Duct Work for HVAC Dorn PMT | $ 2,000.00 | $ 200.00 | 1800 | |
| 5/22/97 | 10845 | 3 | Vernco Inc. | Cemline Steam Generator HVAC | | $ 22,350.00 | | |
| 12/18/97 | 11276 | 3 | Palmer Electr | Electrical Panel - Cleanroom/Super Auto | $ 10,318.00 | $ 9,890.00 | 429.00 | 9,890.00 |

**CLEANROOM, SUPER AUTO**

| | | | | | | | | |
|------|-----|--------|--------|-------------|-------------|----------|-------------|---------|
| 7/28/97 | 10939 | 3 | Nelson & Ass | Well Drilling For New Cleanroom Super A | $ 1,770.00 | $ 300.00 / $ 1,037.50 | 432.50 | |
| 7/15/97 | 10891 | 3 | Gordon, Prill, | Engineering Services For Clean Room & HVAC | | $ 3,090.00 | | |
| 8/30/97 | 11087 | 3 | Gordon, Prill, | Engineering Services For Clean Room & HVAC | | $ 562.50 | | |

*(Handwritten annotations:)*
Location: Mfg — payments due
Location: Mfg — payments due
Location: White — payments due
Location: Mfg — payment due
Location: Mfg — payments due
Location: Mfg — payments due
Location: Mfg — payments due
Location: Mfg — payments due
Location: Super A — payment due

June 12, 1998 (9:47am)

## SCHEDULE 2.2
## WIRE TRANSFER INSTRUCTIONS

The deposit shall be wired to the following account:

Togut, Segal & Segal Special
Account #: 026046849

Chase Manhattan Bank
ABA # 021000021

2 Penn Plaza
New York, NY 10124

Attn: Shawnette Richardson

Please indicate in the wire transfer (1) the name of the sender, (2) the name of the person or company from whose account the funds are being transferred, (3) a telephone number which can be called in case a question arises with respect to the wire and (4) the tax identification number of the person or company transferring the funds.

June 12, 1998 (9:47am)

## SCHEDULE 3.3
## LITIGATION

- <u>Audrey Contente v. Ultrafem, Inc., John Andersen, Charles D. Peebler, Jr., Martin Nussbaum, Richard A. Cone, Joy V. Jones, and Barrie Zesiger,</u> Case No. 98-CIV-0912, pending in United States District Court for the Southern District of New York, alleging wrongful, unlawful and discriminatory conduct.

- <u>Lynn E. McNeill-Ayele and Geachew Ayele v. Ultrafem, Inc. a Delaware Corporation, Longs Drug Stores, Inc., a California corporation, and DOES 1 through 100 inclusive,</u> Case No. 97AS05702, pending in the Superior Court of the State of California in and for the County of Sacramento, alleging personal injury.

- <u>Earl Pruyn, M.D. v. Ultrafem, Inc., a Delaware Corporation, John W. Andersen, Charles D. Peebler, Jr., Audrey Contente, Joy Vida Jones, martin Nussbaum, Richard A. Cone, Barrie Zesiger,</u> Case No. CV 97-149-M-LBE, pending in the United States District Court for the Southern District of Montana, Missoula Division, relating to 10% Subordinated Convertible Debentures. Dismissed without prejudice as to counts; with prejudice as to two counts.

- <u>Philip Berliner, Gerson Sontag and Robert M. Sayre, on behalf of themselves and all others similarly situated v. Ultrafem, Inc., John W. Andersen, Audrey Contente, Dori M. Reap, Tonya G. Hinch, Gary Nordmann, Wendell Guthrie, Richard A. Cone, Joy Vida Jones, Martin Nussbaum, Charles D. Peebler, Jr., Barrie Zesiger, Jeffries & Company and Hampshire Securities Corporation,</u> Case No. 98-CIV-1977 pending in United States District Court for the Southern District of New York, relating to $40 million public offering of 2 million shares of common stock

- <u>John Magnan, on behalf of himself and all others similarly situated v. Ultrafem, Inc., John W. Andersen, Audrey Contente, Charles D. Peebler, Joy Vida Jones, Barrie R. Zesiger and Dori M. Reap,</u> Case No. 98 CIV 1900, pending in United States District Court for the Southern District of New York.

- <u>Tiffany Lewin, on behalf of herself and all others similarly situated v. John W. Andersen, Audrey Contente, Charles D. Peebler, Jr., Joy Vida Jones, Barrie R. Zesiger, and Dori M. Reap,</u> Case No. 98-CIV-2609 pending in United States District Court for the Southern District of New York, relating to $40 million public offering of 2 million shares of common stock

- <u>Marcel Renny, on behalf of himself and all others similarly situated v. John W. Andersen, Audrey Contente, Dori M. Reap, Tonya G. Hinch, Gary Nordmann, Wendell Guthrie, Richard A. Cone, Joy Vida Jones, Martin Nussbaum, Charles D. Peebler, Jr., Barrie Zesiger, Jeffries & Company and Hampshire Securities</u>

June 12, 1998 (9:47am)

Corporation, Case No. 98-CIV-3043 pending in United States District Court for the Southern District of New York, relating to $40 million public offering of 2 million shares of common stock

- Jacqulin Shere and Rose Shere, on behalf of themselves and all others similarly situated v. John W. Andersen, Audrey Contente, Charles D. Peebler, Jr., Joy Vida Jones, Barrie R. Zesiger, and Dori M. Reap, Case No. 98-CIV-35392609 pending in United States District Court for the Southern District of New York, relating to $40 million public offering of 2 million shares of common stock

- Nachum Barnetsky, on behalf of himself and all others similarly situated v. John W. Andersen, Audrey Contente, Dori M. Reap, Tonya G. Hinch, Gary Nordmann, Wendell Guthrie, Richard A. Cone, Joy Vida Jones, Martin Nussbaum, Charles D. Peebler, Jr., Barrie Zesiger, Jeffries & Company and Hampshire Securities Corporation, Case No. 98-CIV-3488 pending in United States District Court for the Southern District of New York, relating to $40 million public offering of 2 million shares of common stock

June 12, 1998 (9:47am)

## SCHEDULE 3.6
## <u>INTELLECTUAL PROPERTY</u>

See Schedule 1.1(a)

Audrey Contente litigation (see Schedule 3.3)

Agreement dated as of February 8, 1996 between Seller and ReProtect, LLC. Seller has not made payments required thereunder for the months of March, April, May, and June 1998, and Seller is in default thereunder.

June 12, 1998 (9:47am)

## SCHEDULE 3.7
## <u>INSURANCE</u>

See insurance listed on Schedule 1.4

June 12, 1998 (9:47am)

## SCHEDULE 3.9
## INVENTORY AND ACCOUNTS RECEIVABLE

### Inventory

Inventory on Seller's books as at 5/31/98 (unaudited)
(stated at lower of weighted average cost or market basis) - $4,018,483

| | |
|---|---|
| Raw Materials | $409,338 |
| Offsite raw Materials | $176,048 |
| Nonconforming inventory | $23,335 |
| WIP | $0 |
| Finished Goods | $3,539,580 |
| Reserve for Inventory writedown | ($129,818) |
| Total Inventory | $4,018,483 |

Does not reflect a physical inventory count

See attached for Finished Goods Inventory details. The finished goods breakout does not reflect the reserve for obsolete inventory.

### Receivables

Accounts Receivable as of 5/31/98 (unaudited) - $503,093

See attached for current receivable listing (Seller makes no guarantees of collection of accounts receivable)

### Customer Orders

During the period from June 1, 1998 through June 11, 1998 Seller has received orders totaling $75,399 (See attached)

05-31-98

| CUSTOMER NAME | CUSTOMER NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| ACME Markets, Inc | ACM0001 | | $ 1,473.07 | $ 1,440.00 | $ - | $ - | $ - | $ 33.07 |
| ACME Markets, Inc Total | | | $ 1,473.07 | $ 1,440.00 | $ - | $ - | $ - | $ 33.07 |
| American Drug Stores | ADS0001 | | $ 24,346.43 | $ 22,880.60 | $ - | $ - | $ 532.15 | $ 149.68 |
| American Drug Stores | ADS0002 | | $ 76.80 | $ - | $ - | $ - | $ - | $ 76.80 |
| American Drug Stores | ADS0003 | | $ 5,680.51 | $ 1,080.00 | $ - | $ 4,359.61 | $ - | $ 248.90 |
| American Drug Stores | ADS0004 | | $ 273.40 | $ - | $ - | $ 273.40 | $ - | $ - |
| American Drug Stores | ADS0005 | | $ 383.16 | $ - | $ - | $ 383.16 | $ - | $ - |
| American Drug Stores Total | | $ 6,807.70 | $ 30,760.30 | $ 23,960.60 | $ - | $ 5,680.17 | $ 532.15 | $ 475.38 |
| Associated Food SLC | AFS0001 | | $ (38.16) | $ (38.16) | $ - | $ - | $ - | $ - |
| Associated Food SLC Total | | | $ (38.16) | $ (38.16) | $ - | $ - | $ - | $ - |
| Albertsons | ALB0001 | | $ 59,917.02 | $ 30,082.06 | $ - | $ 5,959.84 | $ 1,117.44 | $ 22,776.68 |
| Albertsons | ALB0002 | | $ 22,780.01 | $ 8,197.29 | $ - | $ - | $ - | $ 14,582.72 |
| Albertsons Total | | $ 26,528.75 | $ 82,697.03 | $ 38,260.15 | $ - | $ 5,959.84 | $ 1,117.44 | $ 37,359.60 |
| Associated Grocers | ASG0001 | | $ 4,371.68 | $ 3,524.36 | $ - | $ - | $ - | $ 847.32 |
| Associated Grocers Total | | $ 847.32 | $ 4,371.68 | $ 3,524.36 | $ - | $ - | $ - | $ 847.32 |
| Bargain Wholesale | BAR0001 | | $ 29,082.82 | $ - | $ - | $ - | $ - | $ 29,082.82 |
| Bargain Wholesale Total | | | $ 29,082.82 | $ - | $ - | $ - | $ - | $ 29,082.82 |
| Bergen Brunswig | BEB0004 | | $ 5,149.54 | $ - | $ - | $ 5,149.54 | $ - | $ - |
| Bergen Brunswig | BEB0005 | | $ 1,599.95 | $ (29.65) | $ - | $ 1,629.60 | $ - | $ - |
| Bergen Brunswig | BEB0006 | | $ 708.98 | $ (22.00) | $ - | $ 730.98 | $ - | $ - |
| Bergen Brunswig | BEB0007 | | $ (0.01) | $ (0.01) | $ - | $ - | $ - | $ - |
| Bergen Brunswig Total | | $ 7,458.46 | $ (51.66) | $ - | $ 7,510.12 | $ - | $ - |
| J.B. Gottstein & Co. | CAR0001 | | $ 936.00 | $ 936.00 | $ - | $ - | $ - | $ - |
| J.B. Gottstein & Co. Total | | | $ 836.00 | $ 936.00 | $ - | $ - | $ - | $ - |
| Certified Grocers | CEG0001 | | $ 6,840.78 | $ (98.76) | $ - | $ - | $ - | $ 6,939.54 |

Page 1

05-31-98

| NAME | CUSTOMER NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Certified Grocers Total | | $ 190.00 | $ 6,840.78 | $ (98.76) | $ | $ | $ | $ 6,939.54 |
| City Market | CMA0001 | | $ 112.44 | $ (67.82) | $ | $ | $ | $ 180.00 |
| City Market Total | | | $ 112.44 | $ (67.82) | $ | $ | $ 0.26 | $ 180.00 |
| The Copps Corporation | COP0001 | | $ 648.00 | $ 648.00 | $ | $ | $ | $ |
| The Copps Corporation Total | | | $ 648.00 | $ 648.00 | $ | $ | $ | $ |
| Costco | COS0001 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco | COS0002 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco | COS0003 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco | COS0004 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco | COS0005 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco | COS0006 | | $ 606.00 | $ | $ | $ 606.00 | $ | $ |
| Costco Total | | | $ 3,636.00 | $ | $ | $ 3,636.00 | $ | $ |
| Cub Foods | CUB0010 | | $ 94.14 | $ | $ | $ | $ | $ 94.14 |
| Cub Foods Total | | | $ 94.14 | $ | $ | $ | $ | $ 94.14 |
| CVS Distribution | CVS0001 | | $ 5,896.91 | $ | $ | $ 5,642.72 | $ | $ 254.19 |
| CVS Distribution | CVS0002 | | $ 17,798.18 | $ (451.85) | $ | $ | $ 8,533.36 | $ 9,716.07 |
| CVS Distribution | CVS0003 | | $ 5,338.46 | $ | $ | $ 4,944.44 | $ 53.93 | $ 340.09 |
| CVS Distribution | CVS0004 | | $ 5,014.32 | $ | $ | $ | $ 5,014.32 | $ |
| CVS Distribution | CVS0005 | | $ 141.12 | $ | $ | $ | $ | $ 141.12 |
| CVS Distribution | CVS0008 | | $ 3,924.86 | $ | $ | $ 1,969.42 | $ 1,955.44 | $ |
| CVS Distribution | CVS0009 | | $ 377.10 | $ | $ | $ 377.10 | $ | $ |
| CVS Distribution Total | | | $ 38,490.95 | $ (451.85) | $ | $ 12,933.68 | $ 15,557.05 | $ 10,451.47 |
| Dominicks | DOM0001 | | $ 3,273.60 | $ | $ | $ 360.00 | $ 720.00 | $ 2,193.60 |
| Dominicks Total | | $ 2,978.17 | $ 3,273.60 | $ | $ | $ 360.00 | $ 720.00 | $ 2,193.60 |
| Drug Emporium | DRE0003 | | $ 292.80 | $ 292.80 | $ | $ | $ | $ |
| Drug Emporium | DRE0005 | | $ 67.11 | $ (0.09) | $ | $ | $ | $ 67.20 |

05-31-98

| CUSTOMER NAME | NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Drug Emporium | DRE0006 | $ | $ (4.77) | $ (4.77) | $ | $ | $ | $ - |
| Drug Emporium | DRE0016 | $ | $ 284.02 | $ | $ | $ 284.02 | $ | $ - |
| Drug Emporium | DRE0017 | $ | $ 270.04 | $ | $ | $ 270.04 | $ | $ - |
| Drug Emporium | DRE0020 | $ | $ 292.60 | $ 292.60 | $ | $ | $ | $ - |
| Drug Emporium | DRE0021 | $ | $ (8.09) | $ (8.09) | $ | $ | $ | $ - |
| Drug Emporium | DRE0022 | $ | $ 15.12 | $ | $ | $ | $ | $ 15.12 |
| Drug Emporium | DRE0031 | $ | $ 90.62 | $ | $ | $ | $ | $ 90.62 |
| Drug Emporium | DRE0032 | $ | $ 19.44 | $ | $ | $ | $ | $ 19.44 |
| Drug Emporium | DRE0033 | $ | $ 64.80 | $ | $ | $ | $ | $ 64.80 |
| Drug Emporium | DRE0034 | $ | $ 194.40 | $ | $ | $ | $ | $ 194.40 |
| Drug Emporium | DRE0037 | $ | $ 19.44 | $ | $ | $ | $ | $ 19.44 |
| Drug Emporium | DRE0041 | $ | $ 19.44 | $ | $ | $ | $ | $ 19.44 |
| Drug Emporium | DRE0043 | $ | $ 392.00 | $ | $ | $ | $ | $ 392.00 |
| Drug Emporium Total | | $ 392.00 | $ 2,009.25 | $ 572.74 | $ - | $ 554.06 | $ - | $ 882.46 |
| Jack Eckerd Drug | ECK0001 | $ | $ 4,566.75 | $ | $ | $ | $ | $ 4,566.75 |
| Jack Eckerd Drug | ECK0003 | $ | $ 2,093.60 | $ | $ | $ | $ | $ 2,093.60 |
| Jack Eckerd Drug | ECK0005 | $ | $ 1,813.60 | $ | $ | $ | $ | $ 1,813.60 |
| Jack Eckerd Drug | ECK0006 | $ | $ 2,386.80 | $ | $ | $ | $ | $ 2,386.80 |
| Jack Eckerd Drug | ECK0007 | $ | $ 139.68 | $ | $ | $ | $ | $ 139.68 |
| Jack Eckerd Drug | ECK0008 | $ | $ 1,757.28 | $ | $ | $ | $ | $ 1,757.28 |
| Jack Eckerd Drug Total | | $ | $ 12,857.71 | $ - | $ | $ - | $ - | $ 12,857.71 |
| Emco Distributors | EMD0001 | $ | $ 259.20 | $ 259.20 | $ | $ | $ | $ - |
| Emco Distributors Total | | $ | $ 259.20 | $ 259.20 | $ - | $ - | $ - | $ - |
| Fairway Foods | FAI0001 | $ 820.80 | $ 1,252.80 | $ 432.00 | $ | $ - | $ 820.80 | $ - |
| Fairway Foods Total | | $ 820.80 | $ 1,252.80 | $ 432.00 | $ - | $ - | $ 820.80 | $ - |
| Fleming Companies | FLE0001 | $ | $ 9,281.58 | $ 8,918.40 | $ | $ | $ 363.18 | $ - |
| Fleming Companies | FLE0002 | $ | $ 4,944.00 | $ 4,944.00 | $ | $ - | $ - | $ - |
| Fleming Companies | FLE0003 | $ | $ 216.00 | $ 216.00 | $ | $ - | $ - | $ - |
| Fleming Companies Total | | $ 363.18 | $ 14,441.58 | $ 14,078.40 | $ | $ - | $ 363.18 | $ - |

05-31-90

| CUSTOMER NAME | CUSTOMER NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Fred Meyer | FRM0001 | | $ 799.02 | $ (164.69) | $ - | $ 963.70 | $ - | $ - |
| Fred Meyer | FRM0002 | | $ (0.21) | $ (0.21) | $ - | $ - | $ - | $ - |
| **Fred Meyer Total** | | | $ 798.81 | $ (164.89) | $ - | $ 963.70 | $ - | $ - |
| GHC Merchandise | GHC0001 | | $ 7,686.97 | $ 7,686.97 | $ - | $ - | $ - | $ - |
| **GHC Merchandise Total** | | | $ 7,686.97 | $ 7,686.97 | $ - | $ - | $ - | $ - |
| Hughes Family Markets | HUG0001 | | $ 550.02 | $ - | $ - | $ - | $ - | $ 550.02 |
| **Hughes Family Markets Total** | | | $ 550.02 | $ - | $ - | $ - | $ - | $ 550.02 |
| Locin Industries | LOC0001 | | $ 136,036.77 | $ - | $ - | $ - | $ 67,633.32 | $ 68,403.45 |
| **Locin Industries Total** | | | $ 136,036.77 | $ - | $ - | $ - | $ 67,633.32 | $ 68,403.45 |
| Longs Drugs | LOD0012 | | $ 162.32 | $ 161.60 | $ - | $ 0.72 | $ - | $ - |
| Longs Drugs | LOD0014 | | $ 161.60 | $ 161.60 | $ - | $ - | $ - | $ - |
| Longs Drugs | LOD0015 | | $ 143.37 | $ 142.40 | $ - | $ 0.97 | $ - | $ - |
| Longs Drugs | LOD0019 | | $ 143.08 | $ 142.40 | $ - | $ 0.68 | $ - | $ - |
| Longs Drugs | LOD0020 | | $ 158.40 | $ 158.40 | $ - | $ - | $ - | $ - |
| Longs Drugs | LOD0027 | | $ 177.60 | $ 177.60 | $ - | $ - | $ - | $ - |
| Longs Drugs | LOD0029 | | $ 9.30 | $ - | $ - | $ - | $ - | $ 9.30 |
| Longs Drugs | LOD0058 | | $ (280.80) | $ (280.80) | $ - | $ - | $ - | $ - |
| Longs Drugs | LOD0063 | | $ 88.24 | $ - | $ - | $ 88.24 | $ - | $ - |
| **Longs Drugs Total** | | | $ 761.11 | $ 663.20 | $ - | $ 88.61 | $ - | $ 9.30 |
| Lucky Stores | LUC0001 | | $ (36.85) | $ (50.96) | $ - | $ 10.08 | $ 4.03 | $ - |
| **Lucky Stores Total** | | | $ (36.85) | $ (50.96) | $ - | $ 10.08 | $ 4.03 | $ - |
| May Drug Stores | MAY0001 | $ 259.20 | $ 259.20 | $ - | $ - | $ - | $ - | $ 259.20 |
| **May Drug Stores Total** | | $ 259.20 | $ 259.20 | $ - | $ - | $ - | $ - | $ 259.20 |
| McKesson | MCK0001 | | $ (1,369.00) | $ (1,369.00) | $ - | $ - | $ - | $ - |
| McKesson | MCK0003 | | $ 219.46 | $ - | $ - | $ - | $ 219.46 | $ - |

05-31-98

| CUSTOMER NAME | NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| McKesson | MCK0006 | $ | $ 240.00 | $ 240.00 | $ - | $ - | $ - | $ - |
| McKesson | MCK0010 | $ | $ (9.16) | $ (9.16) | $ - | $ - | $ - | $ - |
| McKesson | MCK0012 | $ | $ 283.20 | $ 283.20 | $ - | $ - | $ - | $ - |
| McKesson | MCK0026 | $ | $ 285.45 | $ - | $ - | $ 285.45 | $ - | $ - |
| McKesson | MCK0039 | $ | $ 101.33 | $ - | $ - | $ - | $ - | $ 101.33 |
| McKesson Total | | $ 606.24 | $ (244.73) | $ (854.96) | $ - | $ 285.45 | $ - | $ 101.33 |
| Nash Finch Dist. | NAS0001 | $ 907.20 | $ 1,425.60 | $ 518.40 | $ - | $ - | $ - | $ 907.20 |
| Nash Finch Dist. Total | | $ 907.20 | $ 1,425.60 | $ 518.40 | $ - | $ - | $ - | $ 907.20 |
| Price Less Drug | PRLD001 | $ | $ 2.08 | $ 2.08 | $ - | $ - | $ - | $ - |
| Price Less Drug | PRLD002 | $ | $ 5.81 | $ 5.81 | $ - | $ - | $ - | $ - |
| Price Less Drug Total | | $ | $ 7.89 | $ 7.89 | $ - | $ - | $ - | $ - |
| Price Mart | PRMA001 | $ | $ 292.80 | $ 292.80 | $ - | $ - | $ - | $ - |
| Price Mart Total | | $ | $ 292.80 | $ 292.80 | $ - | $ - | $ - | $ - |
| Promotions Unlimited | PRON001 | $ | $ 9,139.44 | $ 9,139.44 | $ - | $ - | $ - | $ - |
| Promotions Unlimited Total | | $ | $ 9,139.44 | $ 9,139.44 | $ - | $ - | $ - | $ - |
| Rite Aid Corp | RAC0001 | $ | $ 22,963.20 | $ - | $ - | $ - | $ 1,574.40 | $ 21,388.80 |
| Rite Aid Corp | RAC0002 | $ | $ 11,769.60 | $ - | $ - | $ 1,224.00 | $ 1,804.80 | $ 8,740.80 |
| Rite Aid Corp | RAC0003 | $ | $ 21,134.40 | $ - | $ - | $ 3,796.80 | $ 1,190.40 | $ 16,147.20 |
| Rite Aid Corp | RAC0004 | $ | $ 17,539.20 | $ - | $ - | $ 1,080.00 | $ - | $ 16,459.20 |
| Rite Aid Corp | RAC0005 | $ | $ 31,248.00 | $ - | $ - | $ - | $ - | $ 31,248.00 |
| Rite Aid Corp | RAC0006 | $ | $ 40,732.80 | $ - | $ - | $ - | $ - | $ 40,732.80 |
| Rite Aid Corp | RAC0007 | $ | $ 17,572.80 | $ - | $ - | $ - | $ 499.20 | $ 17,073.60 |
| Rite Aid Corp | RAC0008 | $ | $ 6,930.40 | $ - | $ - | $ 432.00 | $ 498.20 | $ 4,598.40 |
| Rite Aid Corp Total | | $ 133,059.10 | $ 167,890.40 | $ - | $ - | $ 6,532.80 | $ 5,568.80 | $ 156,368.80 |
| Ralph's Grocery | RAG0001 | $ | $ 1,055.80 | $ - | $ - | $ - | $ - | $ 1,055.60 |
| Ralph's Grocery | RAG0002 | $ | $ 35,107.20 | $ 3,484.80 | $ - | $ 1,036.80 | $ 3,744.00 | $ 26,841.60 |
| Ralph's Grocery Total | | $ 32,688.00 | $ 36,172.80 | $ 3,484.80 | $ - | $ 1,036.80 | $ 3,744.00 | $ 27,907.20 |

Page 5

05-31-98

| CUSTOMER NAME | NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Rays | RAY0011 | | $ (8.96) | $ (8.96) | $ - | $ - | $ - | $ - |
| Rays | RAY0013 | | $ (8.96) | $ (8.96) | $ - | $ - | $ - | $ - |
| Rays Total | | | $ (17.92) | $ (17.92) | $ - | $ - | $ - | $ - |
| Ryans, Inc | RYA0001 | | $ 185.39 | $ - | $ - | $ - | $ - | $ 185.39 |
| Ryans, Inc Total | | | $ 185.39 | $ - | $ - | $ - | $ - | $ 185.39 |
| Safeway | SAF0001 | | $ 4,767.60 | $ - | $ - | $ 2,346.40 | $ - | $ 2,421.20 |
| Safeway | SAF0002 | | $ 32,019.40 | $ 1,201.50 | $ - | $ 24,128.08 | $ 3,232.24 | $ 3,457.58 |
| Safeway | SAF0003 | | $ (1,235.00) | $ (1,235.00) | $ - | $ - | $ - | $ - |
| Safeway | SAF0005 | | $ 4,129.79 | $ 777.59 | $ - | $ - | $ 3,352.20 | $ - |
| Safeway Total | | $ 38,937.70 | $ 39,681.79 | $ 744.09 | $ - | $ 24,128.08 | $ 5,578.64 | $ 9,230.98 |
| Savemart | SAV0001 | | $ 10,727.38 | $ - | $ - | $ - | $ - | $ 10,727.38 |
| Savemart Total | | $ 1,088.60 | $ 10,727.38 | $ - | $ - | $ - | $ - | $ 10,727.38 |
| Shopko | SHO0001 | | $ 3,940.80 | $ - | $ - | $ 1,348.80 | $ 2,592.00 | $ - |
| Shopko | SHO0002 | | $ 643.20 | $ - | $ - | $ 240.00 | $ 403.20 | $ - |
| Shopko | SHO0003 | | $ 2,064.00 | $ - | $ - | $ 2,064.00 | $ - | $ - |
| Shopko | SHO0004 | | $ 7,944.00 | $ - | $ - | $ - | $ 7,944.00 | $ - |
| Shopko Total | | $ 14,592.00 | $ 14,592.00 | $ - | $ - | $ 3,652.80 | $ 10,939.20 | $ - |
| Smith's Food & Drug | SMI0001 | | $ 12,535.85 | $ 12,456.00 | $ - | $ 2.16 | $ 1.73 | $ 75.96 |
| Smith's Food & Drug Total | | | $ 12,535.85 | $ 12,456.00 | $ - | $ 2.16 | $ 1.73 | $ 75.96 |
| Slater Bros. | STB0001 | | $ 945.06 | $ 945.06 | $ - | $ - | $ - | $ - |
| Slater Bros. Total | | | $ 945.06 | $ 945.06 | $ - | $ - | $ - | $ - |
| Super Valu Corporation | SUV0001 | | $ 3,561.60 | $ 3,561.60 | $ - | $ - | $ - | $ - |
| Super Valu Corporation | SUV0002 | | $ 11,617.09 | $ 11,616.00 | $ - | $ - | $ - | $ - |
| Super Valu Corporation | SUV0003 | | $ 1,615.97 | $ 950.40 | $ - | $ 240.50 | $ 369.58 | $ 55.09 |
| Super Valu Corporation | SUV0005 | | $ 620.49 | $ 612.00 | $ - | $ 8.49 | $ - | $ 1.09 |

05-31-98

| CUSTOMER NAME | NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Super Valu Corporation | SUV0006 | $ 674.06 | $ 2,750.40 | $ 2,750.40 | $ - | $ - | $ - | $ - |
| Super Valu Corporation Total | | $ 674.06 | $ 20,165.55 | $ 19,490.40 | $ - | $ 249.39 | $ 369.58 | $ 56.18 |
| | | | | | | | | |
| Target | TAR0001 | | $ 7,492.80 | $ 7,492.80 | $ - | $ - | $ - | $ - |
| Target | TAR0002 | | $ 5,001.60 | $ 5,001.60 | $ - | $ - | $ - | $ - |
| Target | TAR0003 | | $ 12,823.98 | $ 12,370.64 | $ - | $ 453.34 | $ - | $ - |
| Target | TAR0004 | | $ 11,614.84 | $ 11,006.40 | $ - | $ 608.44 | $ - | $ - |
| Target | TAR0005 | | $ 11,487.95 | $ 10,905.60 | $ - | $ 582.35 | $ - | $ - |
| Target | TAR0006 | | $ 8,836.80 | $ 8,836.80 | $ - | $ - | $ - | $ - |
| Target | TAR0007 | | $ 9,448.01 | $ 8,971.20 | $ - | $ - | $ 476.81 | $ - |
| Target | TAR0008 | | $ 6,416.55 | $ 5,851.20 | $ - | $ - | $ - | $ 565.35 |
| Target | TAR0009 | | $ 13,276.80 | $ 13,276.80 | $ - | $ - | $ - | $ - |
| Target | TAR0010 | | $ 5,092.80 | $ 5,092.80 | $ - | $ - | $ - | $ - |
| Target Total | | $ 2,686.29 | $ 91,492.13 | $ 88,805.04 | $ - | $ 1,644.13 | $ 476.81 | $ 565.35 |
| | | | | | | | | |
| ULTA3 | ULT0001 | | $ 7,171.20 | $ 2,836.80 | $ - | $ 273.60 | $ 1,742.40 | $ 2,318.40 |
| ULTA3 Total | | $ 4,334.40 | $ 7,171.20 | $ 2,876.80 | $ - | $ 273.60 | $ 1,742.40 | $ 2,318.40 |
| | | | | | | | | |
| United Grocers | UNG0001 | | $ 4,819.70 | $ 4,233.60 | $ - | $ - | $ - | $ 586.10 |
| United Grocers Total | | $ - | $ 4,819.70 | $ 4,233.60 | $ - | $ - | $ - | $ 586.10 |
| | | | | | | | | |
| URM Stores | URM0001 | | $ 4,103.50 | $ 4,103.50 | $ - | $ - | $ - | $ - |
| URM Stores Total | | $ - | $ 4,103.50 | $ 4,103.50 | $ - | $ - | $ - | $ - |
| | | | | | | | | |
| Vons Grocery | VON0001 | | $ 4,608.00 | $ - | $ 4,608.00 | $ - | $ - | $ - |
| Vons Grocery Total | | $ - | $ 4,608.00 | $ - | $ 4,608.00 | $ - | $ - | $ - |
| | | | | | | | | |
| Walgreens | WAL0001 | | $ 17,539.31 | $ - | $ - | $ 8,293.68 | $ 3,837.68 | $ 5,407.95 |
| Walgreens | WAL0002 | | $ 14,194.48 | $ - | $ - | $ 12,102.48 | $ - | $ 2,092.00 |
| Walgreens | WAL0003 | | $ 10,192.32 | $ - | $ - | $ 4,749.12 | $ 5,443.20 | $ - |
| Walgreens | WAL0004 | | $ 10,951.07 | $ - | $ - | $ 4,399.92 | $ 6,415.20 | $ 135.95 |
| Walgreens | WAL0005 | | $ 18,023.04 | $ - | $ - | $ 8,310.96 | $ 9,712.08 | $ - |
| Walgreens | WAL0006 | | $ 9,265.68 | $ - | $ - | $ 4,958.64 | $ 4,307.04 | $ - |

Page 7

05-31-98

| CUSTOMER NAME | NUMBER | SALES PROMO ACCRUAL | TOTAL | CURRENT | 1 - 30 DAYS | 31 - 60 DAYS | 61 - 90 DAYS | 91 & OVER |
|---|---|---|---|---|---|---|---|---|
| Walgreens | WAL0007 | $ 4,294.61 | $ 16,035.79 | $ - | $ - | $ - | $ - | $ - |
| Walgreens Total | | $ 4,294.61 | $ 36,201.69 | $ - | $ - | $ 51,614.64 | $ 36,732.52 | $ 7,854.73 |
| Walmart | WAM0001 | | $ 3,185.80 | $ (132.49) | $ - | $ 948.67 | $ 198.72 | $ 2,171.89 |
| Walmart | WAM0002 | | $ 2,057.05 | $ - | $ - | $ - | $ 443.70 | $ 1,613.35 |
| Walmart | WAM0003 | | $ 264.96 | $ - | $ - | $ 264.96 | $ - | $ - |
| Walmart | WAM0005 | | $ (198.72) | $ - | $ 198.72 | $ - | $ - | $ - |
| Walmart | WAM0010 | | $ 66.24 | $ - | $ - | $ 66.24 | $ - | $ - |
| Walmart | WAM0011 | | $ 45.26 | $ - | $ - | $ - | $ 45.26 | $ - |
| Walmart | WAM0012 | | $ 66.24 | $ - | $ - | $ 66.24 | $ - | $ - |
| Walmart | WAM0015 | | $ 66.24 | $ - | $ - | $ 66.24 | $ - | $ - |
| Walmart | WAM0018 | | $ 66.24 | $ - | $ - | $ 66.24 | $ - | $ - |
| Walmart | WAM0024 | | $ 331.20 | $ (331.20) | $ - | $ 331.20 | $ - | $ - |
| Walmart Total | | $ 152.10 | $ 6,150.23 | $ (331.20) | $ 198.72 | $ 1,809.79 | $ 687.68 | $ 3,785.24 |
| Grand Total | | $ 339,208.32 | $ 914,863.45 | $ 237,392.06 | $ 4,806.72 | $ 123,045.90 | $ 152,309.45 | $ 391,309.32 |

Page 8

581,655

Trade Receivables
Before Reserves for Doubtful
Accounts, Sales Returns and
Cash Discounts

**Raw Mtl Inventory**

UltraFem, Inc.
Inventory Analysis - On Site Inventory
for the period ending May 31, 1998

| Part No. | Description | Vendor | Unit of Measure | May Qty on Hand | 5/1/98 Standard Price Per UOM | 5/7/98 Standard Total Value @ Standard |
|---|---|---|---|---|---|---|
| RAW MATERIAL INVENTORY | | | | | | |
| UCCA001 | Corrugated Case 24/6 | Boise Cascade | ea | 69 | 0.1798 | 12.41 |
| UCCA001A | Corrugated Case 24/6 | Boise Cascade | ea | 69 | 0.1798 | 12.41 |
| UCCA004 | Corrugated Case 18/14 | Boise Cascade | ea | 8,087 | 0.2270 | 1,835.75 |
| UCCA005 | Corrugated Case 12/20 | Boise Cascade | ea | 8,660 | 0.2100 | 1,818.60 |
| UCCA006 | Corrugated Case 12/24 | Boise Cascade | ea | 2,100 | 0.2750 | 577.50 |
| UCIW002 | Inkimute Wrap Film 8.75 | Bloomer Plastics | lb | 6,609 | 1.2100 | 7,996.89 |
| UCRF002 | Reservoir Film | Clopay | lb | 15,518 | 3.9700 | 61,606.46 |
| UCRI001 | Rim | Liberty Tool | lb | 4,861,500 | 0.0504 | 245,019.60 |
| UCSW001 | Shrink Wrap Film - 17" | Cryovac | lb | | 151.5000 | 151.5000 |
| UCSW002 | Shrink Wrap Film - 12" | Cryovac | lb | | 100.0400 | 100.0400 |
| UCSW003 | Shrink Wrap Film - 18" | Cryovac | lb | 72 | 150.0600 | 10,800.32 |
| UCSW004 | Shrink Wrap Film - 14" | Cryovac | lb | 42 | 116.7100 | 4,901.82 |
| ULCA001 | Carton 6 ct | Jefferson Smurfit | ea | | 0.0619 | - |
| ULCA001F | Carton 6 ct - French | Jefferson Smurfit | ea | 93,065 | 0.0619 | 5,760.72 |
| ULCA004 | Carton 14 ct | Jefferson Smurfit | ea | 129,994 | 0.0856 | 11,127.49 |
| ULCA004F | Carton 14 ct - French | Jefferson Smurfit | ea | 31,535 | 0.0856 | 2,699.40 |
| ULCA005 | Carton 20 ct | Jefferson Smurfit | ea | 190,417 | 0.1315 | 25,039.84 |
| ULCA005F | Carton 20 ct- French | Jefferson Smurfit | ea | 19,306 | 0.1315 | 2,538.74 |
| ULCA006 | Carton 24 ct | Jefferson Smurfit | ea | 14,000 | 0.1261 | 1,765.40 |
| UI.IN002 | Insert 3 color 7 Panel | Thomas Printing | ea | 489,445 | 0.0409 | 19,977.40 |
| ULIN002F | Insert 3 color 7 Panel - French | Artcraft | ea | 15,643 | 0.0489 | 764.94 |
| ULIN003 | Insert 3 color 8 Panel | Artcraft | ea | | 0.0250 | - |
| ULIN003F | Insert 3 color 8 Panel - French | Artcraft | ea | 28,818 | 0.0355 | 4,374.40 |
| ULIN004 | Insert 8 Panel - Free Video | Thomas Printing | ea | 304,117 | 0.0409 | - |
| ULIN005 | Insert 1 Panel $1.00 Off | Thomas Printing | ea | 68,775 | 0.0104 | 716.43 |
| | | | | GRAND TOTAL | | 409,339.10 |
| | | | | | | 409,339.10 |

6/2/98

UltraGen, Inc.
Inventory Analysis - Off-Site Inventory
for the period ending May 31, 1998

**Offsite Raw Mtl Inventory**

| Part No. | Description | Vendor | Unit of Measure | May Qty on Hand | 5/1/98 Standard Price Per UOM | 5/1/98 Total Value @ Standard |
|---|---|---|---|---|---|---|
| RAW MATERIAL | | | | | | |
| GRP65182 | Rim Compound | Liberty Tool & Mfg. Inc. | lb | 7,659 | 2.2900 | 17,538.19 |
| GRP65182-Compound Form | Rim Compound | Liberty Tool & Mfg. Inc. | lb | 237 | 2.2900 | 543.12 |
| J-VON Lot #25319(@ Liberty Tool) | Rim Compound | Liberty Tool & Mfg. Inc. | lb | - | 2.2900 | - |
| J-VON Lot #25319(@J-VON Rehba | Rim Compound | Liberty Tool & Mfg. Inc. | lb | - | 2.2900 | - |
| J-VON Lot #25319 Compound Form | Rim Compound | Liberty Tool & Mfg. Inc. | lb | - | 2.2900 | - |
| J-VON Lot #25990(@J-VON Rehba | Rim Compound | Liberty Tool & Mfg. Inc. | lb | 31,753 | 2.2900 | 72,714.76 |
| J-VON Lot #25990(@ Liberty Tool) | Rim Compound | Liberty Tool & Mfg. Inc. | lb | - | 2.2900 | - |
| J-VON Lot #25990 Compound Form | Rim Compound | Liberty Tool & Mfg. Inc. | lb | - | 2.2900 | - |
| GRP65183 | Rim Compound | J.K. Mold | lb | 1,834 | 2.2900 | 4,199.86 |
| GRP65571 | Film Compound | Beckwith Tubhae | lb | 500 | 2.2100 | 1,105.00 |
| GRP65571 | Film Compound | Bloomer Plastics | lb | 4,100 | 2.2100 | 9,061.00 |
| GRP65571 | Film Compound | Deerfield Urethane, Inc. | lb | - | 2.2100 | - |
| GRP65571 | Film Compound | Spartac Plastics | lb | 10,459 | 2.2100 | 22,114.39 |
| GRP65571 | Film Compound | Clopay | lb | - | 2.2100 | - |
| ULCA001 | 6 Count Carton | Jefferson Smurfit | ea | 239,000 | 0.0619 | 20,030.40 |
| ULCA001 | 14 Count Carton | Jefferson Smurfit | ea | | 0.0856 | |
| ULCA005 | 20 Count Carton | Jefferson Smurfit | ea | 105,000 | 0.1315 | 13,807.50 |
| ULCA006 | 24 Count Carton | Jefferson Smurfit | ea | 110,500 | 0.1261 | 13,934.05 |
| ULIN002 | Inserts | Aircraft Printers | ea | | 0.0409 | |
| ULIN003 | Inserts | Aircraft Printers | ea | | 0.025 | |
| | | | | | Total | 176,048.27 |
| | | | | | Grand Total | 176,048.27 |

c:\accounticlosing\MAY_INV.XLS

# Non Conforming Mtl

UltraFem, Inc.
Inventory Analysis - Non-Conforming Inventory
for the period ending May 31, 1998

| Part No. | Description | Vendor | Unit of Measure | May Qty on Hand | Standard Price Per UOM 5/1/98 | Total Value @ Standard 5/1/98 |
|---|---|---|---|---|---|---|
| **NON-CONFORMING MATERIAL** | | | | | | |
| UCIW002 | Intimate Wrap Film 8.75 | Bloomer Plastics | lb | 5,073 | 1.21 | 20,137.83 |
| UCRF002 | Reservoir Film | Deerfield | lb | | 3.97 | |
| UCRI001 | Rim | Liberty Tool | ea | 1,200 | 0.0504 | 60.48 |
| ULCA001 | Carton 6 ct | Jefferson Smurfit | ea | 2,380 | 0.0619 | 147.32 |
| ULCA004F | Carton 14 ct - French | Jefferson Smurfit | ea | 8,002 | 0.0856 | 684.97 |
| ULCA005F | Carton 20 ct - French | Jefferson Smurfit | ea | 325 | 0.1315 | 42.74 |
| ULIN003 | Insert 3 color 8 Panel | Artcraft | ea | 99,474 | 0.025 | 2,261.85 |
| 00160-14 | 14 Count Case | Ultrafem, Inc. | cs | | 48.5103 | |
| 00200 | 20 Count Case | Ultrafem, Inc. | cs | | 46.0945 | |
| 00240 | 24 Count Case | Ultrafem, Inc. | cs | | 54.8535 | |
| | | | | | TOTAL | 23,335.19 |
| **QUARANTINED MATERIAL** | | | | | | |
| 00240 | 24 Count Case | Ultrafem, Inc. | cs | | 54.8535 | - |
| UCRI001 | Rim | Liberty Tool | ea | | 0.0504 | - |
| UCRF002 | Reservoir Film | Deerfield | lb | | 3.97 | - |
| UCIW002 | Intimate Wrap Film 8.75 | Bloomer Plastics | lb | | 1.21 | - |
| ULIN005 | Insert 1 Panel $1.00 Off | Thomas Printing | ea | | 0.0104 | - |
| | | | | | TOTAL | - |
| **SPECIAL HANDLING** | | | | | | |
| UCRF002 | Reservoir Film | Deerfield | lb | | 3.97 | - |
| UCRI001 | Rim | Liberty Tool | ea | | 0.0504 | - |
| | | | | | GRAND TOTAL | 23,335.19 |

c:\accounts\design\MAY_INV.XLS

6/9/98

WIP

**Ultrafem, Inc.**
**Inventory Analysis - Work In Process**
**for the period ending May 31, 1998**

| Part No. | Description | Unit of Measure | May Qty on Hand | 5/1/98 Standard Price Per UOM | 5/1/98 Total Value @ Standard |
|---|---|---|---|---|---|
| **WIP** | | | | | |
| UCCA004 | Corrugated Case 12/20 | ca | | 0.227 | |
| UCIW002 | Intimate Wrap Film 8.75 | lb | | 1.21 | |
| UCRF002 | Reservoir Film | lb | | 3.97 | |
| UCRI001 | Rim | ea | | 0.6504 | |
| UCSW003 | Shrink Wrap Film - 18" | cl | | 130.06 | |
| ULCA004 | Carton 20 ct | ca | | 0.0856 | |
| ULIN002 | Insert 3 color 7 Panel | ea | | 0.0409 | |
| ULIN004 | Insert 1 panel, Free Video | ca | | | |
| | | Value in WIP for work order | | | |
| | | | Grand Total | | |

c:\\account\design\MAY_INV.XLS
6/8/98

**Finished Goods**

**Ultraem, Inc.**
Inventory Analysis - Finished Goods
for the period ending May 31, 1998

| Part No. | Description | Unit of Measure | May Qty on Hand | 5/1/98 Standard Price Per UOM | 5/1/98 Total Value @ Standard | Units Per UOM | Total Number of Units |
|---|---|---|---|---|---|---|---|
| **ON SITE** | | | | | | | |
| 00002 | SloScup In Intimate Wrap | ea | 80 | 0.1606 | 12.85 | 1 | 80 |
| 00005 | Inelead Event Pack | ea | | 0.3621 | | 2 | |
| 0006D | 6 Count Case | case | 20,094 | 28.605 | 574,768.87 | 144 | 2,893,536 |
| 0006DA | 6 Count Case-Stickered | case | 944 | 28.605 | 27,003.12 | 144 | 135,536 |
| 0006DF | 6 Count Case-French | case | 876 | 28.605 | 25,704.99 | 144 | 126,144 |
| 00061 | 6 Count Carbon | dn | 12,601 | 1.1843 | 14,923.36 | 6 | 75,606 |
| 00063 | 6 Count 3 Pack | dn | 38 | 3.5766 | 135.97 | 18 | 684 |
| 00126 | Display 12 PC6 CT | case | 562 | 14.2118 | 7,986.97 | 72 | 40,464 |
| 0016D | 16 Count Case | case | | 52.4415 | | 288 | |
| 0016D-14 | 14 Count Case | case | 827 | 48.5103 | 40,118.02 | 252 | 208,404 |
| 0016D-14F | 14 Count Case-French | case | 874 | 48.6554 | 42,793.74 | 252 | 168,848 |
| 00161 | 18 Count Carton | dn | 82,570 | 2.9007 | | 16 | |
| 00161-14 | 14 Count Cartons | dn | | 2.6823 | 221,477.51 | 14 | 1,155,980 |
| 00163 | 18 Count 3 Pack | dn | 4 | 8.7402 | | 48 | |
| 00163-14 | 14 Count 3 Pack | dn | | 8.085 | 32.34 | 42 | 168 |
| 0020D | 20 Count Case | case | 2,107 | 46.0945 | 97,121.11 | 240 | 505,680 |
| 0020DF | 20 Count Case- French | case | 140 | 46.1912 | 6,466.77 | 240 | 33,600 |
| 00201 | 20 Count Carton | dn | 894 | 3.8237 | 3,418.39 | 20 | 17,880 |
| 00201IRC | 20 Count Carton IRC | dn | 787 | 3.8237 | 3,009.25 | 20 | 15,740 |
| 00203 | 20 Count 3 Pack | dn | | 11.5236 | | 60 | |
| 0024D | 24 Count Case | case | 5,890 | 54.8535 | 312,116.42 | 288 | 1,696,720 |
| 0024DIRC | 24 Count Case IRC | case | | 54.8535 | | 288 | |
| 00241 | 24 Count Carton | dn | 10 | 4.5711 | 45.71 | 24 | 240 |
| 00243 | 24 Count 3 Pack | dn | 2 | 3.7133 | 27.43 | 72 | 144 |
| 0024B | Display 24 PC6 CT | case | 302 | 28.4232 | 8,583.81 | 144 | 43,488 |
| 0024B_9 | Display 24 PC6 CT (TC) | case | | 28.4232 | | 144 | |
| 0024BT | Display 24 PC6 CT (IRC) | case | 379 | 28.4232 | 10,772.39 | 144 | 54,576 |
| 0024GT | Display 24 PC6 CT (TNF) | case | 175 | 28.4232 | 4,974.06 | 144 | 25,200 |
| 0024GW | Display 24 PC6 CT-Stickered | case | | 28.4232 | | 144 | |
| 0025D | Inelead Distribution pk | case | | 19.3608 | | 102 | |
| 0036I | Display 36 PC6 CT (IRC) | case | 28 | 42.6348 | 1,193.77 | 216 | 6,048 |
| 0036ST | Display 36 PC6 CT (TNF) | case | 532 | 42.6348 | 24,310.50 | 216 | 127,680 |
| 0122D | Display 12 PC20 CT (IRC) | case | | 24.8644 | | 240 | |
| 01245 | Display 24 PC6 CT (IRC) | case | 67 | 28.4232 | 1,450.35 | 144 | 9,648 |

**Finished Goods**

**Ultralam, Inc.**
**Inventory Analysis - Finished Goods**
**for the period ending May 31, 1998**

| Part No. | Description | Unit of Measure | May Qty on Hand | 5/31/98 Standard Price Per UOM | 5/31/98 Total Value @ Standard | Units Per UOM | Total Number Of Units |
|---|---|---|---|---|---|---|---|
| 01388 | Display 36 PC/6 CT (IRC) | case | 283 | 42.6348 | 10,627.27 | 216 | 55,485 |
| 0141 40T | Display 14 PC/14 CT (M) | case | 18 | 37.5522 | 730.98 | 196 | 4,032 |
| 01416 | Display 14 PC/16 CT (M) | case | - | 40.809B | | 224 | - |
| 0141B_5 | Display 14 PC/16 CT (TC) | case | - | 40.809B | | 224 | - |
| 0141BT | Display 14 PC/16 CT (M) | case | 50 | 40.809B | 2,030.49 | 224 | 11,200 |
| 0224B | Display 24 PC/6 CT (TMF) | case | 110 | 28.4232 | 3,126.55 | 144 | 15,840 |
| 0224BA | Display 18 PC/6 CT (TMF) | case | - | 28.4232 | | 144 | - |
| 0235B | Display 36 PC/6 CT (TMF) | case | 679 | 42.6348 | 21,317.4 | 216 | 146,664 |
| 0235BA | Display 36 PC/6 CT (TMF) | case | 198 | 42.6348 | 8,441.69 | 216 | 42,768 |
| 0435B | Display 36 PC/6 CT (RCH) | case | 328 | 42.6348 | 13,994.21 | 216 | 70,848 |
| 05356 | Display 36 PC/6 CT (TMFH) | case | 112 | 42.6348 | 4,205.85 | 196 | 21,952 |
| 11414 | Display 14 PC/14 CT (IRC) | case | | 37.5522 | | 196 | - |
| 21414 | Display 14 PC/14 CT (NYM) | case | 1,968 | 37.5522 | 73,902.73 | 196 | 385,728 |
| | | TOTAL | | | 1,565,020.35 | | 9,035,984 |
| | **OFF SITE - Morgan & Sampson - Ontario, CA** | | | | | | |
| 00060 | Instead 6 ct | case | 13,168 | 28.605 | 376,670.64 | 144 | 1,896,192 |
| 00060A | Instead 6 ct-Walgreen | case | - | 28.605 | | 144 | - |
| 00128 | Display-Counter-Walgreens | case | 1,334 | 14.2116 | | 72 | - |
| 00150 | Instead 16 ct | case | 19,906 | 48.5103 | 965,646.01 | 252 | 5,016,312 |
| 00150-14 | Instead 14ct | case | 4,009 | 46.0945 | 184,792.85 | 240 | 962,160 |
| 00200 | Instead 20 ct | case | 7,866 | 54.8535 | 107,355.63 | 280 | 537,408 |
| 00240 | Instead 24 ct | case | - | 54.8535 | | 288 | - |
| 00240IRC | Instead 24 ct-IRC | case | - | 28.4232 | | 144 | - |
| 0024B | 6 Ct Promo Displays | case | - | 28.4232 | | 144 | - |
| 0024B_9 | 6 Ct Promo Displays | case | 1 | 28.4232 | | 144 | - |
| 0024BT | 6 Ct Promo Displays | case | - | 28.4232 | | 144 | - |
| 0024BT | 6 Ct Promo Displays | case | - | 28.4232 | | 144 | - |
| 00260 | *Instead Distribution pk | case | - | 54.8535 | | 288 | - |
| 00260A | *Instead Distribution pk | case | 29 | 54.8535 | 542.36 | 96 | 2,784 |
| 0036T | 6 CT Promo Displays | case | - | 28.4232 | | 144 | - |
| 0036BT | 6 CT Promo Displays | case | 1 | 42.6348 | 42.63 | 216 | 216 |
| 01220 | Display 12 PC/20 CT (IRC) | case | - | 42.6348 | | 240 | - |
| 01356 | 6 CT Promo Displays | case | - | 42.6348 | | 216 | - |
| 01411T | 14 Ct Promo Displays | case | - | 42.6348 | | 196 | - |
| 01416 | 16 Ct Promo Displays | case | - | 42.6348 | | 224 | - |

**Durham, Inc.**
Inventory Analysis - Finished Goods
for the period ending May 31, 1998

Finished Goods

| Part No. | Description | Unit of Measure | May Qty on Hand | 5/1/98 Standard Price Per UOM | Total Value @ Standard 5/1/98 | Units Per UOM | Total Number of Units |
|---|---|---|---|---|---|---|---|
| 01416.5 | 18 Ct Promo Displays | case | | 40.6098 | | 224 | |
| 01416T | 16 Ct Promo Displays | case | | 40.6098 | | 224 | |
| 02368 | 6 CT Promo Displays | case | | 42.6348 | | 216 | |
| 03365 | 6 CT Promo Displays | case | | 42.6348 | | 216 | |
| 03365 | 6 CT Promo Displays | case | | 42.6348 | | 216 | |
| 11414 | 14 CT Promo Displays | case | | 37.5522 | | 196 | |
| 21414 | 14 CT Promo Displays | case | | 37.5522 | | 196 | |
| | | | TOTAL | | $ 1,915,748.16 | | 3,005,164 |
| **OFF SITE - Morgan & Sampson - Hawaii** | | | | | | | |
| 00060 | Instead 6 Ct | case | 82 | 28.605 | 2,345.61 | 144 | 11,808 |
| 00160-14 | Instead 14ct | case | 85 | 48.5103 | 4,123.31 | 252 | 21,420 |
| 00200 | Instead 20 ct | case | 48 | 46.0945 | 2,212.54 | 240 | 11,520 |
| 00368T | 6 CT Promo Displays | case | - | 42.6348 | - | 216 | - |
| 00368T | 6 CT Promo Displays | case | 19 | 42.6348 | 810.06 | 216 | 4,104 |
| 11414 | 14 CT Promo Displays | case | 30 | 37.5522 | 1,126.57 | 196 | 5,880 |
| | | | TOTAL | | $ 10,618.15 | | 54,732 |
| **OFF SITE - Rich Williams, Portland, OR** | | | | | | | |
| 00060 | Instead 6 ct | case | 59 | 28.605 | 1,687.70 | 144 | 8,496 |
| 00160-14 | Instead 14ct | case | 101 | 48.5103 | 4,899.54 | 252 | 25,452 |
| 00200 | Instead 20 ct | case | 85 | 46.0945 | 3,918.03 | 240 | 20,400 |
| 00220 | Instead 20 ct | case | 64 | 54.8536 | 3,510.62 | 288 | 18,432 |
| 01248 | Instead 24 ct | case | 17 | 42.8232 | 483.19 | 144 | 2,448 |
| 01365 | 6 CT Promo Displays | case | - | 42.6348 | - | 216 | |
| 01416T | 14 CT Promo Displays | case | 106 | 37.5522 | 3,980.53 | 195 | 20,776 |
| 02248 | 6 CT Promo Displays | case | 80 | 28.2232 | 2,271.86 | 144 | 11,520 |
| 02368 | 6 CT Promo Displays | case | 93 | 42.6348 | 3,665.04 | 216 | 20,088 |
| 11414 | 14 CT Promo Displays | case | - | 37.5522 | - | 196 | |
| 21414 | 14 CT Promo Displays | case | 140 | 37.5522 | 5,257.31 | 196 | 27,440 |
| | | | TOTAL | | $ 29,976.82 | | 155,052 |
| **OFF SITE - John Jeffrey, New Jersey** | | | | | | | |
| 00060 | Instead 6 ct | case | 2,007 | 28.605 | 57,410.24 | 144 | 289,008 |
| 00060A | Instead 6 ct-Walgreen | case | 350 | 28.605 | 10,397.85 | 144 | 51,840 |
| 00160 | Instead 18 ct | case | 88 | 52.2415 | 4,247.76 | 288 | 25,344 |
| 00200 | Instead 20 ct | case | 1,177 | 48.5103 | 57,696.62 | 252 | 296,604 |
| 00200 | Instead 20 ct | case | 104 | 48.0945 | 4,793.83 | 240 | 24,960 |

Ultralem, Inc.
Inventory Analysis - Finished Goods
for the period ending May 31, 1998

**Finished Goods**

| Part No. | Description | Unit of Measure | May Qty on Hand | Standard Price Per UOM | Total Value @ Standard | Units Per UOM | Total Number Of Units |
|---|---|---|---|---|---|---|---|
| | | | 5/1/98 | 5/1/98 | 5/1/98 | | |
| 00240 | Instead 24 ct | case | 784 | 54.8535 | 43,553.61 | 288 | 225,672 |
| 00240IRC | Instead 24 ct-IRC | case | | 54.8535 | | 288 | |
| 01565 | 6 CT Promo Displays | case | | 42.6348 | | 215 | |
| 02245 | 6 CT Promo Displays | case | 160 | 28.2232 | 4,507.71 | 144 | 23,040 |
| 02388 | 6 CT Promo Displays | case | 785 | 42.6348 | 20,677.88 | 216 | 104,760 |
| | | TOTAL | | | 202,625.52 | | 1,642,212 |
| | GRAND TOTAL @ STANDARD | | | | $ 3,523,199.59 | | 18,517,855 |
| | Lower of Cost or Market Adjustment | | | | $ 16,599.58 | | |
| | GRAND TOTAL | | | | $ 3,539,500.00 (1) | | 18,517,855 |

(1) unadjusted for Obsolete Inventory
Reserve of $129,818

c:\account\closing\MAY_INV.XLS

Page 6 of 6

6/9/98

**Ultrafem** _inc._

274 Riverside Avenue
Westport, CT 06880

Tel. (203) 341-3461
Fax (203) 341-7463

Dear HBA Buyer:

Ultrafem, Incorporated, makers of INSTEAD, announced April 1, 1998 that it has filed a Chapter 11 bankruptcy petition. This action has been taken in an attempt to rebuild the Company and its brand INSTEAD.

The Company is currently seeking additional financing or will possibly sell the Company and its assets to a qualified buyer. As the Company comes out of Chapter 11, it will be necessary to establish new terms and conditions concerning cash discounts, trade funding and shipping status. The new policies will be in effect until new financing has been secured or a buyer for the Company is identified.

Your support of the INSTEAD brand has been greatly appreciated and we would like to continue our relationship with you. We are revising our policies to provide incentives to our retail partners who choose to keep INSTEAD in distribution. The following changes demonstrate our commitment to re-establish the business and to reward your efforts in moving the business forward.

Our plans to relaunch the brand will be communicated to you once we emerge from Chapter 11. For now, the following policy changes will be put in place in an effort to simplify our relationship during the transition.

*Cash Discounts*
The current policy is 2% 30 net 31. As of April 1, 1998 the new terms will be 12% 30 net 31. To qualify for these terms all past deductions and receivables must be current (i.e., no receivables over 30 days and all outstanding deductions must be validated and cleared).

*Trade Funding*
As of April 1, 1998 no additional funds will be applied toward trade programs. Any promotions executed by Ultrafem's trade partners will be funded through the additional cash discount funds. Any deductions, other than damaged goods, taken by the trade after April 1, 1998 will not be honored by Ultrafem. As with the cash discount policy, this policy will be in effect until further financing has been secured or a buyer has been found for the company.

June 12, 1998 (9:47am)

## SCHEDULE 3.10
## CONTRACTS AND LEASES

APR. 7.1998  2:30PM  ULTRAFEM                              NO.158    P.3/4

# Ultrafem
### INC.

274 Riverside Avenue
Westport, CT 06880

Tel. (203) 341-3461
Fax (203) 341-7463

**Shipping Status**
Purchase orders in-house or future purchase orders from customers with receivables
balances over 30 days old will not be honored.  Those orders will be filled once all
receivable balances have been paid.

Ultrafem is looking for your support as it attempts to re-establish the Company and
INSTEAD.  Any questions concerning these or other company policies should be directed
to your local representative.

Sincerely,

Jeffrey C. Nardoci
Senior Vice President, Sales

In re - Ultrafem, Inc.                         Case No. 98 B 42280 [PCB]

SCHEDULE G — EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchase," "Agent," etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE: A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of creditors.

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Alpha One<br>1800 Moberly Lane<br>Bentonville Arkansas 72701 | Retail Broker Agreement |
| American Properties as an agent for Lavoisier Properties Corp<br>130 W. 42nd street<br>NY, NY 10036 | Nonresidential Real Property lease for 130 W. 42nd street suite 1103 |
| American Stock Transfer & Trust company<br>40 Wall Street, 46th Floor<br>New York, NY 10005<br>Contact: Ann Carfunkle | Transfer Agent and Registrar Agreement |
| Ascom<br>19 Forest Parkway<br>PO Box 858<br>Shelton, CT 06484-0903<br>Contact: Kathie Ruggiero | Rental agreement for Postage Meter |
| AT&T Capital Leasing Services<br>The Corporate Center<br>PO Box 9104<br>Framingham, MA 01701 | Lease for 4 fax machines |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Audrey Contente<br>211 E. 70th Street, apt 16C<br>New York, NY 10022 | Employment Agreement,<br>Name, Likeness and Voice Release<br>Termination Benefits Agreement<br>Indemnity Agreement<br>Option Certificate and Agreement |
| Belk Mignogna Associates<br>373 Park Avenue South<br>New York, NY 10016<br>Contact: Wendy Blattner | Annual Report Agency |
| Bozell Worldwide<br>40 West 23rd Street<br>New York, NY 10010<br>Contact: Joanne Davis | Contract for advertising, public relations, direct |
| BRI Medical Device Group<br>15825 Shady Grove Road, Suite 70<br>Rockville, MD 20850<br>Contact: David West | Consulting Agreement for Medical Data |
| CED<br>821 Burlington<br>Missoula, MT 59801<br>Attn: Jim | Light bulb Agreement |
| Clopay Plastics<br>312 Walnut Street, Suite 1600<br>Cincinnati, OH 45202-4036 | Reservoir Film Manufacturer |
| CMR<br>700 W. Lincoln, Suite 200<br>Charleston, IL 61920<br>Contact: Wendy Greeson | Agreement regarding management of post office box for collection of consumer letters |
| Colin Kagel<br>94 Long Hill Road<br>Deep River, CT 06417 | Advisory and Consulting Agreement for Human Resources |
| Dana Saad<br>N 3803 Sullivan, Building 105<br>Spokane, WA 99216<br>Attn: Patrick Saad | Contract for Rim Manufacturer |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Deloitte & Touche, LLP<br>2 World Financial Center<br>NY, NY 10281<br>Contact Steve Gallucci | Accounting Agreement |
| Dixon Marketing<br>301 Darby Road<br>PO Box 1618<br>Kinston, NC 28503 | Military Sales Broker Agreement |
| Dori Reap<br>160 E. 38th Street<br>Apt 15H<br>NY, NY 10016 | Employment Agreement<br>Option Certificate (two) and Agreement<br>Amendment to Employment Agreement<br>Letter of Agreement for Expense Allowance |
| Elliott Company<br>Roger Elliott<br>5 Burlington Woods Drive, Suite 203<br>Burlington, MA 01803-4542 | Strategic Partner Finder |
| Epimedix Inc<br>2030 S. Ocean Drive<br>#1827<br>Hallandale, FL 33009<br>Contact: Dr. Jeffrey Perlman | Consulting Agreement on regulatory issues |
| GE Capital Modular Space<br>PO Box 641595<br>Missoula, MT 59806 | Plant/Warehouse located at 1600 North Avenue Missoula, MT 59801 |
| Gelco<br>10700 Prairie Lakes Drive<br>Eden Prairie, MN 55344<br>Contact: Valerie Bunnis | Contract to provide rapid draft system for trade promotions |
| Gruntal (Hampshire)<br>717 5th Ave<br>New York, NY 10022<br>Contact: Jeff Berman | Investment banking agreement |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Hockfield & Associates<br>887 East Wilmette Avenue, Suite J<br>Palatine, IL 60067<br>Contact: Ed Hockfield | Sales Broker Agreement |
| Hynes Sales<br>6525 Morrison Blvd<br>Charlotte, NC 243211<br>Contact: John Greene | Sales Broker Agreement |
| IJ White<br>20 Executive Blvd<br>Farmingdale, NY 11735<br>Attn: Tom Wedell | Contract to build System<br>Accumulator<br>Spare Parts |
| INAC Corp<br>a CIGNA Company<br>401 Whitehorse Road, PO Box 9050<br>Voorhees, NJ 08043 | Commercial Premium Finance Agreement (one for D&O insurance and one for product liability) |
| Jefferson Smurfit<br>1319 Dexter Avenue North #106<br>Seattle, WA 98109<br>Attn: Pete Burquist | Purchase Order for cartons not yet released |
| Jefferson Smurfit<br>1050 N. Kent Street<br>St. Paul, MN 55117 | Letter agreement for storage of cartons |
| Jefferson Smurfit<br>601 Monster Road SW<br>Renton, WA 98056<br>Attn: Dana Pyle | Purchase Order for cartons not yet released |
| John Jeffery Corporation<br>PO Box 697<br>Bellmawr, NJ 21227 | Public warehouse located at 50 Heller Road, Belmar NJ 21227, which stores inventory (no formal agreement) |
| John Andersen<br>c/o Lillie Goodrich<br>7-A Patricia Lane<br>Cos Cob, CT 06807 | Employment Agreement;<br>Option Certificate and Agreement;<br>Amendment to Employment Agreement |
| Landau & Landau<br>36 Seymour Street<br>London W1H 5WD | Residential Real Property Lease<br>Ultrafem UK apartment<br>13 Healhcroft Hampstead Way<br>London NW11 7HH |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Lehman Brothers<br>200 Vessy Street<br>3 World Financial Center<br>New York, NY 10285 | Investment Banking Agreement |
| M&K Associates<br>89 Main Suite 209<br>Medway, MA 02053<br>Contact Mark Moroney | Sales Broker Agreement |
| Market Growth Resources<br>372 Danbury Road<br>Wilton, CT 06897-2530<br>Contact: Mickey Jardon | Contract for consumer promotion services |
| Master Lease a division of Tokai Financial<br>1055 Westlakes Drive<br>Berwyn, PA 19312<br>Contact: Mary An Macri | Rental agreement for Ascom Mail Machine and Ascom scale |
| Med Write Asociates<br>31651 Auburn Drive<br>Birmingham, MI 48025 | Letter of Agreement for Technical Manuscript |
| Meridian Consulting<br>274 Riverside Avenue<br>Westport, CT 06880<br>Contact: Jeff Hill | Consulting Agreement for outsourcing |
| Michelle Blankford<br>2 Hudson Avenue<br>Nyack, NY 10960 | Loan Repayment Agreement |
| Mid States<br>3245 Holman Drive<br>S. Chicago Heights, IL 60411-5599 | Contract to build and install Shingling conveyor |
| Minolta<br>One International Blvd., 10th Floor<br>Mahwah, NJ 07430-0631<br>800 553 3067 ext 2283 for Lyle | Lease for 1 photocopier |
| Mobley Henson consulting<br>3494 Camini Tassajara Road Suite 430<br>Danville, CA 94506 | Finders Agreement |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
| --- | --- |
| Morgan & Sampson Pacific<br>10572 Calle Lee Suite 138<br>Los Alamitos, CA 90720<br>Contact: Chip Carter | Brokerage Agreement |
| Morgan and Sampson<br>1651 S. Carlos Avenue<br>Ontario Ca 91761 | Public warehouse located at 1651 S. Carlos Avenue, Ontario, CA 91761, which stores inventory |
| Morgan & Sampson, Honolulu<br>429C Waiakamike Road<br>Honolulu, HI 96817 | Nonresidential Lease for public warehouse located at 429C Walakamilo Road, Honolulu Hawaii 96817, which stores inventory |
| Mr. & Mrs. Elof Johansson<br>1 East River Place, Apt. 12D/E<br>New York, New York 10021 | Residential Real Property Sublease<br>1 East River Place<br>Apt. Lease |
| NCH<br>75 Tri- State International Suite 400<br>Lincolnshire, IL 60069 | Agreement to manage coupon redemption in US |
| NCH Canada<br>160 McNabb Street<br>Markham, Ontario L3R 4B8<br>Contact: Mike Feeley | Agreement to manage coupon redemption in Canada |
| Nielsen<br>299 Park Avenue<br>New York, NY 10171<br>Contact: Carolyn Cacciola | Agreement to provide syndicated data |
| NPD Group<br>900 West Shore Road<br>Port Washington, NY 11050-0402<br>Contact: Mark Truss | Consulting Agreement to manage diary panel for consumer research |
| Orchard Close LTD<br>c/o The Capco Group<br>Capco House<br>31-37 North Quay<br>Douglas, Isle of Man, British Isles | Agreement for Consulting Services related to investor relations in Europe |
| Pitney Bowes<br>PO Box 85460<br>Louisville, KY 40285-5460 | Postage machine Agreement |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| PL Thomas Group<br>Two North Riverside Plaza, Suite 1760<br>Chicago, IL 60606<br>Contact: Phil Thomas | Financial Investor Relations Services |
| Polygram Filmed Entertainment Distribution<br>9333 Wilshire Blvd<br>Beverly Hills, CA 90210<br>Contact: Kelly Clough | Product Placement Agreement for Your Friends and Neighbors movie |
| Poppe Tyson<br>40 West 23rd Street<br>New York, NY 10010 | Internet Agency Agreement |
| ProActive International<br>Huis Ter Lucht 8<br>3155 EB Maasland<br>The Netherlands<br>Contact: Ban Van der Kooij | Strategic Partner Finder |
| Proskauer Rose LLP<br>1585 Broadway<br>New York, NY 10036<br>Contact: Michael Bellinger | Retention Agreement re: Contente v. Ultrafem and John W. Andersen |
| Quintiles<br>PO Box 13979<br>Research Triangle Park, NC 27709<br>Durham, NC 27703<br>Contact Jim Mannion | Consulting Agreement |
| Remmele Engineering<br>10 Old Highway 8 S.W.<br>New Brighton, MN 55112<br>Contact: William Iacoe | Contracts to Manufacture Equipment Spare Parts Purchase Order - Down Payment on A/P |
| ReProtect<br>The Johns Hopkins University<br>Dept Biophysics/Jenkins Hall<br>3400 N. Charles Street<br>Baltimore, MD 21218<br>Contact Richard Cone | License, research and Product Development Agreement |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Richlund and Associates<br>2050 Bluestone Drive<br>Saint Charles, MO 63303 | Lease for telephone equipment located at 1600 North Avenue, Missoula, MT 59801 |
| Roger Levitt<br>President & CEO<br>Boxing International LLC<br>230 Park Avenue, Suite 1514<br>New York, NY 10169 | Strategic Partner Finder Agreement |
| Rudie Wilhelm Warehouse Co.<br>PO Box 22226<br>Milwaukee, Or 97222-0226 | Pubic warehouse located at 2400 South East Mailwell Drive, Milwaukee, Or 97222, which stores inventory |
| Sales Force<br>135 S. LaSalle Street<br>Dept. 1814<br>Chicago, IL 60674 | Sales Broker Agreement |
| Scott Materials<br>707 Batcheller Lane<br>Sioux Falls, SD 57105 | Agents Fee Agreement |
| Shared Technologies Fairchild Telecom<br>300 West Service Road<br>Chantilly, Va 22021 | Agreement for 130 W. 42nd Street phone system |
| Sharon Hillier<br>945 Field Club Road<br>Pittsburgh, PA 15238 | Consulting Agreement (member of SAB) |
| Shell Company<br>PO Box 2463<br>Houston, TX 77252-2463 | Sales Contract for Raw Materials |
| Shelter West Inc.<br>PO Box 4746<br>Missoula, MT 59806 | Administrative Office located at 629 SW Higgins Avenue, Suite B Missoula, MT 59801 |
| Solow Management Corp.<br>9 West 57th Street New York, NY 10019 | Residential Real Property Lease for corporate apartment at 1 East River Place Apt 12 D/E. |
| Sprint<br>PO Box 930331<br>Atlanta, GA 31193-0331 | Sprint Frame Relay contract |

| Name & Mailing address including zip code of other parties to lease or contract | Description of contract or lease |
|---|---|
| Supermarkets On Line<br>500 W. Putman Ave<br>Greenwich, CT 06830 | Agreement for on line coupon service |
| Ted Cohen<br>316 Eisenhower Parkway<br>Livingston, NJ 07039 | Investigator agreement for rim compression study |
| Telespectrum<br>1100 East Hector Street<br>Suite 416<br>Conshahoken, PA 19428 | 1-800 Instead<br>Voice Mail Box |
| The Sage Group<br>245 Route 22 West, Suite 304<br>Bridgewater, NJ 08807<br>Contact Gordon Ramseier | Strategic Partner Finders Agreement |
| Tonya Hinch<br>25 W. 15 St<br>4th floor<br>NY, NY 10011 | Employment Agreement;<br>Option Certificate and Agreement;<br>Amendment to Employment Agreement |
| Wasserstein Perella & Company<br>31 West 52nd Street<br>NY, NY 10019 | Investment Banking Agreement |
| Western Trade Center<br>PO Box 8182<br>Missoula, MT 59807 | Plant/Warehouse located at 1600 North Avenue, Missoula, MT 59801 |
| Gary Nordmann<br>14 Belmont Place<br>Huntington, NY 11743 | Employment Agreement;  option and Certificate agreement. |

June 12, 1998 (9:47am)

**EXHIBIT 6.2**

TOGUT, SEGAL & SEGAL
Attorneys for Debtor-in-Possession
One Penn Plaza
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT          **HEARING DATE: 6/ /98**
SOUTHERN DISTRICT OF NEW YORK                       **AT: ___ PM**
------------------------------------------------------------X
                                                        :
In re:                                                  : Chapter 11 Case No.
                                                        : 98 B 42280 [PCB]
ULTRAFEM, INC.,                                         :
                                                        :
                         Debtor.                        :
                                                        :
Employer Tax Identification No. 33-0435037              :
                                                        :
------------------------------------------------------------X

### ORDER (i) SCHEDULING (a) HEARING TO APPROVE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND AKCESS PACIFIC GROUP, LLC FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND TO CONSIDER OBJECTIONS, IF ANY; AND (b) A PRIOR BIDDING HEARING TO CONSIDER HIGHER AND BETTER OFFERS; (ii) APPROVING BREAK-UP FEE PAYABLE TO AKCESS PACIFIC GROUP, LLC PURSUANT TO ASSET PURCHASE AGREEMENT; (iii) ESTABLISHING BIDDING PROCEDURES FOR THE HEARINGS; (iv) APPROVING THE FORM AND METHOD OF SERVICE OF NOTICE OF THE PROPOSED SALE AND HEARINGS; AND (v) ESTABLISHING DEADLINE AND PROCEDURES FOR THE <u>FILING AND SERVICE OF OBJECTIONS AND HIGHER OR BETTER OFFERS</u>

Upon the annexed application dated June ____, 1998 (the "Application") of Ultrafem, Inc., as Debtor-in-Possession (the "Debtor"), by its attorneys, Togut, Segal & Segal, seeking entry of an Order pursuant to §§363(b), (f), and (m) and 365(a) and (f) of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"): (i) scheduling (a) a hearing (the

"Approval Hearing") to consider approval of the Asset Purchase Agreement (the "Sale Agreement"), by and between the Debtor and Akcess Pacific Group, LLC (the "Buyer"), annexed to the Application as Exhibit "1", for the sale of substantially all of the Debtor's assets including, without limitation:  the Debtor's patent known as "Vaginal Discharge Collection Device and Intravaginal Drug Delivery System", U.S. Patent No. 5,295,984, and all of the Debtor's other patents, trademarks, servicemarks and other intellectual property;  all the Debtor's personal property including its machinery, equipment and inventory;  and certain unexpired lease agreements and account receivable claims (collectively, the "Assets"), free and clear of all liens, claims, interests, and encumbrances;  and (b) scheduling a prior bidding hearing (the "Bidding Hearing") to consider higher or better offers, if any;  (ii) establishing bidding procedures;  (iii) approving a break-up fee (the "Break-Up Fee") payable to the Buyer pursuant to the terms of the Asset Purchase Agreement;  (iv) approving the form and method of notice of the Approval Hearing and the Bidding Hearing;  and (v) establishing a deadline and the procedures for the filing and service of objections or higher or better offers, if any;

　　　　　　AND the Official Committee of Unsecured Creditors (the "Committee") having no objection to the entry of this Order, as evidenced by the subjoined signature of its attorneys;  and the relief sought appearing reasonable, proper and necessary;  and good and sufficient cause appearing therefor, and no further notice being required, it is

-2-

ORDERED, that the Notice substantially in the form annexed to the Application as Exhibit "2" be, and it is hereby is, approved in all respects; and it is further

ORDERED, that higher or better offers (the "Competing Offer") for the purchase of the Assets must: (i) be on substantially the same terms as contained in the Sale Agreement except for the purchase price which must be higher, by not less than $500,000 (the "Initial Overbid"); (ii) be accompanied by a cashier's or certified check equal to ten (10%) of the purchase price of such bid ("Deposit"), which shall be delivered to Togut, Segal & Segal, as attorneys for the Debtor, to be held in escrow pending the Court's' determination of the Sale and which will be (a) applied toward the purchase price if the bid is approved by the Court whereupon the Deposit will automatically be deemed to be non-refundable; (b) retained by the Debtor if the Sale is approved by the Court, but the successful Bidder fails to timely close; or (c) refunded in full promptly after the Hearing if the bid is not approved; and (iv) provide for the closing (the "Closing") to occur not later than three (3) days after the date the Court signs an order authorizing and approving the Sale to the over-Bidder; and it is further

ORDERED, that all Competing Offers for purchasing the Assets must be made so as to be received by: (i) Togut, Segal & Segal, attorneys for the Debtor, One Penn Plaza, New York, New York 10119, facsimile number (212) 967-4258, Attn: Neil Berger, Esq.; and (ii) Kensington & Ressler, L.L.C., attorneys for the Committee, 400 Madison Avenue, New York, New York 10117-1901, Attn: Howard D. Ressler, Esq.,

-3-

facsimile number (212) 838-7060, by not later than June ____, 1998 at 5:00 PM (the "Submission Date"), unless the Debtor and the Committee in their mutual discretion, extend the Submission Date; and it is further

ORDERED, that any party submitting a Competing Offer shall provide with its offer, to the reasonable satisfaction of the Debtor and the Committee, written evidence that it has the financial capability to pay, at the Closing, the balance of the purchase price approved by the Court ; and it is further

ORDERED, that Competing Offers made in compliance with the provisions of this Order will be considered at the Bidding Hearing which will be conducted by the Debtor at the offices of Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), investment advisor to the Committee, 31 West 52nd Street, 11th Floor, New York, New York 10119 on June ____, 1998 at 10:30 am, at which time and place (i) Competing Offers for the Assets will be entertained, with all bidding above the Initial Overbid being made in increments of at least $100,000, and (ii) an announcement may be made concerning which of the offers, if any, constitutes the highest and best offer for the Assets and is otherwise acceptable to the Debtor (the "Accepted Offer"); and it is further

ORDERED, that the Approval Hearing shall be held before the Honorable Prudence Carter Beatty, Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 617, One Bowling Green, New York, New York, on June _____, 1998 at _____P.M., or soon as counsel

-4-

may be heard, to consider and approve the Sale Agreement or any Accepted Offer; and it is further

ORDERED, that the $150,000 Break-Up Fee payable to the Buyer in accordance with the terms of the Sale Agreement be, and it hereby is, approved; and it is further

ORDERED, that for cause shown and pursuant to Bankruptcy Rules 2002(a)(2) and 9006(c), Notice of the Application, Sale Agreement, the Bidding Hearing and the Sale Hearing shall be good and sufficient, if (1) service of a copy of this Order, the Application and its Exhibits by Federal Express or similar overnight courier is made on or before June ___, 1998 upon:  (a) Carolyn S. Schwartz, United States Trustee for this District, Attn: Pamela J. Lustrin, Esq.;  (b) the Committee, c/o Kensington & Ressler, l.l.c., L.L.C., Attn: Howard D. Ressler, Esq.;  (c) the Debtor's twenty largest creditors;  (d) the Buyer, c/o Zevnik Horton Guibord McGovern Palmer & Fagnani, L.L.P., 333 South Grand Avenue, Los Angeles, California 90071, Attn: Thomas James Wingard, Esq.;  (e) Houlihan Lokey, 31 West 52nd Street, 11th Floor, New York, New York 10119, Attn:  Mr. Michael Stewart;  (f) all parties to the Debtor's unexpired real property leases and executory contracts;  (g) Audrey Contente ("Contente") c/o Skadden, Arps, Slate, Meagher & Flom LLP, 919 Third Avenue, New York, New York 10022-3897, Attn:  Michael L. Cook, Esq.;  (h) Richard C. Potter, Double Arrow Ranch, Seeley Lake, Montana 59868 and c/o Nurture, Inc., 5840 Expressway, Missoula, Montana 59802;  (i) Bruce F. Rose, 215706 Yorba Linda Boulevard, No. 202, Yorba Linda, California 92687;  (j) Wendell W. Guthrie, 445 Daly

-5-

Avenue, Missoula, Montana 59801;  (k) Randy S. Wills, 5331 White Cloud, Florence, Montana 59833;  and upon (l) all parties having filed a Notice of Appearance in this case;  (2) service of the Notice by first class mail is made on or before June _____, 1998 to:  (a) all of the Debtor's known creditors;  and (b) any known party which has expressed an interest in acquiring the Assets;  and (3) publication of the Notice once in the <u>Wall Street Journal</u> (National edition) and if feasible, once in a trade publication that the Debtor and the Committee may, in their joint discretion, determine is likely to reach prospective bidders, is made not later than June 19, 1998;  and it is further

ORDERED, that (i) itemized statements of any and all pre-petition defaults alleged by any non-debtor party to the Debtor's unexpired executory contracts or unexpired leases to be assumed and assigned;  and (ii) objections, if any, to the relief sought by the Application:  must be made in writing, must set forth the name of the non-debtor party, the nature and amount of any claims or interest held or asserted against the Debtor's estate or its property, the basis for such default or objection and the specific grounds therefor, and conform to the requirements of: (a) the Bankruptcy Code;  (b) the Bankruptcy Rules;  and (c) the Local Bankruptcy Rules, and be filed with the Bankruptcy Court, with copies delivered directly to Bankruptcy Judge Beatty's Chambers and to:  (i) the Debtor c/o Togut, Segal & Segal, One Penn Plaza, New York, New York 10119, Attn:  Neil Berger, Esq.;  (ii) the Buyer c/o  Zevnik Horton Guibord McGovern Palmer & Fagnani, L.L.P., 333 South Grand Avenue, Los Angeles, California 92101, Attn:  Thomas James Wingard, Esq.;  (iii) the

-6-

Committee c/o Kensington & Ressler, L.L.C., 400 Madison Avenue, New York, New York 10017-1910, Attn: Howard D. Ressler, Esq.; (iv) Houlihan Lokey, 31 West 52nd Street, 11th Floor, New York, New York 10119;   and (v) the United States Trustee, 80 Broad Street, New York, New York 10004, Attn: Pamela J. Lustrin, Esq., so as to be filed and received not later than June _____, 1998 at 5:00 p.m.;  and it is further

**ORDERED**, that objections, if any, which are not timely filed and served in accordance with the foregoing shall be forever barred and waived;  and it is further

**ORDERED**, that the requirement under Local Bankruptcy Rule 9013-1(b) for the filing of a separate Memorandum of Law be, and it hereby is, dispensed with and waived;  and it is further

[Concluded on Following Page]

-7-

**ORDERED**, that the Approval Hearing may be adjourned from time to time without further notice other than announcement of such adjournment at the Approval Hearing.

DATED:   New York, New York
         June      , 1990

_____
HONORABLE PRUDENCE CARTER BEATTY
UNITED STATES BANKRUPTCY JUDGE


NO OBJECTION:

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
By its attorneys,
KENSINGTON & RESSLER, L.L.C.,
By:

_____
HOWARD D. RESSLER, Esq. (HDR-3881)
A Member of the Firm

-8-

Togut, Segal & Segal
Attorneys for Debtor
  and Debtor-in-Possession
One Penn Plaza
New York, New York 10119
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————X
                                    :

In re:                              :  Chapter 11 Case No.
                                     :  98 B 42280 [PCB]

ULTRAFEM, INC.,                  :

                                     :

                  Debtor.      :

Employer Tax Identification No. 33-0435037  :

                                     :
————————————————————X

### ORDER (i) APPROVING SALE AGREEMENT BY AND BETWEEN THE DEBTOR AND AKCESS PACIFIC GROUP LLC; (ii) AUTHORIZING, PURSUANT TO §363 OF THE BANKRUPTCY CODE, THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (iii) AUTHORIZING, PURSUANT TO §365 OF THE BANKRUPTCY CODE, THE ASSUMPTION AND ASSIGNMENT BY THE DEBTOR OF <u>CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS</u>

          UPON the application (the "Application") of Ultrafem, Inc. (the

"Debtor"), dated June _____, 1998, for the entry of an Order pursuant to §§363(b), (f)

and (m), and 365(a) and (f) of the Bankruptcy Code, authorizing the Sale Agreement

among the Debtor and Akcess Pacific Group LLC (the "Buyer"), dated June _____,

1998 (the "Sale Agreement"), a copy of which is annexed hereto as Exhibit "1",

pursuant to which the Debtor has agreed to sell, subject to approval by this Court, its

patent known as "Vaginal Discharge Collection Device and Intravaginal Drug

Delivery System", U.S. Patent No. 5,295,984 (the "Patent") and all of the Debtor's other patents, copyrights, trademarks, service marks, tradenames and all applications therefore, and all of the assets identified in the Schedule annexed hereto as Exhibit "2" and identified in the Sale Agreement (the "Assets"); and pursuant to the June ____, 1998 (the "Scheduling Order") Order (a) fixing the date, time and place of the hearing to approve the Sale Agreement (the "Approval Hearing"), (b) approving form and manner of notice thereof, and (c) setting the procedures for the submission of competing offers; and good and sufficient notice of the Application, the Bidding Hearing, the Approval Hearing, and the Sale Agreement (all as defined in the Scheduling Order) and the opportunity to file and serve objections and higher and better offers, having been given, as evidenced by Affidavits of Service and Affidavits of Publication filed with the Clerk of this Court, and no further notice being necessary; and upon the record of the Approval Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Application and approval of the Sale Agreement; and the Court having considered any and all competing offers, and having determined that such competing offers are not higher and better offers for the Assets; and the Court having considered any responses and objections to the Application, and having overruled any such objections; and upon the consent of the Committee; and good and sufficient cause being shown therefor; it is

2

**HEREBY FOUND** that:

1.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§1334 and 157(a).  The Application is a core proceeding pursuant to 28 U.S.C. §157(b).

2.    Good and sufficient notice of the Application, the Sale Agreement, the Bidding Hearing, and the Approval Hearing has been given by the Debtor pursuant to the Scheduling Order.

3.    All objections to the Application and the entry of this Order are overruled and the Application is granted.

4.    The Debtor is the owner of the Assets and the interests subject to the Sale Agreement including, without limitation, the Patent, known as: "Vaginal Discharge Collection Device and Intravaginal Drug Delivery System", U.S. Patent No. 5,295,984, and all of the Debtor's other patents, trademarks and other intellectual properties to be conveyed pursuant to the Sale Agreement ("Patents") and the Debtor is able to convey title to the Assets and the Patents to the Buyer pursuant to the terms of the Sale Agreement.

5.    The Debtor is authorized to sell the Assets and the Patents to Akcess Pacific Group, LLC (the "Buyer") pursuant to the Sale Agreement.

6.    The purchase of the Assets and the Patents by the Buyer and the Sale thereof by the Debtor, pursuant to this Order and the Sale Agreement, was negotiated in good faith and represent an arms' length transaction.

3

7. The sale of the Assets pursuant to the Sale Agreement is in the best interests of this estate and its creditors.

8. The terms of the Sale Agreement reflect the Debtor's prudent business judgment under the relevant circumstances.

9. The claims asserted against the Patents by Audrey Contente are the subject of a *bona fide* dispute.

10. The Debtor has satisfied the requirements of §§363(f) and 365(a) and (b) of the Bankruptcy Code.

**IT IS HEREBY ORDERED** that:

A. Pursuant to §§363(b), (f) and 365 of the Bankruptcy Code, the Debtor is authorized to consummate the transactions contemplated under the Sale Agreement, and transfer the Assets and the Patents to the Buyer free and clear of all mortgages, security interests, charges, encumbrances, liens, assessments, covenants, claims, interests, title defects, pledges, and burdens of every kind whatsoever including, without limitation, any and all claims with respect to the Patents and any royalties therefrom asserted by Audrey Contente in the action pending in the United States District Court for the Southern District of New York, Case No. 98 Civ. 0912 or otherwise (collectively, "Liens").

B. Any Liens that encumber or purport to encumber the Assets shall be transferred to and attach to the proceeds of the Assets with the same

4

force, validity, priority and effect, if any, as they had against the Assets and subject to the further order of this Court.

    C.  In the event that any Person or Entity (as those terms are defined in the Bankruptcy Code) which has filed statements or other documents or agreements evidencing Liens on or interests in the Assets has not delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, assignment statements, termination statements, instruments of satisfaction, releases of liens, and other documents for the purpose of documenting the release of all Liens, or other interests which such person or entity has with respect to the Assets, the Debtor is authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets.

    D.  At the Closing, the Buyer is authorized and directed to assume and pay, or otherwise satisfy in full in accordance with their terms or such other terms agreed to by and between the Buyer and such other parties, the Assumed Liabilities (as defined in the Sale Agreement), and the Debtor is permanently relieved of any and all obligations on account of the Assumed Liabilities and all persons or entities who have asserted or may assert a claim on account of any of the Assumed Liabilities are permanently barred from asserting such claim against the Debtor.

5

E.    Upon the Closing, the Buyer shall not be deemed to (i) be the successor of the Debtor, (ii) have, <u>de facto</u> or otherwise merged with or into the Debtor, or (iii) be a continuation or substantial continuation of the Debtor or the enterprise of the Debtor.

F.    Except to the extent otherwise expressly provided in the Sale Agreement and this Order, at the Closing, the Buyer shall not assume any liability or obligation of the Debtor of any kind, character or description whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financing statements of the holder of the liability or obligation.

G.    Upon the Closing, the Buyer will pay to the Debtor the Purchase Price in full (as defined in the Sale Agreement).

H.    The Debtor is hereby granted a valid and perfected first priority lien and security interest in and against all of the Patents (the "Debtor Lien") in the amount of $2,500,000, and the Debtor Lien be, and it hereby is, perfected and effective as of the date hereof, without the necessity of the filing or recordation of any document or other notice. Notwithstanding the foregoing, the Debtor may record a copy of this Order with any recording officer that it may deem necessary or

6

appropriate to evidence, perfect or give notice of the Debtor Lien, and the Buyer shall execute any and all documents which the Debtor reasonably requests with respect to the Debtor Lien, including, but not limited to, evidencing and/or recording the Debtor Lien.

I.    This Court shall retain jurisdiction over the Debtor and the Buyer, including, without limitation, jurisdiction to resolve any disputes, claims, or actions which may arise in connection with the Sale Agreement and any other agreements or instruments executed in connection therewith, the transactions contemplated under the Sale Agreement and such other agreements and instruments and for the purpose of enforcing the terms and provisions of this Order.

J.    The Debtor is authorized and directed to execute, acknowledge, and deliver such corporate name change certificates, deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer and take such other action that may be reasonably necessary to perform the terms and provisions of the Sale Agreement and related agreements, and shall take any other action that may reasonably be requested by the Buyer for purposes of assigning, transferring, granting, conveying, and confirming to the Buyer, or reducing to possession, any or all of the Assets and the Patents and to execute such nonmaterial amendments to the Sale Agreement and related agreements as may be required to effectuate the Sale Agreement and the consummation of the purchase and sale.

7

K.    For each of the Assets consisting of or related to leasehold interests in property owned by others, the conveyance, assignment, transfer, and delivery thereof to the Buyer shall be subject to all of the rights and interests of the owner of the leased property other than rights not enforceable under §365 of the Bankruptcy Code.

L.    From and after entry of this Order, the Debtor shall not take or cause to be taken any action which would interfere with the transfer of the Assets to the Buyer or its assignees or designees in accordance with the terms of this Order.

M.    All persons or entities who are presently, or at the Closing (as defined in the Sale Agreement), in possession of any of the Assets are hereby directed to surrender possession of such Assets to the Buyer or its assignees or designees at the Closing.

N.    From and after the Closing, the Buyer shall have the right and authority, subject to the terms of the Sale Agreement, to collect for the account of the Buyer any sums which shall be due and payable on account of any of the Assets transferred or intended to be transferred to the Buyer at the Closing and to endorse with the name of the Debtor any checks or drafts relating to the Assets which may be payable to the order of the Debtor; provided, however, that the disposition of any such sums and any such checks shall be in accordance with the terms of the Sale Agreement.

O.    At or prior to the Closing, the Seller shall pay or cause to be

8

paid any and all transfer, stamp or other similar taxes and any filing or recording fees payable as a result of the sale or transfer of the Assets and the assumption and assignment of the Assumed Liabilities (as defined in the Sale Agreement).

        P.     The Debtor may, at a time and in a manner satisfactory to the Buyer, in its sole discretion, execute and deliver whatever lawful agreements that are reasonably necessary and make whatever lawful arrangements that are reasonably required to assure the transfer of the Assets free and clear of any claims by any governmental unit for taxes incurred as a consequence of the sale of any of the Assets under the terms of the Sale Agreement or to relieve the Buyer from any claim for transferee liability with respect to such taxes.

        Q.     Pursuant to §365(f) of the Bankruptcy Code, conditioned upon the closing of the transactions contemplated by the Sale Agreement, all obligations under executory contracts and unexpired leases listed in schedules of the Sale Agreement shall be assumed by the Debtor and assigned to the Buyer, without the execution of any further documents or instruments. Unless the other parties to such unexpired leases or executory contracts shall have waived their rights to receive a cure of any pre-petition defaults, the Debtor shall cure all defaults under such executory contracts or unexpired leases within thirty (30) days after the Closing, and this Court shall retain jurisdiction to hear and determine any and all disputes in connection therewith. Upon the Closing, the Debtor shall have no further obligations under such executory contracts or expired leases pursuant to §365(k) of the Bankruptcy Code.

9

R.    The provisions of this Order authorizing the Debtor to enter into the Sale Agreement and authorizing and directing the transactions contemplated by the Sale Agreement shall be self-executing and neither the Debtor nor the Buyer shall be required to execute or file any releases, termination statements, assignments, consents, or other instruments to effectuate consummation to implement the foregoing provisions hereof except as provided in the Sale Agreement and this Order.  Notwithstanding the foregoing, the Debtor, Buyer and all other parties are authorized and directed to take any and all actions necessary and appropriate to effectuate, consummate, and implement fully the Sale Agreement.

S.    The Buyer is a purchaser in good faith of the Assets and is entitled to the protection afforded by §363(m) of the Bankruptcy Code.

T.    This Order is binding upon and inures to the benefit of any successors or assigns of the Debtor or the Buyer, including any trustee appointed in this case or any subsequent case of the Debtor under Chapter 7 of the Bankruptcy Code.

U.    This Order is a final, appealable order.

DATED:    New York, New York
          June            , 1998

------------------------------------------------
HONORABLE PRUDENCE CARTER BEATTY
UNITED STATES BANKRUPTCY JUDGE

10

**EXHIBIT "2"**

ULTRAFEM, INC.
Debtor-in-Possession
Chapter 11
Case No. 98 B 42280 [PCB]

## SCHEDULE OF ASSETS TO BE CONVEYED PURSUANT TO SALE AGREEMENT

      1.    All patents, copyrights, trademarks, service marks, and trade names, and all applications therefor, whether U.S. or foreign, and franchises, goodwill and other intangible property including but not limited to, product formulas, research and development, trade secrets and know how, including, without limitation, the Debtor's patent known as "Vaginal Discharge Collection Device and Intravaginal Drug Delivery System", U.S. Patent No. 5,295,984;

      2.    All machinery, equipment, furniture, office equipment, other fixed assets, tools and molds, equipment and material tangible personal property owned by the Debtor and useful or used in the operation of its business wherever located including the Assets located at the Debtor's plant and warehouse in Missoula, Montana and its offices in New York City, and any assignable third party warranties;

      3.    All existing inventory, finished goods and work-in-progress, and related raw materials, boxes, packaging and other materials and supplies and any assignable third party warranties;

      4.    All fixtures and improvements, including work-in-progress, if any, owned by the Debtor and located in and on the real property leased by the Debtor and used or useful in the operation of its business and any assignable third party warranties;

      5.    All of the other fixed and other tangible property owned by the Debtor or useful in the operation of its business, and replacements thereof and improvements thereto;

      6.    All open trade accounts receivable, unbilled orders, and contract rights relating to the sale of the Product existing as of the Closing Date;

      7.    All records relating to regulatory filings, inspection reports and correspondence relating thereto, including but not limited to 510(k) application(s) sales, distribution, advertising and marketing, including all market research, artwork, advertising, marketing concepts, marketing materials and market measurement data associated with the Product, and the Debtor's files, logs and other records, including accounting records specifically relating to the operation of the Debtor's

business, as Buyer may reasonably require, but not including any corporate or accounting books or records of the Debtor;

        8.    To the extent assignable, the rights of the Debtor under or to the contracts, licenses, leases and agreements listed in Schedule 1.3 of the Sale Agreement in effect on the Closing Date relating to the operation of the Business and the Assets (other than agreements with employees) including confidentiality agreements, non-disclosure agreements and non-compete agreements, and any renewals or extensions thereof; and

        9.    All of the Debtor's right, title and interest in and to the name "Ultrafem" and the business now known as Ultrafem, Inc., which engages in the manufacture, distribution and sale of the Product.

Togut, Segal & Segal
Attorneys for Debtor
 and Debtor-in-Possession
One Penn Plaza
New York, New York 10119
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                     :
In re:                                               :  Chapter 11 Case No.
                                                     :  98 B 42280 [PCB]
ULTRAFEM, INC.,                                      :
                                                     :
                                       Debtor.       :
                                                     :
Employer Tax Identification No. 33-0435037           :
                                                     :
-----------------------------------------------------------------------X

## ORDER (i) APPROVING SALE AGREEMENT BY AND BETWEEN THE DEBTOR AND AKCESS PACIFIC GROUP LLC;  (ii) AUTHORIZING, PURSUANT TO §363 OF THE BANKRUPTCY CODE, THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES;   AND (iii) AUTHORIZING, PURSUANT TO §365 OF THE BANKRUPTCY CODE, THE ASSUMPTION AND ASSIGNMENT BY THE DEBTOR OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS

UPON the application (the "Application") of Ultrafem, Inc. (the "Debtor"), dated

June 15, 1998, for the entry of an Order pursuant to §§363(b), (f) and (m), and 365(a) and (f) of

the Bankruptcy Code, authorizing the Sale Agreement among the Debtor and Akcess Pacific

Group LLC (the "Buyer"), dated June 12, 1998 (the "Sale Agreement"), a copy of which is

annexed hereto as Exhibit "1", pursuant to which the Debtor has agreed to sell, subject to approval

by this Court, its patent known as "Vaginal Discharge Collection Device and Intravaginal Drug

Delivery System", U.S. Patent No. 5,295,984 (the "Patent") and all of the Debtor's other patents,

copyrights, trademarks, service marks, tradenames and all applications therefore, and all of the

assets identified in the Schedule annexed hereto as Exhibit "2" and identified in the Sale Agreement

(the "Assets"); and pursuant to the June 16, 1998 (the "Scheduling Order") Order (a) fixing the

date, time and place of the hearing to approve the Sale Agreement (the "Approval Hearing"), (b)

approving form and manner of notice thereof, and (c) setting the procedures for the submission of

competing offers; and good and sufficient notice of the Application, the Bidding Hearing, the

Approval Hearing, and the Sale Agreement (all as defined in the Scheduling Order); and upon the

affidavit of Michael Stewart of Houlihan Lokey Howard & Zukin ("HLHZ"); and the opportunity

to file and serve objections and higher and better offers, having been given, as evidenced by

Affidavits of Service and Affidavits of Publication filed with the Clerk of this Court, and no further

notice being necessary; and upon the record of the Approval Hearing; and all parties in interest

having been heard or having had the opportunity to be heard regarding the Application and

approval of the Sale Agreement; and the Court having considered any and all competing offers,

and having determined that such competing offers are not higher and better offers for the Assets;

and the Court having considered any responses and objections to the Application, and having

overruled or approved the resolution of any such objections; and upon the consent of the

Committee; and good and sufficient cause being shown therefor; it is

> **HEREBY FOUND** that:

> i.        This Court has jurisdiction over this proceeding pursuant to 28
>
>           U.S.C. §§1334 and 157(a). The Application is a core proceeding
>
>           pursuant to 28 U.S.C. §157(b).

> ii.       Good and sufficient notice of the Application, the Sale Agreement,
>
>           the Bidding Hearing, and the Approval Hearing has been given by

the Debtor pursuant to the Scheduling Order.

iii.        All objections to the Application and the entry of this Order are

overruled and the Application is granted.

4.        The Debtor is the owner of the Assets and the interests subject to the Sale

Agreement including, without limitation, the Patent, known as: "Vaginal Discharge Collection

Device and Intravaginal Drug Delivery System", U.S. Patent No. 5,295,984, and all of the

Debtor's other patents, trademarks and other intellectual properties to be conveyed pursuant to the

Sale Agreement ("Patents") and the Debtor is able to convey title to the Assets and the Patents to

the Buyer pursuant to the terms of the Sale Agreement.

5.        The Debtor is authorized to sell the Assets and the Patents to Akcess Pacific

Group, LLC (the "Buyer") pursuant to the Sale Agreement.

6.        The purchase of the Assets and the Patents by the Buyer and the Sale

thereof by the Debtor, pursuant to this Order and the Sale Agreement, was negotiated in good

faith and represent an arms' length transaction.

7.        The sale of the Assets and the Patents pursuant to the Sale Agreement is in

the best interests of this estate and its creditors.

8.        The terms of the Sale Agreement reflect the Debtor's prudent business

judgment under the relevant circumstances.

9.        The claims asserted against the Patents by Audrey Contente are the subject

of a *bona fide* dispute.

10.        The Debtor has satisfied the requirements of §§363(f) and 365(a) and (b) of

the Bankruptcy Code.

**IT IS HEREBY ORDERED** that:

A.    Pursuant to §§363(b), (f) and 365 of the Bankruptcy Code, the Debtor is authorized to consummate the transactions contemplated under the Sale Agreement, and transfer the Assets and the Patents to the Buyer free and clear of all mortgages, security interests, charges, encumbrances, liens, assessments, covenants, claims, interests, title defects, pledges, and burdens of every kind whatsoever including, without limitation, any and all claims with respect to the Patents and any royalties therefrom asserted by Audrey Contente in the action pending in the United States District Court for the Southern District of New York, Case No. 98 Civ. 0912 or otherwise (collectively, "Liens").

B.    Any Liens that encumber or purport to encumber the Assets and the Patents shall be transferred to and attach to the proceeds of the Assets and the Patents with the same force, validity, priority and effect, if any, as they had against the Assets and the Patents and subject to the further order of this Court.

C.    In the event that any Person or Entity (as those terms are defined in the Bankruptcy Code) which has filed statements or other documents or agreements evidencing Liens on or interests in the Assets and the Patents has not delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, assignment statements, termination statements, instruments of satisfaction, releases of liens, and other documents for the purpose of documenting the release of all Liens, or other interests which such person or entity has with respect to the Assets and the Patents, the Debtor is authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets and the Patents.

D.    At the Closing, the Buyer is authorized and directed to assume and

pay, or otherwise satisfy in full in accordance with their terms or such other terms agreed to by and between the Buyer and such other parties, the Assumed Liabilities (as defined in the Sale Agreement), if any, and the Debtor is permanently relieved of any and all obligations on account of the Assumed Liabilities and all persons or entities who have asserted or may assert a claim on account of any of the Assumed Liabilities are permanently barred from asserting such claim against the Debtor.

   E. Upon the Closing, the Buyer shall not be deemed to (i) be the successor of the Debtor, (ii) have, de facto or otherwise merged with or into the Debtor, or (iii) be a continuation or substantial continuation of the Debtor or the enterprise of the Debtor.

   F. Except to the extent otherwise expressly provided in the Sale Agreement and this Order, at the Closing, the Buyer shall not assume any liability or obligation of the Debtor of any kind, character or description whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financing statements of the holder of the liability or obligation.

   G. Upon the Closing, the Buyer will pay to the Debtor the Purchase Price in full (as defined in the Sale Agreement).

   H. The Debtor is hereby granted a valid and perfected first priority lien and security interest in and against all of the Patents (the "Debtor Lien") in the amount of $2,500,000, and the Debtor Lien be, and it hereby is, perfected and effective as of the date hereof, without the necessity of the filing or recordation of any document or other notice. Notwithstanding the foregoing, the Debtor may record a copy of this Order with any recording

officer that it may deem necessary or appropriate to evidence, perfect or give notice of the Debtor

Lien, and the Buyer shall execute any and all documents which the Debtor reasonably requests

with respect to the Debtor Lien, including, but not limited to, evidencing and/or recording the

Debtor Lien.

     I.   This Court shall retain jurisdiction over the Debtor and the Buyer,

including, without limitation, jurisdiction to resolve any disputes, claims, or actions which may

arise in connection with the Sale Agreement and any other agreements or instruments executed in

connection therewith, the transactions contemplated under the Sale Agreement and such other

agreements and instruments and for the purpose of enforcing the terms and provisions of this

Order.

     J.   The Debtor is authorized and directed to execute, acknowledge, and

deliver such corporate name change certificates, deeds, assignments, conveyances, and other

assurances, documents, and instruments of transfer and take such other action that may be

reasonably necessary to perform the terms and provisions of the Sale Agreement and related

agreements, and shall take any other action that may reasonably be requested by the Buyer for

purposes of assigning, transferring, granting, conveying, and confirming to the Buyer, or reducing

to possession, any or all of the Assets and the Patents and to execute such nonmaterial

amendments to the Sale Agreement and related agreements as may be required to effectuate the

Sale Agreement and the consummation of the purchase and sale.

     K.   For each of the Assets consisting of or related to leasehold interests

in property owned by others, the conveyance, assignment, transfer, and delivery thereof to the

Buyer shall be subject to all of the rights and interests of the owner of the leased property other

than rights not enforceable under §365 of the Bankruptcy Code.

L.      From and after entry of this Order, the Debtor shall not take or cause to be taken any action which would interfere with the transfer of the Assets to the Buyer or its assignees or designees in accordance with the terms of this Order.

M.      All persons or entities who are presently, or at the Closing (as defined in the Sale Agreement), in possession of any of the Assets are hereby directed to surrender possession of such Assets to the Buyer or its assignees or designees at the Closing.

N.      From and after the Closing, the Buyer shall have the right and authority, subject to the terms of the Sale Agreement, to collect for the account of the Buyer any sums which shall be due and payable on account of any of the Assets transferred or intended to be transferred to the Buyer at the Closing and to endorse with the name of the Debtor any checks or drafts relating to the Assets which may be payable to the order of the Debtor;  provided, however, that the disposition of any such sums and any such checks shall be in accordance with the terms of the Sale Agreement.

O.      At or prior to the Closing, the Debtor shall pay or cause to be paid any and all transfer, stamp or other similar taxes and any filing or recording fees payable as a result of the sale or transfer of the Assets and the assumption and assignment of the Assumed Liabilities (as defined in the Sale Agreement).

P.      The Debtor may, at a time and in a manner satisfactory to the Buyer, in its sole discretion, execute and deliver whatever lawful agreements that are reasonably necessary and make whatever lawful arrangements that are reasonably required to assure the transfer of the Assets free and clear of any claims by any governmental unit for taxes incurred as a consequence of the sale of any of the Assets under the terms of the Sale Agreement or to relieve the Buyer from any claim for transferee liability with respect to such taxes.

Q.    At the Closing, the Debtor shall be authorized pursuant to Section 328 of the Bankruptcy Code to pay all fees due and payable to HLHZ pursuant to the engagement letter between the Committee and HLHZ dated May 14, 1998, as modified and approved by this Court by Order dated June 9, 1998.  Reimbursement of HLHZ's expenses shall be subject to further Order of this Court, upon due application therefor by HLHZ pursuant to Section 330 of the Bankruptcy Code.

R.    Pursuant to §365(f) of the Bankruptcy Code, conditioned upon the closing of the transactions contemplated by the Sale Agreement, all obligations under executory contracts and unexpired leases listed in Schedule 1.3 of the Sale Agreement shall be assumed by the Debtor and assigned to the Buyer, without the execution of any further documents or instruments.  Unless the other parties to such unexpired leases or executory contracts shall have waived their rights to receive a cure of any pre-petition defaults, the Debtor shall cure all defaults under such executory contracts or unexpired leases within thirty (30) days after the Closing, and this Court shall retain jurisdiction to hear and determine any and all disputes in connection therewith.  Upon the Closing, the Debtor shall have no further obligations under such executory contracts or expired leases pursuant to §365(k) of the Bankruptcy Code.

S.    Consistent with paragraph 13 of the Sale Agreement, the Debtor and Buyer shall maintain all documents, data compilations and tangible objects of the Debtor which are in their possession or which may come into their possession for a period of fourteen months from the date hereof, and neither the Debtor nor Buyer will destroy or abandon those documents, data compilations or tangible objects without prior written notice to, among others, (i) Schoengold & Sporn, P.C., 233 Broadway, New York, New York 10279, Attn:  Christopher Lometti, Esq.;  (ii) Abbey, Gardy & Squiteri, LLP, 212 East 39th Street, New York, New York 10016;  Attn:  Jill S.

Abrams, Esq.; and to such other parties as the Court may direct. Inspection of the documents, data compilations and tangible objects may be had upon reasonable request, with the cost and expense of such inspection to be borne by the party marking the request.

        T.     The provisions of this Order authorizing the Debtor to enter into the Sale Agreement and authorizing and directing the transactions contemplated by the Sale Agreement shall be self-executing and neither the Debtor nor the Buyer shall be required to execute or file any releases, termination statements, assignments, consents, or other instruments to effectuate consummation to implement the foregoing provisions hereof except as provided in the Sale Agreement and this Order. Notwithstanding the foregoing, the Debtor, Buyer and all other parties are authorized and directed to take any and all actions necessary and appropriate to effectuate, consummate, and implement fully the Sale Agreement.

        U.     The Buyer is a purchaser in good faith of the Assets and is entitled to the protection afforded by §363(m) of the Bankruptcy Code.

        V.     This Order is binding upon and inures to the benefit of any successors or assigns of the Debtor or the Buyer, including any trustee appointed in this case or any subsequent case of the Debtor under Chapter 7 of the Bankruptcy Code.

        W.     This Order is a final, appealable order.

DATED:     New York, New York
            June   26     , 1998

                    /s/ Prudence Carter Beatty

                    HONORABLE PRUDENCE CARTER BEATTY
                    UNITED STATES BANKRUPTCY JUDGE

TOGUT, SEGAL & SEGAL LLP
Attorneys for Debtor-in-Possession
One Penn Plaza
New York, New York 10119
(212) 594-5000
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT                    **HEARING DATE:  8/1/00**
SOUTHERN DISTRICT OF NEW YORK                        **AT:  2:30 p.m.**
-----------------------------------------------------------------X
                                                    :
          In the Matter                             :  Chapter 11
                                                    :  Case No. 98 B 42280 [PCB]
              -of-                                   :
                                                    :
          ULTRAFEM, INC.,                            :
                                                    :
                      Debtor.                        :
                                                    :
     Tax I.D. No.:  33-0435037                            :
-----------------------------------------------------------------X

### ORDER CONFIRMING DEBTOR'S PLAN OF LIQUIDATION

        Ultrafem, Inc. (the "Debtor") having filed its Plan of Liquidation, dated May 15, 2000 (a

copy of which is on file with the Clerk of the Bankruptcy Court) (the "Plan")[1]:  and the Debtor's

Disclosure Statement dated May 15, 2000 having been approved by an Order of the Court dated June

14, 2000 (the "Disclosure Statement Order") as containing "adequate information" as such term is

defined under section 1125 of the Bankruptcy Code;  and the Disclosure Statement Order having,

among other things:  (i) authorized the Debtor to solicit acceptances or rejections of the Plan;  (ii)

approved the form of Ballot which was transmitted with the Disclosure Statement and Plan for voting

---

[1]    Capitalized terms not otherwise defined in this Order shall have the
       meaning ascribed to them in the Plan.

purposes; (iii) scheduled the hearing on confirmation of the Plan to commence on August 1, 2000 (as

continued from time to time, the "Confirmation Hearing"); (iv) directed that objections to confirmation

of the Plan be filed and served pursuant to Bankruptcy Rule 3020(b) so that such objections, if any,

would be filed with the Court and served upon certain specified parties no later than July 19, 2000; (v)

directed that all Ballots to accept or reject the Plan be received on or before 5:00 p.m. on July 19,

2000, to be eligible to be counted in determining whether the Plan is accepted or rejected by the

requisite majorities; (vi) directed the Debtor to transmit by June 21, 2000, to all holders of Claims not

previously expunged or subordinated by prior Orders of the Court and who were entitled to vote on the

Plan and certain other parties, a copy of (a) the Disclosure Statement; (b) the Plan; (c) notice of: (1)

the Court's approval of the Disclosure Statement; (2) the time within which acceptances or rejections of

the Plan must have been filed; (3) the time within which objections to Confirmation of the Plan must be

served and filed; and (4) the date and time of the Confirmation Hearing; and Affidavits of Service

demonstrating compliance with the service requirements of the Disclosure Statement Order having been

filed with the Clerk of the Court; and the acceptances and rejections of the Plan of those holders of

Claims that voted thereon having been duly received and tabulated by Togut, Segal & Segal LLP,

attorneys for the Debtor ("TS&S"); and a certification by TS&S of Ballots accepting and rejecting the

Plan having been filed with the Court; and upon the Affidavit of Kathy Del Gaudio, the responsible

person and Board Designee of the Debtor, in support of confirmation of the Plan; and upon the record

made at the Confirmation Hearing held on August 1, 2000; and upon the entire record of the Chapter

11 Case; and after due deliberation; and sufficient cause appearing therefor; and

**IT HAVING BEEN FOUND AND DETERMINED** by this Court that:

A.    This Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. section 1334. Confirmation of the Plan is a "core proceeding" pursuant to 28 U.S.C. section 157(b)(2), and this Court has jurisdiction to enter a Final Order with respect thereto.

B.    The classification of Claims and Interests in Article III of the Plan is necessary and reasonable to implement the Plan and satisfies the requirements of section 1122(a) of the Bankruptcy Code.

C.    Article III of the Plan adequately and properly identifies and classifies all Claims and Interests and satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code, and each Claim or Interest in each such class (each, a "Class") is substantially similar to the other Claims or Interests in such Class.

D.    The Plan identifies the Classes of Claims and Interests which are not impaired and which are impaired. Therefore, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code as permitted by section 1123(b)(1) of the Bankruptcy Code.

E.    Article IV of the Plan also specifies the treatment of each impaired Class of Claims and satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

F.    The Plan provides for the same treatment for each Claim or Interest in a particular Class and satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

– 3 –

G.    As described in Article V of the Plan, the Plan provides adequate means for its implementation, including, among other things:

(i)    On or before the Effective Date, the Debtor shall establish the Confirmation Account. The Confirmation Account shall be funded with Available Cash sufficient to make distributions to the holders of all Allowed Claims which are to be paid in cash in their allowed amounts as of the Effective Date unless otherwise agreed to by the holder of such claim;

(ii)    Following the Effective Date, any additional monies recovered from Avoidance Actions, the J&L Note, or otherwise shall be deposited into the Confirmation Account.

H.    Section 1123(a)(6) of the Bankruptcy Code is not applicable in this case.

I.    Under the Plan, Kathy Del Gaudio will continue to assist the Debtor to wind down its affairs and she will act as the Plan Administrator. Thus, the requirements of section 1123(a)(7) of the Bankruptcy Code are satisfied.

J.    The Debtor's rejection of any remaining executory contracts and unexpired leases, if any, pursuant to sections 365 and 1123 of the Bankruptcy Code, as provided for in Article VI of the Plan are reasonable exercises of sound business judgment, is in the best interests of the Debtor and its estate, and complies with section 1123(b)(2) of the Bankruptcy Code.

K.      The Plan complies with all applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016(b), is dated and specifically identifies the Debtor as the plan proponent, and satisfies the requirements of

section 1129(a)(1) of the Bankruptcy Code.

L.      The Debtor has complied with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to the Plan.  Good, sufficient and timely notice of the Plan, Disclosure Statement and the Confirmation Hearing has been given to all holders of Claims and Interests and to other parties-in-interest to whom notice was required to be given.  The solicitation of votes was made in good faith and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Ballots of holders of Claims entitled to vote on the Plan were properly solicited and tabulated, and holders of at least two-thirds in amount and a majority in number of the Claims in Class 4 actually voting have accepted the Plan.  Consequently, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

M.      The Plan has been proposed in good faith and not by any means forbidden by law, as evidenced by the totality of the circumstances surrounding the formulation of the Plan and by the recoveries of holders of Claims and Interests thereunder.  The Plan is based upon arm's-length negotiations between the Debtor and the Creditors Committee.  Consequently, the Plan satisfies the requirements of section 1129(a)(3) off the Bank-ruptcy Code.

N.    Any payment made or to be made under the Plan or by any person acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or will be subject to the approval of, the Court as reasonable, satisfying the requirements of section 1129(a)(4) of the Bankruptcy Code.

O.    The Debtor has disclosed the identity and affiliation of the Plan Administrator, thus satisfying the requirements of section 1129(a)(5) of the Bankruptcy Code.

P.    Section 1129(a)(6) of the Bankruptcy Code is inapplicable because the Plan does not contain rate changes for which a governmental regulatory commission has jurisdiction after confirmation.

Q.    Section 1129(a)(7) of the Bankruptcy Code requires each holder of a Claim or Interest in an impaired Class to accept the Plan, or receive or retain under the Plan property having a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive on account of such Claim or  Interest if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.  Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), and Class 6 ( Interests) are, or may be deemed to be, impaired under the Plan.  Holders of Claims in Class 5 and Interests in Class 6 will not, as a result of the Debtor's insolvency, receive any Distributions on account of their Claims and Interests and that is not less than the amount that such holders would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

R.      Section 1129(a)(8) of the Bankruptcy Code requires that for each Class of

Claims or Interests under the Plan, such Class or Interest has either accepted the Plan or

is not impaired under the Plan.  With the exception of Class 5 and Class 6 which are

deemed to have rejected the Plan, each of the impaired Classes of Claims has accepted

the Plan.  Notwithstanding, the Plan may be confirmed because it does not discriminate

unfairly, and it is fair and equitable according to the provisions of section

1129(b)(2)(C)(ii) of the Bankruptcy Code.

S.      The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy

Code since, except to the extent that the holder of a particular Claim has agreed to a

different treatment of such Claim, the Plan provides (i) for a holder of an Administration

Expense Claim to be paid in full, in cash, on or before the later of the Effective Date or

the date on which payment thereon is due in the ordinary course, and (ii) for holders of

Allowed Claims of a kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy

Code, to receive Cash, equal to the amount of such Allowed Claim, as soon as is

practicable after the Effective Date.

T.      The provisions of section 1129(a)(10) of the Bankruptcy Code are satisfied

because at least one impaired Class of Claims has accepted the Plan, determined

without including any acceptance of the Plan by any insider.

U.      Section 1129(a)(11) of the Bankruptcy Code requires that a plan must be

"feasible" and for the Court to determine that the debtor is not likely to require liquida-

tion or further financial reorganization unless such liquidation is contemplated by the

Plan. The Debtor's Plan is a plan of liquidation. Reliable evidence has been presented that the Debtor will be able to perform its obligation under the Plan following confirmation. Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.      The Debtor has paid, and shall, by the Plan Administrator, continue to pay all amounts as they come due under 28 U.S.C. section 1930, satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.      Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan because the Debtor has not modified any retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, during the pendency of the Chapter 11 Case.

X.      Because not all of the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied, the Debtor seeks to confirm the Plan under section 1129(b) of the Bankruptcy Code.

Y.      No governmental unit has maintained that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the requirements of Section 5 of the Securities Act of 1933 and, therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Z.      Any conditions precedent to confirmation set forth in the Plan have been satisfied or waived.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

27.    The Plan is confirmed pursuant to section 1129(b), having satisfied all of the requirements of section 1129(a) of the Bankruptcy Code, except as to sections 1129(a)(8) and 1129(b)(2)(C).

28.    The appointment of Kathy Del Gaudio as Plan Administrator of the Debtor pursuant to Article V of the Plan is hereby approved, and the Plan Administrator shall obtain a bond as required by the guidelines promulgated by the United States Trustee, to be paid for by the Debtor's estate.

29.    The Plan Administrator shall not be deemed to be the agent for any of the Creditors in connection with the funds held or distributed pursuant to this Plan. The Plan Administrator shall not be liable for any mistake of fact or law or error of judgment or any act or omission of any kind unless it constitutes gross negligence or willful misconduct or breach of fiduciary duty on the part of the Plan Administrator. The Plan Administrator shall be indemnified and held harmless by the Estate against all Claims arising out of her duties under this Plan, except to the extent her actions constitute gross negligence or wilful misconduct or breach of fiduciary duty, including the cost of defending such Claims. The Plan Administrator may obtain, at the expense of the Debtor's estate, commercially reasonable liability or other appropriate insurance with respect to the estate's indemnification of the Plan Administrator. The Plan Administrator may conclusively rely, and shall be fully protected personally in acting upon any statement, instrument, opinion, report, notice, request, consent, order, or other instrument or document which she believes to be genuine and to have been signed or

- 9 -

presented by the proper party or parties. The Plan Administrator may rely upon information previously generated by the Debtor and such additional information provided to her by former employees of the Debtor.

30.     The record of the Confirmation Hearing be, and it hereby is, closed.

31.     No appeal, motion for reconsideration, motion to alter or amend, or any other motion or proceeding regarding the provisions of this Order relating to confirmation of the Plan shall in any way affect the validity or effectiveness of any actions taken pursuant to the provisions of this Order relating to the Plan, all of which shall remain in full force and effect unless stayed pending appeal. Reversal or modification of this Order on appeal or otherwise shall not affect the validity or effectiveness of the provisions of this Order relating to the Plan, all of which shall remain in full force and effect unless stayed pending disposition of such appeal or other proceeding.

32.     In accordance with section 1142 of the Bankruptcy Code, the implementation and consummation of the Plan in accordance with its terms is hereby authorized and approved.

33.     Except as otherwise required by the Plan or other Order of this Court, as of the date hereof, the Debtor is hereby authorized, pursuant to sections 365 and 1123 of the Bankruptcy Code, to reject all pre-petition executory contracts and other unexpired leases to which it is a party.

34.     All proofs of claim for Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Court and served upon TS&S within thirty

-10-

(30) days after the date of service of notice of this Order (or notice of the Order approving the rejection of such executory contract or unexpired lease). Any such Claims, proofs of which are not timely filed, will be forever barred from assertion against or payment from the Debtor and its estate.

35.    In accordance with section 1141(c) of the Bankruptcy Code, any property treated, transferred or otherwise dealt with by the Plan will be free and clear of all Claims against the Debtor and the Debtor's Estate.

36.    In accordance with section 1142 of the Bankruptcy Code, the Debtor is hereby authorized and empowered, without a further order of this Court to issue, execute, deliver, file, and record any document, and to take any action necessary or appropriate to implement, effectuate and consummate the Plan and the transactions therein contemplated in accordance with its terms, whether or not any such document is specifically referred to in the Plan.

37.    All steps necessary for the implementation of the Plan and all corporate action of the Debtor required to comply with the requirements of the Plan be, and they hereby are, authorized and approved.

38.    In accordance with the Plan, applications for allowance of Administrative Expense Claims, other than applications of Professional Persons pursuant to section 330 of the Bankruptcy Code for compensation and reimbursement of expenses through the Confirmation Date, must be filed within thirty (30) days after the date of this Confirmation Order with the Clerk of the Bankruptcy Court, with a copy served upon

-11-

the Debtor, c/o Ms. Kathy Del Gaudio, c/o Delta Funding Corp., 28 Davison Avenue,

Lynbrook New York 11563. The Debtor shall serve a copy of this Confirmation Order

within five (5) business days after its entry on: (i) all parties who were previously served

with notice of hearing for approval of the Disclosure Statement; and (ii) known entities

who conducted business with the Debtor on or after the Petition Date that may

potentially assert an Administrative Expense Claim. Service of this Confirmation Order

in accordance with this paragraph shall be deemed proper and adequate notice of the

deadline to file applications for the Allowance of Administrative Expense Claims.

39.     In accordance with the Plan, applications of Professional Persons pursuant to

section 330 of the Bankruptcy Code for compensation and reimbursement of expense

through the Confirmation Date shall be filed within 45 days after the Effective Date.

40.     Except as otherwise provided by the Plan, upon the Effective Date, title to all

property and assets dealt with by the Plan shall pass to the post-Effective Date Debtor,

free and clear of all Claims and Interests.

41.     Neither the Debtor, the Committee (including their past and current members),

any of their respective officers, directors, employees or agents (acting in such capacity),

nor any professional persons employed by any of them shall have or incur any liability to

any entity (including any Creditor, holder of any Interest or any other parties in interest)

for any action taken or omitted to be taken in their capacity as such and in connection

with or related to the formulation, preparation, dissemination, implementation,

confirmation, or consummation of this Plan, the Disclosure Statement, or any contract,

release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with this Plan, or in connection with the sale of any assets or pursuit of any claims on behalf of the Debtor's estate, <u>provided, however,</u> that the provision of this section shall have no effect on the liability of any entity that would otherwise result from any action or omission to the extent that such action or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or breach of fiduciary duty.

42.     Notwithstanding confirmation of the Plan, the Court shall retain exclusive jurisdiction of all matters arising out of, and related to, the Debtor's Chapter 11 Cases and the Plan pursuant to sections 105 and 1142 of the Bankruptcy Code and for, among other things, the purposes set forth in Article XII of the Plan, including without limitation, pending or future adversary proceedings and objections to claims.

43.     All persons or entities holding Claims or Interests which are dealt with under the Plan be, and they hereby are, directed to execute, deliver, file, or record any document, and to take any action necessary to implement, effectuate and consummate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents to be executed by them in connection with the Plan.

44.     In the event of any inconsistencies between the Plan or other agreement or document intended to implement the provisions of the Plan, the provisions of the Plan shall govern.  In the event of any inconsistencies between the Plan and this Order, the provisions of this Order shall govern.

- 14 -

45.    The Debtor shall pay, by the last day of the month following the entry of this

Order, the statutory fees due, if any, the United States Trustee pursuant to 28 U.S.C.

section 1930(a)(6).


DATED:    New York, New York
          August 1 , 2000                          /s/ Prudence Carter Beatty
                                         _____
                                              PRUDENCE CARTER BEATTY
                                                 BANKRUPTCY JUDGE


**CONSENTED TO:**

OFFICIAL COMMITTEE OF
  UNSECURED CREDITORS,
By its Attorneys,
KENNSINGTON & RESSLER, L.L.C.
By:


 /s/ Howard D. Ressler
HOWARD D. RESSLER, L.L.C. (HDR-3881)
A Member of the Firm
400 Madison Avenue
New York, NY 10017-1910
(212) 838-6000