```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                          :
INSTEAD, INC., a California               :
Corporation,                              :
                                          :   08 Civ. 5236 (DLC)
                    Plaintiff,            :
                                          :   OPINION & ORDER
          -v-                             :
                                          :
REPROTECT, INC., a Maryland               :
corporation, DR. RICHARD CONE, and DR.    :
THOMAS MOENCH,                            :
                                          :
                    Defendants.           :
-----------------------------------------X
```

Appearances:

For Plaintiff:
Robert S. Weisbein
Dana C. Rundlöf
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016-1314

For Defendants:
Eric J. Lobenfeld
Dillon Kim
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022

DENISE COTE, District Judge:

In 1996, the corporate defendant ReProtect, Inc. ("ReProtect") and non-party Ultrafem, Inc. ("Ultrafem") entered into an agreement. Ultrafem filed for bankruptcy in 1998, and plaintiff Instead, Inc. ("Instead") became an assignee of certain rights purchased from Ultrafem following its bankruptcy filing. Instead brings this action for a declaratory judgment

as to certain intellectual property rights and certain rights relating to a non-competition agreement, as well as for anticipatory breach of the non-competition agreement. Instead's claims depend upon a finding that Instead acquired Ultrafem's rights under Ultrafem's 1996 agreement with ReProtect. Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint against them. For the reasons that follow, defendants' motion is granted.

BACKGROUND

The following facts are taken from the amended complaint, as well as from exhibits attached to that complaint, and are assumed to be true for the purposes of deciding the motion. On February 8, 1996, ReProtect and Ultrafem entered into a License, Research and Product Development Agreement (the "Agreement") to facilitate the research, development, and marketing of women's reproductive health products. Defendant Dr. Richard Cone is the Chairman of ReProtect's Board of Directors, and defendant Dr. Thomas Moench is ReProtect's President and Chief Operating Officer (collectively the "Individual Defendants"). Prior to the Agreement, the two companies had each developed women's reproductive health products: ReProtect owned a patent for an "Acidic Buffer" gel, and Ultrafem owned a patent for a "Feminine Cup." The Agreement between the two companies had several

components: a research and development agreement, a "Cup License," a "Gel License," (collectively the "Licenses"), and a non-competition agreement.

The research and development component of the Agreement provided that ReProtect would research and develop applications and uses for the Feminine Cup in exchange for monthly payments from Ultrafem. ReProtect and Ultrafem would each own an undivided one-half interest in any products or technologies that came out of this research. The Agreement further provided that upon its termination, each company would have the right to develop and exploit any intellectual property in which they owned a one-half interest.

The Cup License component of the Agreement granted Ultrafem an "exclusive worldwide perpetual license" to use and commercially exploit "all of [ReProtect's] right, title, and interest in" the Acidic Buffer in connection with the Feminine Cup. In exchange, Ultrafem was to pay ReProtect $100,000, grant ReProtect certain stock options, and pay ReProtect certain royalties.

The Gel License Component of the Agreement granted Ultrafem a "worldwide perpetual license" to use and commercially exploit "all of [ReProtect's] right, title, and interest in" the Acidic Buffer (the "Gel") for use without the Feminine Cup or other vaginal device. In exchange, Ultrafem was to pay ReProtect

3

$100,000, grant ReProtect certain stock options, and pay ReProtect certain royalties.

The non-competition portion of the Agreement provided that during the "Non-Competition Period," ReProtect and the Individual Defendants would not participate in the marketing of any vaginal product that was competitive with "(i) any vaginal product which Ultrafem is then marketing or (ii) any vaginal product which Ultrafem has the right . . . to market and with respect to which an application for Phase I clinical trials has been submitted to the FDA . . ., in any geographic area in which any of Ultrafem's products are then being marketed." The Agreement provided that with respect to any vaginal product that utilized the Acidic Buffer or any component therefore, the Non-Competition Period would end on the latest to occur of certain specified dates after the termination of the Agreement or "the date Ultrafem does not have any obligation to pay any royalties pursuant to" inter alia the Cup and Gel Licenses.

On March 10, 1998, Ultrafem failed to make its required monthly payment as required by the research and development component of the Agreement. Shortly thereafter, on April 1, 1998, Ultrafem filed for Chapter 11 bankruptcy protection. In connection with its bankruptcy, Ultrafem sold substantially all of its assets to Akcess Pacific Group, LLC ("Akcess") pursuant

4

to a June 12, 1998 Asset Purchase Agreement ("Purchase Agreement").

The Purchase Agreement provided that Ultrafem sold Akcess all of its "right, title and interest in and to the patents, copyrights, trademarks, service marks, and trade names . . . the material terms of which are listed on Schedule 1.1(a)." Ultrafem also sold Akcess the rights it had under its non-competition agreements.

The Purchase Agreement also specified that certain assets were excluded from the sale to Akcess. Included in Schedule 1.4 of the Purchase Agreement, titled "Excluded Assets," was the "Agreement dated as of February 8, 1996 between [Ultrafem] and ReProtect, LLC. [Ultrafem] has not made payments required thereunder for the months of March, April, May and June 1998, and [Ultrafem] is in default thereunder." Likewise, Schedule 3.6 of the Purchase Agreement, titled "Intellectual Property," lists the Agreement and noted that Ultrafem had "not made payments required thereunder for the months of March, April, May and June 1998, and [Ultrafem] is in default thereunder." Finally, in the bankruptcy court's order approving the sale of assets from Ultrafem to Akcess, the court noted that all obligations under executory contracts listed in Schedules of the Purchase Agreement were assumed and assigned by Ultrafem to Akcess. Schedule 1.3 of the Purchase Agreement, titled "Assumed

5

Liabilities," does not list any contracts between Ultrafem and ReProtect.

Instead asserts that as of the time of Ultrafem's bankruptcy and the Purchase Agreement, Ultrafem owned patent rights under the Cup License and Gel License ("Intellectual Property Rights"), and was a party to the non-competition agreement.  Instead further asserts that as part of the Purchase Agreement, Ultrafem sold these Intellectual Property Rights and non-competition agreement rights to Akcess, and that Akcess subsequently assigned the Intellectual Property Rights and non-competition agreement rights to Instead.  Instead states that in 2003, ReProtect asserted for the first time that Instead did not in fact own Cup and Gel patent rights, and that ReProtect was not obligated to comply with the non-competition provision of the Agreement.  Instead also states that ReProtect and the Individual Defendants have informed Instead that they will not abide by the non-competition provision.

Instead seeks a declaratory judgment that the Licenses have not been terminated (claims one and two of the complaint) and that it owns patent rights under those Licenses (claims three and four); it also seeks a declaratory judgment that it owns an undivided one-half interest in certain products and technologies related to the research and development component of the Agreement (claim five).  Furthermore, Instead seeks a

6

declaratory judgment requiring ReProtect to abide by the non-competition provision (claim six) and seeks damages for ReProtect's anticipatory breach of that provision (claim seven). Defendants have moved to dismiss the complaint in its entirety.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted).  At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss."  Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).  Under the pleading standard set forth in Rule 8(a)(2), complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff."  Dura Pharms., Inc. v. Broudo,

7

544 U.S. 336, 347 (2005).  A court considering a 12(b)(6) motion, however, must apply a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008) (citation omitted).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  In deciding the motion, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted).  Courts "are not obliged to accept the allegations of the complaint as to how to construe such documents," but at the motion to dismiss stage courts "should resolve any contractual ambiguities in favor of the plaintiff."  Subaru Distribs. Corp. v. Subaru of America, Inc., 425 F.3d 119, 122 (2d Cir. 2005).

ReProtect argues that Instead's claims must be dismissed, because the terms of the Purchase Agreement stated that the Agreement was excluded from the assets transferred from Ultrafem to Access, such that any rights under the Agreement were not

8

transferred to Akcess (and therefore could not subsequently be assigned to Instead). Instead argues that the Agreement is severable into three separate components -- the research and development component, the Licenses, and the non-competition agreement -- and that the listing of the "Agreement dated as of February 8, 1996 between [Ultrafem] and ReProtect" as an "Excluded Asset" in Schedule 1.4 of the Purchase Agreement pertained only to the research and development component, and therefore did not exclude from the sale the licenses and non-competition agreement.

Under New York law,[1] "the severability of a contract is a question of the parties' intent, 'to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted.'" In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 81 (2d Cir. 1996) (quoting Christian v. Christian, 42 N.Y.2d 63, 73 (1977)). "[W]here the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (citation omitted).

---

[1] The Agreement states that New York law governs its interpretation, and both parties rely on New York law in their submissions. In addition, the Purchase Agreement provides that it is governed by New York law, except where superseded by federal law.

"As a general rule, [a] contract is considered severable and divisible when by its terms, nature, and purpose, it is susceptible of division and apportionment." Balfour, 85 F.3d at 81 (citation omitted). "Generally, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents." Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1098 (2d Cir. 1992). "While form is not conclusive, the fact that the parties entered into only one agreement encompassing numerous terms rather than two agreements is influential." Id. at 1098-99 (citation omitted). In Ginett, the Second Circuit found an agreement to be indivisible where "[a]ll references to the compensation plan utilize singular nouns and pronouns ('this agreement', 'This plan')[, t]here is no express severability clause, no obvious unit-for-unit transaction, and no way to determine the agreed-upon consideration for each part of the contract." Id. at 1099 (citation omitted). Finally, "[a] divisible contract differs from other contracts only in the respect that on performance by one party of each of its successive divisions, the other party becomes liable for his or her performance of that division." Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 266 (2d Cir. 1999) (citation omitted).

In interpreting contracts in general, the rules under New York law are well-established:

> the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. Typically, the best evidence of intent is the contract itself; if an agreement is complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms. If the contract is ambiguous, extrinsic evidence may be considered to ascertain the correct and intended meaning of a term or terms. Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-78 (2d Cir. 2004) (citation omitted); see also Chapman v. New York State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008). "The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citation omitted). Finally, "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts. Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the

pleadings." Eternity Global Master Fund Ltd., 375 F.3d at 178 (citation omitted).

Instead asserts that the Agreement is severable because each of the three different components concerns a different subject matter, has a separate duration, and each has separate consideration, such that the parties' performances can be apportioned into separate pairs. Instead is correct that the Agreement's terms apportion the consideration, at least as to the research and development and License components. The Agreement states that Ultrafem's monthly payments were "[i]n consideration of" ReProtect's research and development activities, and that Ultrafem's payments of $100,000, options, and royalties were "[i]n consideration of" the Cup and Gel Licenses. Although the consideration was apportioned, the parties unambiguously manifested their intent to have one single agreement by expressly linking the performance of the different components of the Agreement. For example, the Agreement states that the parties "acknowledge that the license granted hereunder is unique and that Ultrafem may have no adequate remedy at law for the failure of ReProtect . . . to perform [its] . . . obligations hereunder including, without limitation, the non-competition" clause, and as such the Agreement grants Ultrafem the right to specific performance of ReProtect's obligations under the Agreement. The parties also link the performance of

12

the research and development component to the Licenses via the termination provision of the Agreement.  The Agreement states that "[t]his Agreement shall terminate" early if Ultrafem fails to make its required monthly payments that are in consideration of ReProtect's research and development activities.  Once "the Agreement" terminates, only those licenses for products and applications that meet certain specific conditions continue.  Additionally, the termination clause, like the other provisions throughout the Agreement, does not refer in any way to multiple agreements, but refers singularly to "this Agreement."  The very first paragraph of the Agreement defines the entire agreement that follows as the "Agreement."  Thus, the components of the Agreement are not divisible as Instead suggests.

Even assuming that it were possible to divide the Agreement into separate agreements, Instead's argument fails for an entirely separate reason.  The clear and unambiguous terms of the Purchase Agreement reflect that the Agreement was excluded from the sale and do not support Instead's suggestion that only the research and development provisions were excluded.

Schedule 1.4 of the Purchase Agreement, which lists the assets specifically excluded from the sale from Ultrafem to Akcess, has an entry for the "Agreement dated as of February 8, 1996 between [Ultrafem] and ReProtect, LLC.  Seller has not made payments required thereunder for the months of March, April,

13

May, and June 1998, and [Ultrafem] is in default thereunder." The natural reading of this listing is that it refers to the entire Agreement executed on February 8, 1996, rather than to just one unspecified component.  Similarly, in Schedule G of the Purchase Agreement, which lists all of Ultrafem's executory contracts, the listing for contracts with ReProtect lists only the title of the Agreement, and does not give any indication that it is referring only to one or more divisible pieces of that Agreement.

The principal argument Instead offers for its contention that the Schedule 1.4 listing "did not include, as excluded assets, among other things, the Gel Patent Rights and Cup Patent Rights" is that the listing references Ultrafem's failure to make monthly payments.  While Instead claims that the failure to make those payments is "a fact relevant only to the research and development component of the 1996 Agreement," the failure to make the monthly payments is relevant to the entire Agreement. The termination provision of the Agreement states that such a failure can trigger the termination of the entire Agreement, in which case the Licenses could only be continued if certain conditions were satisfied.  The termination of the Agreement is also significant for determining the length of the non-competition period.  Thus, the contention that the failure to

make such payments was only "relevant" to the research and development portion of the Agreement must be rejected.

Similarly, were Instead's reading correct, one would expect that the other components of the Agreement, e.g., the rights under the Licenses that were supposedly being transferred to Akcess, would be listed somewhere in the Purchase Agreement. But, they are not. Section 1.1(a) of the Purchase Agreement states that Ultrafem is transferring "all right, title and interest in and to . . . patents, copyrights, trademarks," the "material items of which" are listed in Schedule 1.1(a). Schedule 1.1(a) lists two patents, 13 patents pending, four trademarks, and the name "Ultrafem," but makes no reference to the patent rights under the Licenses with ReProtect that Instead asserts were not excluded assets and that were transferred to Akcess. Likewise, Schedule 3.6 of the Purchase Agreement, titled "Intellectual Property," does not separately list any of the Licenses and lists only the Agreement dated February 8, 1996, and notes that Ultrafem had "not made payments required thereunder for the months of March, April, May and June 1998, and [Ultrafem] is in default thereunder."

Instead's strained and unsupported reading of the Purchase Agreement cannot create ambiguity where there is none. Under its clear and unambiguous terms, the reference to the "Agreement" in Schedule 1.4 is a reference to the entire

Agreement between Ultrafem and ReProtect, and as such the Gel and Cup Patent rights and rights under the non-competition agreement were not transferred to Akcess in the Purchase Agreement, and Instead's claims relating to these rights must be dismissed. Because none of the rights contained in the Agreement were transferred to Akcess in the Purchase Agreement, Instead has no rights under the Agreement, and we need not reach ReProtect's other arguments for dismissing the complaint.

CONCLUSION

The defendants' September 19, 2008 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED:

Dated:   New York, New York
         February 5, 2009

                                    _____
                                         DENISE COTE
                                    United States District Judge